IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No.: 3:11-cv-00597

THE FAIRPOINT COMMUNICATIONS, INC.
ET AL. LITIGATION TRUST

                Plaintiff,

  - v. -

VERIZON COMMUNICATIONS, INC.,
NYNEX CORPORATION, VERIZON NEW
ENGLAND, INC., CELLCO PARTNERSHIP
d/b/a Verizon Wireless, AND VERIZON
WIRELESS OF THE EAST, L.P.

                Defendants.

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

                                                          **Page**

I.    PLAINTIFF CANNOT RECOVER $551 MILLION THAT SPINCO NEVER TRANSFERRED TO VERIZON ................................................................................. 1

II.   THERE IS NO ALLEGATION OF LACK OF REASONABLY EQUIVALENT VALUE WITH RESPECT TO THE TSA PAYMENTS .................................................... 3

III.  NONE OF PLAINTIFF'S ALLEGATIONS SUPPORTS A MOTIVE TO DEFRAUD ........................................................................................................................ 6

IV.  PLAINTIFF CANNOT RECOVER PUNITIVE DAMAGES .......................................... 8

CERTIFICATE OF COMPLIANCE .............................................................................................. 11

CERTIFICATE OF SERVICE ........................................................................................................ 12

The premise of Plaintiff's Opposition is wrong. Defendants are not asking the Court to accept their view of the facts. Rather, each of the claims from which Defendants seek relief—including Claim III against the Wireless Defendants, which Plaintiff has now voluntarily withdrawn—must be dismissed because Plaintiff's own allegations are insufficient to state a claim as a matter of law.

## I. PLAINTIFF CANNOT RECOVER $551 MILLION THAT SPINCO NEVER TRANSFERRED TO VERIZON.

Plaintiff cannot "recover" from Verizon the $551 million in debt that Spinco incurred in the Landline Transaction because Spinco did not transfer any property to Verizon when it issued that debt; it incurred an ***obligation*** to pay money to Verizon in the future as partial consideration for the transfer of Verizon's landline business in Vermont, New Hampshire and Maine. The Bankruptcy Code provides that a trustee may "recover" property or its value only if the debtor in fact "transferred" its "property." 11 U.S.C. § 550(a). If instead the debtor incurred an ***obligation*** to pay a debt, as Spinco did here, the sole remedy the Code provides is for the debtor to "avoid" that debt. *See In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005) (where an avoided "obligation is rendered unenforceable, there is nothing to return and § 550 affords no remedy").[1]

Plaintiff does not dispute this rule of law. Rather, Plaintiff argues that Spinco, as the note issuer, obtained an interest in "note proceeds" and that it may pursue a fraudulent transfer claim based on the alleged transfer of those proceeds to Verizon. (Opp. at 5.) This argument fails

---

[1] One of Plaintiff's own cases, *Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787 (7th Cir. 2009), makes this clear. In that case, the debtor had purchased assets for $3.1 million in cash and an additional $2.9 million promissory note. *Boyer*, 587 F.3d at 791, 793. While the bankruptcy court found that the transaction was a fraudulent conveyance, it only allowed the estate to recover the cash that had been paid. *Id.* at 791 With respect to the outstanding $2.9 million note, the court held only that the seller could not "enforce" the note. *Id.*

because it flatly contradicts what Plaintiff alleges actually occurred.  Nowhere does the Amended Complaint allege that there were cash proceeds from the Spinco Notes or that any note proceeds were transferred to Verizon.  Rather, the Complaint alleges that Spinco *issued the notes directly to Verizon* as partial consideration for the landline business it was acquiring.  (Am. Compl. at ¶ 108 ("As a result of the transactions, the Verizon Group will receive $1.7 billion in combined cash and principal amount of the [Spinco Notes].").)  Spinco did not obtain an interest in any proceeds from the Spinco Notes *because there were no cash proceeds from the notes*.  Instead, Spinco obtained the *assets* being acquired through the Transaction in exchange for having issued the notes.  (*Id.* at ¶ 1.)

All of the cases that Plaintiff cites are inapposite.  Each of those cases involved a debtor that borrowed money from a lender and then transferred that money to a third party.  *See In re Marshall*, 550 F.3d 1251, 1256 (10th Cir. 2008) (debtor used loan proceeds to pay a creditor); *In re Appleseed's Intermediate Holdings, LLC*, No. 11-10160 KG, 2012 WL 748652, at *5-6 (D. Del. Mar. 7, 2012) (debtor used loan funds to pay a dividend to its shareholders); *In re MacMenamin's Grill, Ltd.*, 450 B.R. 414, 417 (Bankr. S.D.N.Y. 2011) (debtor used loan funds to purchase shareholders' stock); *In re Moses*, 256 B.R. 641, 643 (B.A.P. 10th Cir. 2000) (debtor used loan proceeds to pay a creditor); *In re Ohio Bus. Machs., Inc.*, No. 06-8005, 2007 WL 177941, at *2 (B.A.P. 9th Cir. Jan. 25, 2007) (same).  There is no such transfer here.  Spinco chose to finance part of the Landline Transaction by issuing notes directly to Verizon and obtaining assets, not by obtaining funds from a third party.  (Am. Compl. at ¶ 108.)  Accordingly, there are no "note proceeds" from a third party at issue here.

Contrary to Plaintiff's suggestion, Verizon's contemporaneous description of the Landline Transaction was fully consistent with this reality.  Verizon's SEC filings disclosed that

it would obtain $1.7 billion in "value" through "a combination of cash distributions to Verizon and debt securities." (Opp. at 11-12.) That disclosure specifically distinguished between the "cash distributions" ($1.16 billion) and the "debt securities" ($551 million) Verizon would receive. (*Id.*) And while Verizon unquestionably obtained value from the Spinco Notes—it received Spinco's promise to repay the debt and was able to exchange those notes for Verizon debt held by third-parties—the fact remains that Spinco transferred nothing and incurred only an obligation to make payments on the notes. Under well-settled law, Spinco's "IOU" did not constitute a "transfer" of "property" of the "debtor" sufficient to support a fraudulent transfer claim. *See Don E. Williams Co. v. Comm'r*, 429 U.S. 569, 582-83 (1977) ("[A] promissory note, even when payable on demand and fully secured, is still, as its name implies, only a promise to pay, and does not represent the paying out or reduction of assets."); *Covey v. Commercial Nat'l Bank*, 960 F.2d 657, 661 (7th Cir. 1992) ("[A] note or guarantee is not a 'transfer' . . . ."); *MacMenamin's*, 450 B.R. at 429 ("There clearly is a difference between making a transfer and incurring an obligation . . . ."); *cf. Barnhill v. Johnson*, 503 U.S. 393, 397-98 (1992) (stating a "transfer" occurs only when the debtor disposes of its property).

Because Spinco did not transfer any property when it issued the Spinco Notes to Verizon, Plaintiff's claims based on those notes fail as a matter of law.

## II.  THERE IS NO ALLEGATION OF LACK OF REASONABLY EQUIVALENT VALUE WITH RESPECT TO THE TSA PAYMENTS.

As Verizon set out in its opening papers, the Amended Complaint is utterly devoid of any facts alleging that the crucial back-office transition services FairPoint received under the TSA were worth less than the amount paid to Verizon's subsidiary VIT. (Defs.' Mem. at 20.) Plaintiff's opposition concedes this point, tacitly admitting that FairPoint received at least

3

reasonably equivalent value in the form of these "critical" services for the $170 million it allegedly paid under the TSA. (Opp. at 24.)

Plaintiff's only response is to claim that the "TSA was not a stand-alone agreement" and must be collapsed into the "overall Transaction." (Opp. at 24 (citing *In re Jevic Holding Corp.*, Bankr. No. 80-11006, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011).) In *Jevic*, the court agreed to consider collapsing a series of transfers that allegedly comprised the leveraged buyout of the debtor: an initial $90 million acquisition loan secured by the debtor's assets, a $101.2 million credit agreement to refinance that loan, and a sale-leaseback done after the debtor defaulted under the refinancing facility. 2001 WL 4345204, at *7. Each transaction in the series followed from—and indeed replaced—the previous one, involved the same assets, and was allegedly part of one scheme to acquire the debtor. On these facts, the Court held that the claim survived a motion to dismiss.[2] *Id.*

The TSA payments, by contrast, are easily separated from the consideration Verizon received in exchange for its landline business in Maine, New Hampshire and Vermont. While Verizon received cash and Spinco Notes in exchange for the landline business, (*see* Am. Compl. at ¶ 108 ("As a result of the transactions, the Verizon Group will receive $1.7 billion in combined cash and principal amount of the [Spinco Notes]")), Verizon subsidiary VIT received a monthly fee for the transition services it delivered to FairPoint after its acquisition of the landline business, (*id.* at ¶ 129 ("Verizon was to be paid approximately $15 million per month in return for the services set forth above along with a one-time Cutover fee of $34 million.").) FairPoint,

---

[2] The court in *Jevic* observed: "An LBO is the classic context in which courts have collapsed multiple transactions for the purpose of assessing and finding fraudulent transfer liability." 2001 WL 4345204, at *4 (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995) ("This [collapsing] approach finds its most frequent application to lenders who have financed leveraged buyouts of companies that subsequently become insolvent.")).

4

or its subsidiaries, continued to make TSA payments to VIT nearly a year after the Closing. (*Id.* at ¶ 134.) Indeed, at the time of the Transaction, the amount of the future TSA payments was unknown, since it was unclear how long FairPoint would need VIT's services. (*Id*. at ¶¶ 129-134.) Because the TSA payments were made in exchange for indisputably valuable and necessary services—and not for the landline business—there is no basis to "collapse" the TSA Payments into the consideration exchanged for the landline business. These transfers, which were identified and treated independently in the Amended Complaint, must be analyzed separately. *See In re Sunbeam Corp.*, 284 B.R. 355, 371-73 (S.D.N.Y. 2002) (rejecting collapsing theory with respect to challenged loans and dismissing fraudulent conveyance claims).

Plaintiff points to just a single allegation from the Amended Complaint to support its contention that it has adequately pled "reasonably equivalent value" with respect to the TSA. (Opp. at 26 (citing Am. Comp. at ¶ 96) ("But the fair value of the assets received by Spinco and the Combined Entity in connection with the Transaction was no greater than $900 million, and likely significantly less.").) That paragraph, however, contains no mention or allegation regarding the value of the services that FairPoint received under the TSA, nor does any other paragraph in the Amended Complaint. Because Plaintiff has failed to allege this necessary element, Plaintiff has failed to state a claim based on the TSA.[3]

---

[3] Plaintiff's conclusory assertion that the TSA "fits within the plain terms of the statute" (Opp. at 26) fails to show that the TSA was an employment contract, and so 11 U.S.C. §548(a)(1)(B)(ii)(IV) does not apply. But in any event, to state a claim for constructive fraudulent transfer, Plaintiff must *also* allege facts supporting allegations of lack of reasonably equivalent value, which it has failed to do with respect to the TSA payments. *In re Caremerica, Inc.*, 409 B.R. 346, 353-354 (Bankr. E.D.N.C. 2009).

### III. NONE OF PLAINTIFF'S ALLEGATIONS SUPPORTS A MOTIVE TO DEFRAUD.

Plaintiff acknowledges that, for its actual fraud claims to survive a motion to dismiss, the Complaint must "provide some factual basis that creates a plausible inference of fraudulent intent." *In re Refco, Inc., Sec. Litig.*, No. 07 MDL 1902 GEL, 2009 WL 7242548, at *8 (S.D.N.Y. Nov. 13, 2009). In its Opposition, Plaintiff provides a laundry list of allegations from its Amended Complaint, which Plaintiff claims give rise to an inference of fraudulent intent. But just because Plaintiff asserts that a particular factual allegation gives rise to an inference of fraudulent intent does not make it so. The Court need not accept "unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

*First*, it does not follow from Plaintiff's allegations that FairPoint's management had "little experience," failed to include a sufficient working capital cushion and failed to include line loss trends and other operating expenses, (Am. Compl. at ¶¶ 46, 47), that FairPoint intended to defraud anyone. At most, these allegations suggest that FairPoint's management was negligent or, as the Amended Complaint puts it, "uninformed" or "wildly optimistic." (*Id.* at ¶ 47.) Nothing in the Amended Complaint (or Plaintiff's opposition) suggests that FairPoint's management intentionally created false projections. Moreover, the Amended Complaint admits that FairPoint hired three financial advisors to analyze and review the Transaction on its behalf, negotiated and performed due diligence in an arms-length transaction with a third party, and that the Transaction was reviewed and approved by three state regulatory agencies. (*Id.* at ¶¶ 39, 44, 56-57, 68.) Plaintiff's contention that FairPoint did all of this in order to commit intentional fraud defies common sense and should not be accepted by this Court.

6

***Second***, Plaintiff's assertion that FairPoint intentionally misrepresented what it was acquiring and that Verizon intentionally misrepresented the performance of those assets are also implausible. (Opp. at 19.) For its part, FairPoint disclosed the Merger and Distribution Agreements to the public when it announced the deal, and those agreements defined exactly what assets FairPoint would—and would not—receive. (Am. Compl. at ¶ 60-62.) And Verizon's alleged unwillingness to share material ***non-public*** information with FairPoint, (*see id*. at ¶ 127), does not suggest fraudulent intent. Nor did Verizon have any reason to misrepresent the value of those assets and provide FairPoint with a business that was doomed to fail. To the contrary, because Verizon's own shareholders were to receive 60 percent of FairPoint, (*id.* at ¶ 37), it had every incentive to want FairPoint to succeed.

***Third***, Plaintiff's conclusory allegations about FairPoint's alleged financial condition in the months leading up to the closing do not suggest it had a motive to defraud anyone. FairPoint could not have been motivated to defraud its ***existing*** creditors because it paid those creditors in full. (*Id.* at ¶ 107.) As for its future creditors, there are no allegations that FairPoint made its projections in bad faith, knew those projections were not achievable or knew that it would be insolvent after the transaction.

Plaintiff's utter failure to allege actual fraud is confirmed when its allegations are measured against the "badges of fraud" that courts have identified—but that Plaintiff does not. *See In re Summit Place, LLC*, 298 B.R. 62, 70 n.1 (Bankr. W.D.N.C. 2002). Specifically, the transfer was not to an insider; FairPoint did not retain possession or control of the property that it transferred; the transfer was disclosed to the public, and multiple creditors and regulatory agencies reviewed and approved it; the transfer was not made in response to a lawsuit or a

threatened lawsuit; the transfer was not of substantially all of FairPoint's assets; and FairPoint did not abscond, remove or conceal assets. *See id.*

In sum, no allegations plausibly suggest that FairPoint, Spinco or Verizon acted with fraudulent intent. Accordingly, Plaintiff's actual fraud claim should be dismissed.

## IV. PLAINTIFF CANNOT RECOVER PUNITIVE DAMAGES

Plaintiff "acknowledges that punitive damages may not be an available remedy under Section 550 of the [Bankruptcy] Code." (Opp. at 23.) It nevertheless attempts to salvage its claim for punitive damages by asserting it has "pled recovery in the alternative 'under . . . other applicable state or federal law.'" (*Id.*) Plaintiff is not free to make such an election. Plaintiff's "remedies ***are limited*** to those provided for under § 550 of the Bankruptcy Code." *In re Lexington Oil & Gas Ltd., Co.*, 423 B.R. 353, 376 (Bankr. E.D. Okla. 2010) (emphasis added); *In re Tronox Inc.*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010).

The two bankruptcy court opinions that Plaintiff cites, both from Texas courts, do not change this conclusion. (Opp. at 23 (citing *In re Pace*, 456 B.R. 253 (Bankr. W.D. Tex. 2011); *In re Advanced Modular Power Sys.*, 413 B.R. 643 (Bankr. S.D. Tex. 2009).)[4] In fact, they are contrary to the overwhelming weight of authority. *See In re Tronox*, 429 B.R. at 111 ("Section 550 bars punitive damages notwithstanding their possible availability under state law."); *In re First Independence Capital Corp.*, 181 F. App'x 524, 530 (6th Cir. 2006) (ability to recover under state law "irrelevant" to recovery under Section 550); *In re Martin*, No. 08-52631, 2011 WL 6130422, at *12 (Bankr. E.D. Tenn. Dec. 8, 2011); *In re Allou Distrib., Inc.*, 446 B.R. 32, 65

---

[4] In the only case that awarded exemplary damages, *In re Advanced Modular*, the damages were not based solely on fraudulent transfer but were also a product of "(a) Spoliation of evidence; (b) Breach of fiduciary duty and usurpation of business opportunities; (c) Conversion of estate property; (d) Turnover of property of the estate; [and] (e) Unauthorized post-petition transfers." 413 B.R. at 681.

(Bankr. E.D.N.Y. 2011); *In re Lexington*, 423 B.R. at 375-76; *Hyundai Translead, Inc. ex rel. Estate of Trailer Source, Inc. v. Jackson Truck & Trailer Repair Inc.*, 419 B.R. 749, 760-61 (M.D. Tenn. 2009); *In re Myers*, 320 B.R. 667, 670-71 (Bankr. N.D. Ind. 2005); *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255, 275 (Bankr. N.D. Tex. 2003).

As these cases caution, "the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer." *In re Brentwood*, 292 B.R. at 275. Where Congress intended for a party to have the choice of applying either state or federal law under the Bankruptcy Code, it explicitly granted that party such authority. *See, e.g.*, 11 U.S.C. § 522(b)(3) (allowing debtor to elect to exempt property under either state or federal law). Here, where the Code does not grant such an election, it should not be implied judicially. *See Doe v. Chao*, 306 F.3d 170, 178 (4th Cir. 2002).

Instead, this Court should follow the vast majority of cases and dismiss Plaintiff's request for punitive damages. *Hyundai Translead*, 419 B.R. at 760-61 (dismissing trustee's prayer for punitive damages under Section 550 even though state statute may have allowed such damages); *In re Myers*, 320 B.R. at 670-71 (denying trustee's request for treble damages because "it is the Bankruptcy Code and not state law that determines the defendant's liability when a transfer is avoided"); *In re Martin*, 2011 WL 6130422, at *12; *In re Lexington Oil*, 423 B.R. at 375-76; *In re Brentwood*, 292 B.R. at 275.

9
Case 3:11-cv-00597-FDW-DCK   Document 58   Filed 05/10/12   Page 11 of 14

Dated: May 10, 2012
Charlotte, North Carolina

          /s/ Robert E. Harrington_____
Robert E. Harrington
N.C. State Bar No. 26967
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Phone: 704-337-8387
Facsimile: 704-373-3987
rharrington@rbh.com

*Attorneys for Defendants*

*Of Counsel*
Lee Ann Stevenson
Matthew F. Dexter
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Phone: 212-446-4917
Facsimile: 212-446-6460
leeann.stevenson@kirkland.com
matthew.dexter@kirkland.com

Philip D. Anker
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Phone: 212-230-8890
Facsimile: 212-230-8888
philip.anker@wilmerhale.com

## CERTIFICATE OF COMPLIANCE

Pursuant to the Case Management Order entered on March 21, 2012 in this action, counsel for Defendants certify that the foregoing reply memorandum is less than 3,000 words (excluding the case caption, table of contents, and any certificates of counsel) as reported by the word processing software in which it was prepared.

This 10th day of May, 2012.

s/ Robert E. Harrington
Robert E. Harrington

## CERTIFICATE OF SERVICE

I hereby certify on this day I electronically filed the foregoing with the Court using the CM/ECF system which will electronically notify the following counsel of record re same:

>Jonathan D. Sasser
>James M. Weiss
>**ELLIS & WINTERS LLP**
>PO Box 33550
>Raleigh, North Carolina 27636
>jon.sasser@elliswinters.com
>jamie.weiss@elliswinters.com


>Charles B. Hampton
>J. Wiley George
>W. Scott Locher
>**ANDREWS KURTH LLP**
>600 Travis, Suite 4200
>Houston, Texas 77002
>champton@akllp.com
>wileygeorge@andrewskurth.com
>slocher@akllp.com


This 10th day of May, 2012.

>s/ Robert E. Harrington
>Robert E. Harrington