| | |
|---|---|
| THE FAIRPOINT COMMUNICATIONS, INC. *ET AL.* LITIGATION TRUST, <br><br>      Plaintiff, <br><br>      vs. <br><br> VERIZON COMMUNICATIONS, INC., NYNEX CORPORATION, VERIZON NEW ENGLAND, INC., AND VERIZON INFORMATION TECHNOLOGIES L.L.C., <br>     Defendants. | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

Mark Holliday, solely in his capacity as Litigation Trustee (the "Trustee") of The FairPoint Communications, Inc. *et al.* Litigation Trust (the "Trust"), and the Trust (collectively "Plaintiff") for its Complaint against Verizon Communications, Inc. ("Verizon"), NYNEX Corporation ("NYNEX"), Verizon New England, Inc. ("Verizon New England"), and Verizon Information Technologies L.L.C. ("VIT") (collectively, "Defendants"), alleges:

## I.

## NATURE OF THE ACTION

1.     This is a fraudulent transfer action to avoid and recover, pursuant to federal and applicable state law, over $2 billion of transfers that Defendants received from a transaction ("Transaction") by which Verizon placed its Northern New England conventional landlines into a newly-formed entity, Northern New England Spinco Inc. ("Spinco"), that it spun-off to its

shareholders and merged into FairPoint Communications Inc. ("FairPoint"). Verizon received over $2 billion from this Transaction while the spun-off entity, Spinco, and the entity resulting from the merger ("New FairPoint" or the "Combined Entity") were saddled with an enormous debt load (about $2.5 billion) that was used to pay Verizon and other Defendants over $2.0 billion of transfers and other obligations incurred to effect this Transaction.

2.      Just 18 months after the Transaction, the Combined Entity--which remained named FairPoint Communications Inc.--and its subsidiaries predictably filed for relief under chapter 11 of the United States Bankruptcy Code.

3.      FairPoint and its subsidiaries were able to emerge from bankruptcy protection through confirmation of a reorganization plan. As part of that plan, the Trust was formed and was conveyed FairPoint and its subsidiaries' Estates causes of action against Verizon and its affiliates. Pursuant to the plan, creditors of the Combined Entity are the Trust's beneficiaries.

4.      Pursuant to Section 544(b) of the Bankruptcy Code and applicable state fraudulent transfer law, Plaintiff, on behalf of creditors of the Combined Entity, seeks to avoid the transfers of Spinco, FairPoint and/or the Combined Entity's interests in property that Defendants received from the Transaction as constructive fraudulent transfers and actual fraudulent transfers. Additionally, Plaintiff seeks to avoid those transfers pursuant to the actual and constructive fraudulent transfer provisions of Section 548 of the Bankruptcy Code and to recover for the avoidable transfers pursuant to Section 550 of the Bankruptcy Code or other applicable law.

## II.

## JURISDICTION AND VENUE

5.      The Court has previously determined that jurisdiction and venue are proper in the Western District of North Carolina in connection with the Court's rulings regarding removal and the Motion to Transfer Venue filed by Defendants in this action.

## III.

## THE PARTIES

6.      Verizon is a Delaware corporation headquartered in New York, New York and is the largest telecommunications provider in the United States.  It was, and continues to be, a highly sophisticated organization with knowledge of national and international telecommunications trends, capacities, and the industry.

7.      Defendant NYNEX is a Delaware corporation headquartered in New York, New York.

8.      Defendant Verizon New England is a New York corporation headquartered in Boston, Massachusetts.

9.      Defendant Verizon Information Technologies L.L.C. is a Delaware Limited Liability Company.

10.     FairPoint Communications, Inc. was a Delaware corporation with its principal place of business in North Carolina.

11.     On October 26, 2009 (the "Petition Date"), the Combined Entity and various of its subsidiaries[1] (collectively, the "Debtors") filed petitions for relief under Chapter 11 of the

---

[1]      On or after the Petition Date, the following affiliates of the Combined Entity also filed bankruptcy petitions: C&E Communications, Ltd., Berkshire New York Access, Inc., Be Mobile Communications, Inc., Bentleyville Communications Corp., Berkshire Cable Corp., Berkshire Cellular, Inc., Berkshire Net, Inc., Berkshire

Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

12.     The Debtors could not pay creditors the billions of dollars they were owed in full, in cash, under any confirmable plan of reorganization.

13.     The Debtors' creditors agreed to restructure a portion of the Combined Entity's debt and convert more than a billion dollars worth of debt into common stock of the reorganized FairPoint.  Pursuant to a plan of reorganization, the Debtors' creditors also received the benefit of recoveries from the causes of action asserted in this lawsuit.

14.     The Debtors' *Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Plan") was confirmed by the Bankruptcy Court on January 13, 2011.

15.     The Plan and the confirmation order, dated January 13, 2011, provide for the creation of the Trust.   On the Plan's "Effective Date," January 24, 2011, the reorganized FairPoint executed the FairPoint Litigation Trust Agreement (the "Trust Agreement"), creating

---

Telephone Corp., Big Sandy Telecom, Inc., Columbine Telecom Co., Comerco, Inc., Commtel Communications Inc., Community Service Telephone Co., El Paso Long Distance Co., Enhanced Communications of Northern New England Inc., Exop of Missouri, Inc., FairPoint Broadband, Inc., FairPoint Carrier Services, Inc., FairPoint Communications Missouri, Inc., FairPoint Communications Solution Corp. - New York, FairPoint Communications Solution Corp. - Virginia, FairPoint Logistics, Inc., FairPoint Vermont, Inc., Fremont Broadband, LLC, Fremont Telcom Co., GTC Communications, Inc., YCom Networks, Inc., Unite Communications Systems, Inc., The El Paso Telephone Co., Odin Telephone Exchange, Inc., Northern New England Telephone Operations LLC, MJD Services Corp., GTC Finance Corp., GTC, Inc., Peoples Mutual Long Distance Co., Peoples Mutual Services Co., Peoples Mutual Telephone Co., Ravenswood Communications, Inc., Yates City Telephone Co., Chouteau Telephone Co., Chautauqua and Erie Telephone Corp., China Telephone Co., GITCO Sales, Inc., GIT-Cell, Inc., Germantown Long Distance Co., Fretel Communications, LLC, Elltel Long Distance Corp., Ellensburg Telephone Co., C-R Telephone Co., C-R Long Distance, Inc., C-R Communications, Inc., Maine Telephone Co., Sunflower Telephone Co., Inc., Marianna and Scenery Hill Telephone Co., Marianna Tel, Inc., Standish Telephone Co., ST Long Distance, Inc., ST Enterprises, Ltd., ST Computer Resources, Inc., Sidney Telephone Co., Utilities, Inc., Telephone Service Co., MJD Ventures, Inc., Northland Telephone Co. of Maine, Inc., The Orwell Telephone Co., Quality One Technologies, Inc., Taconic Technology Corp. Taconic Telcom Corp., Telephone Operating Co. of Vermont LLC, Orwell Communications, Inc., The Columbus Grove Telephone Co., The Germantown Independent Telephone Co., UI Communications, Inc., UI Long Distance, Inc., UI Telecom, Inc., ST. Joe Communications, Inc., and Chautauqua & Erie Communications, Inc. (the "Subsidiaries" and collectively with FairPoint, the "Debtors" or "FairPoint Entities").

the Trust and vesting it with the causes of action asserted herein and empowering the Trustee with authority to pursue them.

16.     The Trustee, a trustee of a trust created under the laws of the State of New York, is a successor of the Debtors and a representative of their estates under §§ 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code.

## IV.

## FACTUAL BACKGROUND

**Verizon's Origins - From A Baby Bell to A Behemoth**

17.     In 2000, Verizon provided domestic landline communications services in 32 states and the District of Columbia.  These states included some with high population densities and very profitable landline businesses, and some in rural locales such as Vermont, Maine and New Hampshire with higher infrastructure cost.  Along with its landline business, Verizon also owned a substantial part of the wireless market and an international segment of wireless and landline communications operations that extended to approximately forty countries.  At the time of its formation, Verizon was often described as a behemoth, controlling and dominating the telecommunications industry.

18.     Verizon was formed as a result of the break-up of the former American Telephone & Telegraph Co. system of local exchange companies in every major city in the United States (the "Bell System").  As a result of an antitrust lawsuit, the Bell System was divested in 1984 into seven Regional Bell Operating Companies or "Baby Bells."

19.     Bell Atlantic Corp. ("Bell Atlantic") was one of the regional operating companies formed as a result of the Bell System breakup.  On June 30, 2000, GTE Corporation, formerly General Telephone & Electronic Corporation ("GTE"), the largest "independent" telephone

Case 3:11-cv-00597-MOC-DCK   Document 68   Filed 06/28/12   Page 5 of 47

company during the days of the Bell System, merged with Bell Atlantic. GTE and Bell Atlantic's merger formed a combined entity called Verizon Communications, Inc. This merger was valued at $52 billion at the time of its announcement. It was designed to create a combined company with the scale and scope to compete as one of the telecommunications industry's top-tier companies, providing long-distance and data services nationwide as part of a full package of other telecommunications services.

**FairPoint**

20. FairPoint's origins were more modest. It was founded as MJD Communications Inc. in 1991, a Delaware corporation headquartered in North Carolina. FairPoint was established for the purpose of acquiring and operating local telephone companies in rural markets. Historically, RLECs (rural local exchange carriers) like FairPoint faced a higher cost structure than telecommunications carriers in other regions because of the large fixed cost nature of the upfront investment and relatively low customer density. Rural areas typically have local access line density of less than 100 local access lines per square mile, while urban areas often have local access line density in excess of 300 local access lines per square mile. This leads to higher average operating and capital cost per line for RLECs in comparison to non-rural operators. In recognition of this higher cost, RLECs, including FairPoint, often benefited from government subsidized rural access rates.

21. Before the Transaction, FairPoint had grown by more than 25 acquisitions to having about 221,014 landline customers in 12 states. No single state represented over 25% of its customer case. Most of the communities FairPoint's telephone companies served had fewer than 2,500 lines. Its largest acquisition at that time involved approximately 60,000 lines.

6

22.     During this period, FairPoint's acquisitions activities - - and later the entire company - - were led by Eugene Johnson ("Johnson").  A founder of FairPoint, he became Chief Executive Officer and Chairman on January 2, 2002.  Johnson was described by his subordinates as the "eternal optimist" and a "deal junkie."  Verizon later would take advantage of these personality traits.

23.     On or about February 8, 2005 FairPoint did an initial public offering of its stock. Thereafter, FairPoint was a publicly held corporation whose stock traded on the New York Stock Exchange under the ticker symbol "FRP."  Its stock price was considered a yield based stock whose trading value was tied to the regular dividend it paid.

24.     In connection with its IPO, on February 8, 2005, FairPoint entered into a senior secured credit facility with a syndicate of financial institutions, including Deutsche Bank Trust Company Americas, as administrative agent (the FairPoint "Legacy Credit Facility").  At the time the Transaction closed, the total amount owing under the FairPoint Legacy Credit Facility was $694,062,421.40.

25.     Following the IPO, Johnson and FairPoint's head of development, Walter Leach, remained on the lookout for acquisition opportunities.

**Challenges Facing the Landline Industry**

26.     Challenges facing the landline (traditional, wire-carried telephone services) industry caused Verizon to rethink its business strategy.  After the break up of the Bell System, regional Bell operating companies and rural local exchange carriers ("RLECs") became the two types of incumbent local exchange carriers ("ILECs").  Due to technological changes and innovations in the industry, Congress passed the Telecommunications Act of 1996 (the "1996 Act"), deregulating the ILEC industry and opening up competition to CLECs (competitive local

exchange carriers), which were typically newer telecommunications companies that did not possess the advantage of incumbency in a particular region. The 1996 Act was designed to expose the markets to competition by removing regulatory barriers to entry. Since ILECs like FairPoint were the incumbent carriers, they were regulated much more stringently than CLECs.

27.     In the meantime, mobile phones and wireless communications were captivating the nation. Verizon realized that in addition to increased competition generally, customers were increasingly dissatisfied with traditional, slow speed Digital Subscriber Line ("DSL") internet service. DSL is a medium for transferring data over traditional copper phone lines. The new technologies included cable broadband, which was generally much faster than DSL and could handle more data. The landline industry was also facing pressure from new internet-enabled wireless, data, and Voice over Internet Protocol ("VoIP") telecommunications services.

28.     Saddled with an increasingly outdated DSL capability, and unable to compete with the rapidly growing cable broadband, Verizon decided a massive deployment of fiber optic cable ("FIOS") was the answer. FIOS is an upgraded network architecture which is considered "future proof" in that it allows for rapid and relatively inexpensive upgrades to optical transport technology. For example, FIOS requires fewer active elements in the field when compared to the older and decaying copper networks. As such FIOS requires lower on-going maintenance costs. Verizon therefore formulated a business plan to divest most of its landline assets (keeping just its most profitable ones in populated areas) and to raise capital to expand its fiber optic and other emerging telecommunications technology businesses.

29.     To execute the divestiture part of the plan, Verizon's John Diercksen, Executive Vice President - Strategy, Development and Planning, established a divestiture team lead by

Steve Smith and Goodwin Bennett.  The team accomplished divesting 1.7 million landline access lines in five states within 2 years of Verizon's formation.

**Project Nor'Easter**

30.     During the summer of 2005, the first events occurred that would propel FairPoint into the Transaction that would eventually lead to its bankruptcy.  FairPoint asked the now bankrupt investment banking firm of Lehman Brothers to take a message to Verizon that FairPoint was interested in acquiring Verizon's rural access lines in Idaho.  That led to an initial meeting on September 30, 2005 between Johnson and Leach of FairPoint and Diercksen and Smith of Verizon.   During the meeting, Verizon declined to sell its Idaho business but encouraged FairPoint to consider what FairPoint would later describe in its public filings as "[Verizon's] wireline, long distance and Internet service provider businesses in Maine, New Hampshire and Vermont."  Although it was Verizon that proposed the transaction to FairPoint, FairPoint would later lead the public to believe it was FairPoint's idea.

31.     Indeed, even FairPoint's description of the business that it was acquiring - - "Verizon's wireline, long distance and Internet service provider businesses in Maine, New Hampshire and Vermont" - - was misleading.  The Transaction was not a purchase of a complete and self-supporting business operation.  Verizon intended to, and did, retain two critical pieces of the business, as described below.  Those "holes" in the deal ensured that FairPoint would never receive the benefits for which the market thought it was bargaining.

32.     First, the Spinco business would not include Verizon's more advanced business products that ran on the IP Network, and high end business products, and the business customers that used those products in the northern New England states.  The IP Network is the newer, next-generation network Verizon was building in that region.  FairPoint, thus, was forced to build a

new advanced IP Network once the Transaction was consummated. In addition, Verizon never sold, and FairPoint never received, the products that ran on the IP Network, or the business customers that used such products (*e.g.*, ethernet services, Virtual Private Network services, Voice over IP services, IP-PBX or IP-Centrex services, SIP Trunking, and other MPLS based IP services).

33.     Significantly, the IP Network and the business products Verizon retained were the segments of the ILEC industry that were growing, and helping to mitigate the impact of line losses in peer companies. In contrast, the Spinco Assets were a declining set of assets - - the rapid line loss of the Spinco Assets was a clear example of why it was referred to as the "shrinking part" of the ILEC industry.

34.     The other critical component of the northern New England business which Verizon retained was the extensive operations necessary to run the network, including most notably IT systems for processing and collecting bills and responding to service requests. Over 30% of total annual expenses for Spinco Assets were for operations not transferred into the Combined Entity, including a sales force to sell to enterprise customers and the Network Operating Center which was the technical operations center that controlled and monitored the network and collection call centers, to name a few. The Combined Entity had to build these operations from the ground up and should have anticipated operating cost increases not decreases. As a result of those two critical exclusions, the Combined Entity can be characterized as only half a business.

35.     At FairPoint's December 14, 2005 board of directors meeting, Johnson requested and received approval to pursue further discussions with Verizon. Later that month FairPoint signed a non-disclosure agreement with Verizon.

36.     On February 13, 2006, Verizon sent a letter (the "Discussion Letter") to FairPoint, dictating how a transaction had to be structured. Verizon required that the potential transaction be structured as a tax-free spin-off or split-off of Verizon's landline business in Maine, Vermont and New Hampshire, followed by a merger with FairPoint. Because Verizon wanted the transaction structured as a "Reverse Morris Trust," which would make the cash and stock transferred to Verizon at closing tax free, Verizon dictated that the Verizon's shareholders must own more than 50% of the Combined Entity's stock. Verizon also specified that existing business debt would be included among the liabilities contributed to the Combined Entity, potentially up to the limit of Verizon's tax basis in the assets and additional leverage beyond the contributed debt would be added to the subsidiary via new debt. Thus, the very structure of the proposed deal contemplated saddling the new Combined Entity with enormous liabilities.

37.     Johnson presented the proposed transaction with Verizon at a March 15, 2006 meeting of FairPoint's board of directors. Following the presentation, the board reconfirmed its direction to management to continue discussions with Verizon.

38.     Five days later, March 20, 2006, FairPoint formally engaged Lehman Brothers and Morgan Stanley as its financial advisors in connection with a proposed transaction with Verizon. On May 19, 2006, FairPoint also engaged Morgan Stanley as a financial advisor in connection with a proposed transaction with Verizon. The investment bankers Lehman and Morgan were to be paid only if a deal was consummated.

39.     On March 16, 2006, FairPoint submitted to Verizon a proposal to acquire the Spinco Assets in a spin-off and subsequent merger as Verizon proposed. FairPoint proposed a Spinco valuation at what FairPoint thought was a multiple of Spinco's projected 2006 EBITDA (earnings before interest, taxes, depreciation and amortization). As Verizon suggested, the

proposal contemplated FairPoint selling its 7.5% interest in the Orange County — Poughkeepsie Limited Partnership to a Verizon subsidiary, Cellco Partnership (a "Transfer" and part of the "Fraudulent Consideration"). Poughkeepsie generated current cash flow for FairPoint and was an attractive asset for Verizon. The proceeds of the sale were expected to fund (in part) FairPoint's significant fees and expenses for the Transaction.

40. Verizon viewed FairPoint's bid as surprisingly excellent and higher than Verizon's internal numbers supported. Nevertheless, Verizon pushed back in the negotiations to increase FairPoint's bid. On April 20, 2006, FairPoint submitted a revised proposal setting forth, among other things, a capital structure for Spinco which included $1.7 billion of debt the proceeds of which would go to Verizon.

41. By June of 2006, the investment bankers had given the transaction project the code name "Nor'easter," a term used in New England to describe a major storm along the East coast that can cause devastating damage. They also gave Verizon the code name "Viper," an offensive term for someone who is considered to be malicious or treacherous.

42. Negotiations continued. During the earlier part of 2006, Verizon continued its broadband build out in the state of New Hampshire so as to offer more to its customers there. But, tellingly, by July of 2006, when a deal with FairPoint looked like a reality to Verizon, Verizon abruptly stopped its broadband build out in New Hampshire.

**Limited Due Diligence**

43. It was not until June 27, 2006, that FairPoint's working team conducted due diligence in Verizon's data room in Dallas, Texas. Walt Leach took a team of people to Dallas, Texas for two and a half days to review the contents of Verizon's data room which consisted primarily of contracts and regulatory orders. The data room did not contain historical financial

data. All financial information provided by Verizon to FairPoint came through Steve Smith, head of Verizon's divestiture team, who was in complete control of the flow of information.

44.     Historic financial data on Spinco was problematic for Verizon. The Spinco business had no historic financial information because the assets that comprised Spinco had never functioned as a stand alone company. Nevertheless, Verizon extracted information from Verizon's system and purported to create a set of financials for Spinco. Neither FairPoint nor its advisors were given the ability to test extensively the data underlying the numbers. In addition, upon information and belief, even though Verizon had created long-term financial projections for the Spinco Assets, Verizon did not share them with FairPoint.

45.     Because of FairPoint's history as a small RLEC, FairPoint's management had little experience modeling or projecting cash flows or EBITDA based on landlines with no rural access rates supporting them, much less <u>1.3 million</u> of them. They also had no experience in the wholesale market, which was part of the Spinco Assets. Furthermore, Verizon not only made no effort to assist FairPoint but stood silent knowing FairPoint's projections for the Spinco Assets were inconsistent with Verizon's projections.

46.     Projections are not reasonable unless they include a sufficient working capital cushion to allow the company to withstand reasonably foreseeable risks. Mere survival is not enough. For revenue projections to be reasonable, FairPoint had to account for difficulties that were likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error. FairPoint's projections did not. They were not only uninformed, they were wildly optimistic and did not have a cushion to cover even a minimal degree of difficulty caused by general economic conditions or specific events which might effect the Combined Entity.

47.     Furthermore, although Lehman Brothers and Morgan Stanley were working with FairPoint preparing projections for the Combined Entity on which FairPoint's offer would be based, the bankers made clear that they did not assume responsibility for the verification of any information, whether publicly available or furnished to them, about FairPoint, Verizon, Spinco or comparable transactions.  Neither Lehman Brothers nor Morgan Stanley rendered a fairness opinion with respect to the Transaction, and neither expressed an opinion about FairPoint's decision to engage in the Transaction.

48.     FairPoint walked away from the potential transaction with Verizon three times, but Verizon, according to Walt Leach, was "relentless" in its pursuit of FairPoint.  On September 29 and October 17, 2006, at John Diercksen's invitation, Johnson met with him as Diercksen tried to keep the deal alive.  Diercksen was successful.  On October 18, 2006, Johnson met with the FairPoint board of directors to seek approval to continue negotiations.

**Financial Alchemy**

49.     In the fall of 2006, the Spinco Assets' EBITDA was declining.  With the EBITDA decline, among other obstacles the Spinco landlines faced, Verizon believed this would be its only shot at unloading the decaying Spinco Assets.

50.     FairPoint tried to monitor Spinco's EBITDA performance, but could do so based only on information Verizon provided.

51.     Verizon and FairPoint each had prepared projected 2007 EBITDA for the Spinco Assets.  Verizon had spotted an important discrepancy between their respective projections for Spinco's 2007 EBITDA, but Verizon did not inform FairPoint of the discrepancy.

52.     Verizon knew its projections (and those of FairPoint) were "aggressive." On top of that, Verizon knew that the Regulators delaying a Transaction would put further pressure on the "aggressive" projections.

53.     In stark contrast to that, Verizon led FairPoint to believe that Verizon's "aggressive" Spinco EBITDA projection should be increased with "add backs." Verizon did that, creating what then was called an "Adjusted EBITDA" for the Spinco Assets. At least one Verizon employee characterized the derived "Adjusted EBITDA" as "financial alchemy." Nevertheless, the Adjusted EBITDA number for the Spinco Assets was written into the Merger Agreement and credit agreement. The Adjusted EBITDA number hid from the market the true dilapidating state of the Spinco Assets.

**Signing Up the Deal**

54.     On December 8, 2006, Verizon and Spinco's legal counsel, Debevoise & Plimpton LLP, submitted initial drafts of a merger agreement, a distribution agreement and other transaction documents to FairPoint and its legal counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"). Verizon was also a client of Paul Hastings at the time and remains so to this day. Paul Hastings would later serve as Debtors' counsel for the bankrupt Combined Entity.

55.     On January 4, 2007, FairPoint selected Lehman Brothers, Morgan Stanley, and Bank of America (collectively, the "Underwriters") to lead the financing of the Transaction.

56.     On January 14, 2007, FairPoint's board of directors met to consider and act upon the proposed Transaction. It was approved. Representatives of Deutsche Bank (the agent bank on the FairPoint Credit Facility which would be paid off with proceeds of a new loan if the Transaction closed) gave FairPoint's board of directors Deutsche Bank's financial analysis and an oral opinion as to the fairness of the Transaction. The fairness opinion was heavily qualified,

noting that Deutsche Bank had not independently verified any information concerning FairPoint, Verizon, or Spinco. Similarly, the fairness opinion stated that it relied on FairPoint's financial projections and analyses of synergies expected from the Transaction.

57. Verizon's own financial advisors struggled with valuing the businesses. Their "comparable companies" for purposes of valuing the Combined Entity were not viewed internally by Verizon as comparable.

**The Deal Structure**

58. On December 20, 2006, Verizon incorporated Spinco and made Steve Smith its sole director and an officer of the company. Steve Smith was an employee of Verizon and acting within the course and scope of his employment. Through its ownership and employment of Spinco's sole board member and officer, Verizon controlled Spinco. Therefore, Verizon's intent is imputed to Spinco.

59. On January 15, 2007, FairPoint, Spinco and Verizon signed a Plan of Merger agreement ("Merger Agreement") and Verizon and Spinco signed a Distribution Agreement that, subject to many promises and conditions in the agreements, one of which was the approval of the regulators, the Transaction for FairPoint to acquire the Spinco Assets would be done.

60. Also on January 15, 2007, as part of the planned Transaction, the following additional agreements were signed:

(i)    a Transition Services Agreement (the "TSA") between Verizon's then subsidiaries, Northern New England Telephone Operations Inc. and Enhanced Communications of Northern New England Inc., as Buyers, and Verizon's other subsidiary, Verizon Information Technologies LLC, as Supplier,

(ii)    an Employee Matters Agreement between Verizon and Spinco (the "Employee Matters Agreement"),

(iii)    a Tax Sharing Agreement between Verizon and Spinco (the "Tax Sharing Agreement"),

(iv)    a Master Services Agreement (the "Master Services Agreement") with Capgemini U.S. LLC ("Capgemini"), and

(v)    a Partnership Interest Purchase Agreement (the "Interest Purchase Agreement") between FairPoint's subsidiary, Taconic Telephone Corp. ("Taconic") and Verizon's subsidiaries, Cellco Partnership d/b/a Verizon Wireless ("Cellco") and Verizon Wireless of the East LP (both the Verizon "Wireless Companies"), for Taconic to sell its 7.5% limited partnership interest in Orange County-Poughkeepsie Limited Partnership (the "NY Cellular Partnership Interest") to the Verizon Wireless Companies.

**Market Reaction to the Transaction**

61.    On January 16, 2007, Verizon and FairPoint announced that they had entered into the Merger and Distribution Agreements.

62.    Even without a complete understanding or appreciation of the facts, the stock market's verdict was that FairPoint was getting the short end of the stick. From the date the Transaction was announced to the day after the Closing, FairPoint's common stock price lost over 63% of its value. At the same time Verizon's stock rose.

**Post-Signing Troubles**

63.    When accomplished, the Transaction would add 1,429,358 customers for FairPoint's services, increasing its customer base by about 746%. FairPoint needed to be able to service those customers well and to keep them content with their new telecommunications

provider's capabilities. Verizon's employees who had serviced those customers, and who would become employees of the Combined Entity, were key to that effort. Soon after the Merger Agreement and the Distribution Agreement were signed, Johnson gave a welcome speech to those employees. Beyond the welcome speech, however, Verizon precluded FairPoint from communicating with these critical employees.

64.     These employees would have had knowledge of the problems with the Spinco Assets and systems; they were the people who worked day-in and day-out with the Spinco Assets and would be in the best position to help FairPoint with the transition. FairPoint's lack of access to critical information would lead to a myriad of post-signing problems particularly with respect to the design of the IT system.

65.     Verizon denied FairPoint access to its employees who would become part of the Combined Entity despite a Merger Agreement provision allowing FairPoint to have such access.

66.     In the years leading up to the Merger Agreement, Verizon had neglected the Spinco business and starved it of capital expenditures. Because of Verizon's refusal to allow FairPoint to fully diligence the Spinco Assets, FairPoint did not realize the extent of Verizon's neglect until after Closing.

**Controversy and Public Protests Before the Regulators**

67.     The Public Utilities Commissions in Maine, New Hampshire, and Vermont (the "PUCs") had to approve the Transaction in order for it to be consummated.

68.     Local consumers and residents, public advocacy groups and even competitive local exchange carriers in the three affected states vociferously objected to the Transaction before the PUCs.

69. The Communications Workers of America ("CWA") and the Internal Brotherhood of Electrical Workers ("IBEW", together with CWA, the "Unions"), to which roughly 60% of the Spinco workers belonged, organized protest rallies in a number of northern New England locations.

70. A common theme in the filings with the PUCs objecting to the Transaction was that the Combined Entity would not have the requisite experience and expertise to operate the Spinco Assets and would not be financially viable. Many of the filed objections requested that at a minimum, if the PUCs were to approve the Transaction, they should impose certain financial conditions, commitment to service quality and broadband expansion requirements on the Combined Entity. The Unions urged the regulators and FairPoint's shareholders to reject the Transaction because "Cash flow from these access lines will have to be plowed back into network upgrades in order to satisfy regulators and customers who are demanding improved service quality. Management's projected profit windfall from this deal is an illusion."

71. Verizon, however, had its own resources to marshal in the battle over regulatory approval. In 2007 and 2008, Verizon spent about $8.7 million and $13.52 million, respectively, on telephone utilities industry lobbying. Its affiliates spent another approximate $3.86 million and $4.5 million, respectively, on telecom services and equipment industry lobbying.

72. Vermont State Senator Vince Illuzzi, who in 2007 vigorously opposed the Transaction, later stated that the Vermont Public Service Board "should be called the Utility Service Board, rather than the Public Service Board," because it is too close to the industries it regulates.

73.     Verizon's Diercksen believed he had to take the lead and in order to get the PUCs to approve the Transaction because he believed that Johnson was not capable of getting the deal done.

74.     To manage the PUC process, Verizon's Diercksen had behind-the-door meetings with governors and other politicians.

75.     Ultimately, each of the three states approved the Transaction with conditions. The PUCs required the Combined Entity to expand broadband, improve service, retain current employees, and accept rate freezes.  The PUCs also imposed financial requirements that attempted to address the Combined Entity's financial viability.  Those requirements, however, were prospective and begged the question of whether the Combined Entity would be financially viable.

76.     The PUCs' approval requirements overall increased the Combined Entity's cash flow requirements.

77.     New Hampshire PUC Commissioner Graham Morrison still vigorously dissented from approving the Transaction, stating:

> I do not question FairPoint's good intentions.  But no amount of courage and valor could prevent the vastly outnumbered Spartan-led Greek warriors from being overrun by the Persian invaders at Thermopylae in 480 B.C.  So, too, with FairPoint, as they will increasingly face competition for their core customer from wireless voice, text and data carriers such as Verizon Wireless and AT&T, from VoIP vendors like Ooma, Lingo and Skype and from Wi-Fi competitors yet to come.  The difference is that, while the defeated Greek warriors at Thermopylae could ultimately look to a newly inspired Athens to summon the naval resources necessary to save their civilization, FairPoint has no reserves, it has only its captive landline customers and reworked 3rd generation DSL over copper… with an eye to the future of technology options, Verizon is choosing now to exit the regulated environment.  Clearly Verizon believes they are not exiting the retail telecommunications market; they are merely leaving behind the regulated space and an outdated copper infrastructure …  Verizon exits, and FairPoint overnight becomes the Incumbent Local Exchange Carrier (ILEC) in New Hampshire, and this vastly smaller and financially challenged entity will be faced with the same

20

issues and problems that the greater Verizon felt were too challenging to undertake.

78.     From signing until closing, the Unions' protests against the Transaction damaged FairPoint's name in Maine, Vermont, and New Hampshire.

**Competition Intensifies**

79.     As the regulatory approval process dragged on, competition against the Spinco business intensified.   Verizon itself was soliciting Spinco business customers to switch to a Verizon division.   Verizon also was offering Spinco business customers the alternatives of wireless voice, data, and other services as well as long distance services, prepaid calling card services, and the resale of local exchange services.

80.     The cable companies also were ramping up their phone service offerings. Comcast and Time Warner, having acquired Adelphia's New England cable subscribers (including those in northern New England) from the Adelphia bankruptcy estate on July 31, 2006, were updating quickly and offering phone service to Spinco's business customers, either as a separate service or as bundled with their cable or satellite television and high speed internet service.

81.     When Comcast and Time Warner acquired Adelphia's New England subscribers, Verizon knew that their entry into the Spinco Assets' market area would harm the Spinco Assets earning capacity.

**February 25, 2008 and the Costly Credit Agreement Amendment**

82.     In February 2008, as the regulatory approval process dragged on, FairPoint projected that it would very soon default on several important debt covenants contained in its Legacy Credit Agreement and, therefore, would receive a going concern qualification from its

auditors. To avert default, FairPoint paid a steep price to get the Legacy Credit Facility lenders to amend the credit agreement.

83.     Also in February 2008, FairPoint's auditors issued a report and audit of the company's financials, expressing adverse opinions on the effectiveness of the company's internal controls over financial reporting. Among other things, FairPoint's auditors indicated that management oversight and review procedures designed to monitor the effectiveness of control activities in its northern New England division were ineffective.

**The Post-Closing Insolvency of Spinco and Combined Entity and Lack of Reasonably Equivalent Value**

84.     As the Closing drew near, Verizon engaged Houlihan Lokey ("Houlihan") to provide a solvency opinion to Verizon's and Spinco's Board of Directors. As previously indicated, prior to the merger, Spinco was a wholly-owned subsidiary of Verizon and its sole director and company officer was Steve Smith, the Verizon employee spearheading the divestiture.[2]

85.     By seeking a solvency opinion just prior to Closing, Verizon, Spinco, and their respective Board of Directors were concerned about the viability of Spinco and Combined Entity as a result of the proposed Transaction. Yet it is also clear from the opinion Verizon solicited and received, Verizon had no intention of jeopardizing the proposed Transaction with an analysis that reflected the true financial picture of Spinco and the Combined Entity post-Closing. Instead, Verizon simply wanted Houlihan to provide an opinion that would give Verizon cover for receiving the Fraudulent Consideration despite the Combined Entity being doomed to fail.

---

[2] Paragraphs 84 and 85 have been slightly modified from the version of the Second Amended Complaint filed on May 29, 2012 (*see* Document 60-1).

22

86.     In its solvency opinion to Verizon and Spinco's Board of Directors, Houlihan stated that post-Closing Spinco and the Combined Entity would be solvent, would have adequate capital and would be able to pay their debts as they became due.  That opinion, however, was replete with numerous waivers and disclaimers.  The opinion was also based on inappropriately optimistic projections prepared by FairPoint's management that Houlihan acknowledged it did not independently test or verify.    Nor does it appear that Verizon provided Houlihan with Verizon's own internal projections of Spinco, which, upon information and belief, were significantly more pessimistic than those used by Houlihan.  The Houlihan opinion was also based on numerous other inappropriate assumptions and errors that, if corrected for, would plainly establish that post-Closing Spinco and the Combined Entity were not solvent, did not have adequate capital and could not pay their debts as they became due.

87.     Verizon knew that Houlihan was using inflated management projections and knew or should have known that many other key assumptions in Houlihan's opinion were wrong, and thus that the Houlihan solvency opinion was not reliable.  In fact, Houlihan's valuation of the Spinco assets was so wildly off base it implied that Verizon was being underpaid for the Spinco assets by perhaps as much as $1 billion if not more, which Verizon knew was not true as reflected in part by the market's negative reaction to FairPoint in connection with the proposed Transaction.  That Verizon would solicit and blindly accept such an unreliable opinion from Houliahn is not surprising, however, because Verizon was simply looking for cover for the time when the Combined Entity inevitably failed.

88.     For example, to test whether the post-Closing fair value of Spinco or the Combined Entity exceeded their respective liabilities, i.e. balance sheet solvency, Houlihan calculated an estimated "Enterprise Value from Operations" of Spinco and the Combined Entity

Case 3:11-cv-00597-MOC-DCK   Document 68   Filed 06/28/12   Page 23 of 47

which it then compared to the estimated post-Closing Pro Forma Debt to opine that both entities would be balance sheet solvent immediately after Closing. To calculate Enterprise Value, however, Houlihan used comparable company multiples of EBITDA that were inappropriately high and not reasonably comparable for a number of reasons, including that the multiples were from companies that had assets and services that Spinco and the Combined Entity did not have and/or could not provide. When an appropriate EBITDA multiple is used in the solvency analysis, both Spinco and the Combined Entity were balance sheet insolvent immediately after Closing.

89.     Similarly, by failing to independently test or verify the projections, Houlihan used grossly inflated "Adjusted EBITDA" projections in support of its solvency opinion. As an example, the projections used by Houlihan did not appropriately account for line loss and DSL penetration rates that were apparent by March 2008, and also failed to include on a go-forward basis certain operating expenses, including expenses associated with services that were to be provided by Verizon on a temporary basis under the TSA. When appropriate EBITDA projections are used in the solvency analysis, both Spinco and the Combined Entity were balance sheet insolvent immediately after Closing.

90.     The Houlihan opinion was also based, in part, on a flawed discounted cash flow ("DCF") analysis of both Spinco and the Combined Entity. Such flaws included the use of the inappropriate projections described above, as well as flaws in the discount rate and terminal value multiples utilized in the analysis. When appropriate DCF assumptions are used in the solvency analysis, both Spinco and the Combined Entity were balance sheet insolvent immediately after Closing.

91.     Plaintiff estimates that immediately after Closing, Spinco's liabilities exceeded the fair value of its assets by at least $350 million, and likely more, and the Combined Entity's liabilities exceeded the fair value of its assets by at least $440 million, and likely more. As such, both entities were rendered insolvent by the Transaction.

92.     An appropriate solvency analysis by Houlihan would also have revealed that the Combined Entity would be undercapitalized and not be able to pay its debts as they became due post-Closing. For example, for the same reasons discussed above, an accurate assessment of the Combined Entity's financial prospects immediately after Closing would have revealed that by 2009, if not sooner, the Combined Entity would likely be in violation of its debt covenants, and thus in default of its credit facility. In fact, this is exactly what happened.

93.     As discussed further herein, less than one year after Closing, the Combined Entity was forced to suspend its payment of dividends because of cash flow problems, liquidity requirements and its high level of indebtedness. At or about this same time, the Combined Entity was forced to initiate discussions with the administrative agent of its credit facility to seek a waiver for debt covenant breaches that were anticipated to occur by June 30, 2009. When those discussions failed, the Combined Entity sought a deferment and restructuring of other debt obligations so as to remain in compliance with the debt covenants in its credit facility.

94.     But even those efforts were not sufficient to forestall the inevitable failure of the Combined Entity. By May 2009, a mere fourteen months after Closing, the Combined Entity knew that it would likely be in violation of its debt covenants no later than the end of September 2009, and engaged the financial advisory firm of Rothschild Inc. ("Rothschild") to assist in the development of a restructuring plan. As addressed further herein, the Combined Entity thereafter

failed to make its credit facility principal and interest payments due September 30, 2009, ultimately leading to its bankruptcy filing one month later.

95.     An appropriate solvency opinion by Houlihan would also have revealed that Spinco and the Combined Entity were plainly not receiving reasonably equivalent value for the transfer of the Fraudulent Consideration and other obligations at issue in this lawsuit.  For many of the same reasons already discussed, the fair value of assets transferred to Spinco and the Combined Entity was no greater than $900 million, and likely significantly less, compared to the billions in Fraudulent Consideration transferred to Verizon and additional liabilities and obligations Spinco and the Combined Entity assumed in connection with the Transaction.

**FairPoint's Huge Out of Pocket Costs To Consummate the Transaction**

96.     FairPoint did not have the ability to pay its pre-Closing costs that it had estimated would be $110 million.  To fund those costs, Verizon agreed to have its Wireless Companies pay Taconic $55 million for the NY Cellular Partnership, and to reimburse FairPoint an additional $40 million.  In total, Verizon agreed to provide $95 million of FairPoint's projected $110 million pre-Closing costs.

97.     The TSA, which was originally entered among Verizon subsidiaries,  imposed a high monthly cost on the Combined Entity to use Verizon's IT system to service the Spinco business's customers.  FairPoint thus recognized the need to transition off of Verizon's system to its own as soon as possible after Closing.  To do that, after the Merger Agreement was signed, FairPoint was compelled to begin building and creating and hiring new systems and infrastructure, including an IT network, operations centers, call centers, accounting systems, and personnel, to support the Spinco business, which was roughly six times FairPoint's size.  As a

Case 3:11-cv-00597-MOC-DCK   Document 68   Filed 06/28/12   Page 26 of 47

result, as the Closing neared, FairPoint already had spent millions of dollars to build the new IT System.

98.     Having spent such enormous sums, FairPoint's president believed that the company would need to file bankruptcy if Closing did not occur.   FairPoint's management believed FairPoint was too deeply invested and indebted to walk away from the proposed Transaction and survive.   Being under such compulsion to close the proposed Transaction, FairPoint was less than a willing participant.

99.     As set forth above, during the fifteen months that FairPoint waited for regulatory approval, the Spinco business continued to erode.  According to Crowley, FairPoint's CFO, each time between January 15, 2007 and Closing that Verizon's Steve Smith called him with updated financial data, "I prepared myself for the worst and it was always worse than that."  In the words of FairPoint's Peter Nixon, by March 2008 "a thousand stars had to line up perfectly for it to work."

100.     Fair value is commonly viewed as the amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.  Not only did FairPoint not have knowledge of all the facts, on March 31, 2008 it was under the compulsion to close the Transaction or face immediate bankruptcy.

101.     FairPoint was compelled to go through with the Transaction due to the huge sums it had expended to consummate the deal.  Without the reimbursement it could expect from Verizon under the Merger Agreement for those expenses, and having sunk millions into creating an IT network for the Spinco Assets, FairPoint could not survive outside bankruptcy.  FairPoint chose to delay the day of reckoning but in order to do so it became liable for approximately $2

billion in new debt, knowing the proceeds would be transferred to Verizon. The alternative more beneficial to creditors was for FairPoint to walk away. Because it didn't, more creditors were left unpaid.

**Transaction Timeline for March 31, 2008**

102.    Below is a step-by-step list and schematic illustrating the sequence of events that occurred on or about March 31, 2008 (the "Closing") that effectuated the Transaction. At the Closing, Spinco, FairPoint, and by merger the Combined Entity made transfers to and incurred and assumed obligations for Verizon's benefit. The transfers and the incurrence of obligations were inextricably linked components of a single transaction. The transfers (each being referred to as a "Transfer" and collectively, the "Transfers") included the Special Payment, the Spinco Notes proceeds, and the liabilities assumed and obligations incurred for the benefit of Verizon including the payments subsequently made to VIT under the TSA.

103.    *Step 1* — The Verizon Group engaged in a series of restructuring transactions to effect the transfer to Spinco and entities (including a special purpose entity formed for holding Vermont property) that became Spinco's subsidiaries of (i) specified assets and liabilities associated with the local exchange business of Verizon New England in Maine, New Hampshire and Vermont and (ii) the customers of the Verizon Group's related long distance and Internet service provider businesses in those states.

104.    *Step 2* —FairPoint and Spinco entered into a $2.03 billion credit facility (the "Senior Secured Credit Facility"), which facilitated the Transaction and resulting fraudulent Transfers, consisting of a revolver in an aggregate principal amount of $200 million, a term loan A facility in an aggregate principal amount of $500 million, a term loan B facility in the

aggregate principal amount of $1.13 billion (together with the term loan A facility, the "Term Loans") and a delayed draw term loan in an aggregate principal amount of $200 million.

105.     *Step 3* — Spinco made a borrowing under the Senior Secured Credit Facility and used such funds to pay the Verizon Group $1.16 billion (the "Special Payment").

106.     *Step 4* —FairPoint made a borrowing of $470 million under the Term Loans and $5.5 million under the delayed draw term loan and used those funds plus $235.5 of the required capital contribution from Verizon to pay off its Legacy Credit Facility.

107.     *Step 5* — Verizon sold about $543 million in commercial paper ("Verizon CP") to a group of investment banks and Verizon retained the cash proceeds.  Spinco issued senior notes, due 2018, in the principal amount of $551 million (the "Spinco Notes") to Verizon New England, which were immediately upstreamed to Verizon.  Verizon transferred the Spinco Notes to the investment banks in exchange for "pay off" of the Verizon CP pursuant to a March 27, 2008 Exchange Agreement.  The investment banks sold the Spinco Notes to public holders, who took the Notes in good faith and for value.  The economic reality and effect of this step, which the parties intended, was that Verizon received the Spinco Notes proceeds, Spinco and the Combined Entity received none of the proceeds but were left with the Spinco Notes principal and interest payment obligations, as was made clear by the Prospectus issued before closing which states:

> "As a result of the transactions, the Verizon Group will receive $1.7 billion of combined cash and principal amount of the [Spinco Notes"].  The Verizon Group will be permitted to...exchange the [Spinco Notes] for debt obligations of the Verizon Group or transfer the Spinco securities to stockholders or creditors of the Verizon Group."

Verizon structured the Notes portion of the Transaction in this manner to minimize its tax liability.  Verizon took cash tax-free in the Transaction equal to its tax basis in Spinco.  But

Verizon took extra cash -- also tax free -- through structuring the Notes in the above manner. Had Spinco sold debt in the public markets and transferred the proceeds to Verizon, Verizon would have incurred a taxable gain. Instead, Verizon structured the Notes portion in the round-about fashion to effectively receive Spinco's Notes proceeds interest and avoid tax liability.

108. *Step 6* —Spinco issued additional shares of stock ("Spinco Stock Shares") that are distributed to Verizon New England and upstreamed to Verizon.

109. *Step 7* — Spinco merged with and into FairPoint (the two becoming the "Combined Entity") and the Spinco Stock Shares were converted to shares of common stock of the Combined Entity and distributed to Verizon shareholders.

110. *Step 8* — The Combined Entity drew the remaining $194.5 million under the delayed draw term loan to pay costs of the IT System and other cash flow shortfalls.



111.   The Spinco Notes had a maturity date of April 1, 2018.   Interest on the Spinco Notes was payable semi-annually in cash on April 1 and October 1 of each year.   The Spinco Notes bore interest at a fixed rate of 13.125%, resulting in annual interest costs of approximately $72 million, with principal due at maturity.

112. As a result of the borrowings under the Senior Secured Credit Facility and related Transfers of cash to Verizon and the issuance of the Spinco Notes, the proceeds of which went to Verizon, Spinco, FairPoint, and the Combined Entity were left insolvent, undercapitalized, and unable to pay their debts as they became due.

113. On March 31, 2008, when the Transfers occurred, there existed one or more creditors of Spinco, FairPoint, and/or the Combined Entity that had allowable claims in the subsequent bankruptcy of the Combined Entity that could avoid the Transfers complained of herein.

**No More Access to Capital**

114. As previously noted, Verizon, FairPoint and Spinco also entered into a Tax Sharing Agreement as part of the Transaction. In this agreement, the Combined Entity agreed not to take any action that would disqualify the Spin-Off as a tax-free spin-off. This meant, among other things, that the Combined Entity could not issue additional shares of stock or significantly modify the Spinco Notes before their maturity. The Tax Sharing Agreement severely restricted the Combined Entity's access to equity capital. This, together with the Combined Entity's complete reliance on Verizon for the IT support for over 85% of its landlines, provided Verizon with control over the Combined Entity. Through that control, Verizon's intent, therefore, can be imputed to FairPoint and the Combined Entity.

**Problems with Syndication**

115. In January 2007, the Underwriters had committed to underwrite the loans to Spinco, FairPoint, and the Combined Entity that were to provide the funds for the Special Payment to Verizon.

116.    As Closing neared fifteen months after the Signing, the loan commitment was becoming a worse and worse deal for the Underwriters.  Their cost of funds and the Combined Entity's default risk had increased but, as the Underwriters told FairPoint's CFO, they could not find a way out of their commitment.

117.    On the day of Closing, the Underwriters funded the loans that allowed Spinco, FairPoint, and the Combined Entity to make transfers to Verizon.  But the markets had come to realize that the Transaction was a very bad deal for FairPoint.  Accordingly, the Underwriters could only syndicate the loan at a substantial discount, losing (upon information and belief) about $200 million the day the Transaction closed.

**Verizon's Latest "Mark"**

118.    What FairPoint, the regulators and the market did not learn until after the Closing was this:  the Transaction that ensnared FairPoint was no less than the third Verizon disposition of unwanted assets that would result in disaster for the acquiring company.  Verizon's zeal to rid itself of its antiquated systems and services was nationwide.  Before FairPoint became Verizon's latest "mark," there was Hawaiian Telcom Communications, Inc. and Idearc Inc.

119.    On May 21, 2004, Verizon announced the entry into an agreement to sell its landline operations in Hawaii, consisting of 715,000 access lines, for $1.65 billion to The Carlyle Group ("Carlyle").  Carlyle is a private equity fund that traditionally had not been in the telecommunications industry.  On May 2, 2005, Carlyle consummated the transaction with Verizon to acquire its Hawaiian landline business ("Hawaiian Telcom").

120.    As a part of this transaction, Verizon refused to sell the back-office systems necessary for the Hawaiian access lines.  Carlyle was forced to enter into a transition services agreement, whereby Verizon agreed to provide Hawaiian Telcom with certain transition services

for a limited period of time in return for prohibitively expensive payments. Hawaiian Telcom engaged BearingPoint Inc. to build back-office IT infrastructure to allow Hawaiian Telcom to migrate off Verizon's systems by February 2006. BearingPoint's involvement with Hawaiian Telcom contributed to BearingPoint's bankruptcy as well.

121. Unfortunately, due to a myriad of difficulties, cutover was extended to April 1, 2006, resulting in significant transition services expenses. Even after engagement of a new replacement consulting firm on February 5, 2007, Accenture LLP, Hawaiian Telcom continued to suffer from issues related to the development and deployment of key back-office and IT systems.

122. Hawaiian Telcom's landline assets were declining assets, and the transition resulted in a heavily leveraged entity. As a result, right from the date of the divestiture Hawaiian Telcom started to show signs of trouble. By February 4, 2008, Hawaiian Telcom announced the resignation of its CEO, and the appointment of an interim executive management firm to help turn around the business. By the end of 2008, unable to manage its increasing debt load on the back of declining landline assets, Hawaiian Telcom filed for bankruptcy protection in the United States Bankruptcy Court for the District of Hawaii.

123. Simultaneously with its decision to divest landline assets, Verizon also determined that its directory operations were not as lucrative. Accordingly, in November 2006, Verizon formed Idearc Inc. ("Idearc") and Verizon spun-off its online directory operations business to Idearc in a tax-free transaction.

124. In connection with the spin-off, Verizon shareholders received one share of Idearc common stock for every twenty shares of Verizon's common stock. As a result of this spin-off, Idearc incurred almost $9.5 billion of debt for Verizon's dying directory publishing business that

was worth far less and upstreamed the vast majority of the loan proceeds to Verizon. The overleveraged nature of the transaction caused Idearc to file for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Texas on March 31, 2009, two and a half years after the spin-off transaction.

**The Combined Entity's Business Continues to Decay**

125. The Transaction resulted in a highly leveraged Combined Entity that owned approximately 1.7 million landlines without sufficient infrastructure to operate them. John Crowley, the Combined Entity's CFO, "saw the writing on the wall" shortly before Closing, recalling the last due diligence call before the Spinco Notes issued. After hearing Verizon's Steve Smith give a "very legalistic and crafty" answer to a question about landlines loss trends in New England holding steady, Crowley felt certain things were going to be "really bad" after Closing. It took Crowley less than six months thereafter to arrange his exit from the Combined Entity.

126. Verizon had made it impossible for FairPoint to monitor EBITDA and the effect of landline customer loss on a real time basis between January 15, 2007 and Closing, claiming that Verizon's status as a public company prohibited it from giving FairPoint certain financial information until it was available to the public. Yet, upon information and belief, an underlying motive for Verizon was to make sure certain data was not delivered to FairPoint until sixty days after Closing so the Unions and regulators in the regulatory review process could not obtain such data prior to receipt of regulatory approval. Regardless, Spinco's business declined sharply such that FairPoint was shocked upon learning the true numbers after Closing.

**Problems with Transitioning Critical Functions of the Business**

127. Verizon refused to transfer to Spinco the IT System on which the Spinco business relied. As a result, a third party, Capgemini, was retained to assist in developing and deploying the new systems, processes, and personnel to operate the Spinco business.

128. Pursuant to the terms of the Transition Services Agreement, for a short time following the Closing, Verizon, through its subsidiary VIT, was to remain responsible for critical functions such as internal information technology, customer care, order management, broadband help desk support, E-911 services, network monitoring, billing and collection, and supply chain systems. The point in time when the Combined Entity would become responsible for these critical functions was referred to as the cutover (the "Cutover"). The Cutover was originally scheduled for September 2008. Until then VIT was to be paid approximately $15 million per month in return for the services set forth above along with a one-time Cutover fee of $34 million. Due to delays in completing the IT System, when all was said and done, the Combined Entity transferred to Verizon, through its subsidiary VIT, upon information and belief, over $170 million for transition services (collectively a "Transfer" and part of the "Fraudulent Consideration").

129. The Verizon IT System on which the Spinco business ran had over 600 systems that had been developed and integrated over many decades. Before Closing, FairPoint and Capgemini had limited opportunities to go in and view Verizon's network and gain an understanding of how it functioned. Following Closing, when the Combined Entity had the Spinco business's employees who had some understanding of Verizon's IT System, the magnitude of the task ahead of the Combined Entity became clear. According to Johnson, "It was like slogging through quicksand."

130.     By June 2008, the Combined Entity had announced a two-month delay in the Cutover to the end of November 2008.   The Combined Entity's difficulties in reaching the Cutover were based, in large part, on the way the Transaction was structured.   The difficulties stemmed from, among other things, the Combined Entity being required to give a 60-day irrevocable notice of its intent to Cutover, FairPoint having no pre-Closing and insufficient post-Closing access to the system and employees who ran it, the Combined Entity not receiving key systems staff and managers, and the implications of a "dark period" due to a flash Cutover.

131.     By December 19, 2008, Verizon was anxious to drag the deal across the finish line and get it off the Verizon IT System, with Verizon's number one priority being to avoid any blame for Cutover problems.   By January 2009, Verizon's spin off of landlines in Hawaii had failed.

132.     At midnight on January 30, 2009, the Combined Entity began a Cutover from Verizon's systems to new systems and processes developed by Capgemini.   The Cutover was completed on February 9, 2009, after which  the Combined Entity operated the Spinco business using the new systems.   The Cutover did not go smoothly, leading a PUC expert to question what Verizon could have done to avert the problems.

133.     From Closing until the Cutover occurred, the Combined Entity paid VIT $15 million per month to use the Verizon IT System.   During that time, however, Verizon refused to allow the Combined Entity to implement any new marketing initiatives or repackage products in response to competition while it still was using Verizon's system.   This gave competitors, including Verizon, a huge advantage.

134.     From the day after Closing (4/1/08) to the Cutover completion date (2/9/09), the Combined Entity's common stock share price decreased another 66%.

**The Combined Entity Suspends Dividend**

135.     During 2008, FairPoint's legacy operations experienced an 8.5% decline in the number of voice landline customers, while the newly acquired Spinco business experienced a 12.3% decline during the same period.

136.     Maintaining a dividend was important to management, but as a result of earnings declines, on March 4, 2009, less than one year after the Closing, the Combined Entity's Board of Directors voted to suspend the quarterly dividend on the company's common stock.  Within two days, the Combined Entity's stock price had dropped over 97% from its share price when the Transaction was announced in January 2007.  Although the stock market underwent a significant correction during this period, Verizon's stock remained relatively stable, as did most telecoms.

137.     Verizon's track record of spectacularly failed highly-leveraged divestitures continued.  The Combined Entity failed to make its credit facility principal and interest payments due September 30, 2009.  Its failure to pay the principal amount on the due date and failure to pay the interest within five days of the due date constituted events of default under the Senior Secured Credit Facility.

138.     On October 26, 2009, just 18 months after the Transaction, the Combined Entity and its affiliates had no choice but to file Chapter 11 petitions. At the time of filing, the Combined Entity was saddled with over $2.7 billion of debt as a result of the Transaction.  The Combined Entity's failure was foreseeable – it was a direct result of problems inherent to the Transaction's structure, including Verizon's retention of the key components that could have allowed the Combined Entity to succeed.

139.     On February 8, 2010, the Debtors filed their Plan, which proposed to convert over $2.7 billion of debt into a new term loan, common stock equity of a reorganized FairPoint, and

38

interests in the Trust, and to create a litigation trust to which the Debtors' Estates would convey their claims against Verizon and its affiliates to the Litigation Trust for prosecution to the benefit of those Estates. Creation of the litigation trust and the prospect for Trust recoveries in this lawsuit was an important part of the process for all constituencies involved in the Debtors' bankruptcies to arrange an agreed upon Plan.

140.    In connection with the Plan, on September 1, 2010, the Debtors filed a *Fourth Supplement to Plan Supplement to Debtors' Plan of Reorganization* [Docket No. 1761], which included Schedule 11.1(A) (Rejected Executory Contracts) to the Plan. Through Schedule 11.1(A) of the Plan, the Debtors rejected, *inter alia*, i) the Merger Agreement (as amended), ii) the Tax Sharing Agreement, and iii) the Employee Matters Agreement.

141.    The Bankruptcy Court confirmed the Plan on January 13, 2011.

142.    On the Plan's effective date, the reorganized FairPoint executed the Trust Agreement, creating the Trust, conveying to the Trust and empowering it and its Trustee to pursue the causes of action asserted herein. The Trust and Trustee are "duly appointed representatives of FairPoint's Estates pursuant to section 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code." Section 8.17(a) of the Plan provides that on the effective date, "FairPoint or Reorganized FairPoint shall transfer the Litigation Trust Assets to the Litigation Trust." The Litigation Trust Assets include:

> [A]ll Causes of Action which may be asserted, by or on behalf of FairPoint or FairPoint's Estates against Verizon Communications Inc. and its affiliates in respect of matters arising in connection with that certain Agreement and Plan of Merger, by and between Verizon, Northern New England Spinco, Inc., and FairPoint Communications.

Section 1.2(a) of the Trust Agreement. Accordingly, Plaintiff files this suit to prosecute the causes of action of creditors under Sections 544(b), 548, and 550 of the Bankruptcy Code and the North Carolina Uniform Fraudulent Transfer Act or other applicable state fraudulent transfer or

39

conveyance law. The creditor causes of action asserted herein vested in the Debtors' Estate on the Petition Date and are now vested in Plaintiff pursuant to the confirmed Plan and the Trust Agreement.

**Present Day Verizon**

143. Verizon's strategy worked. Today, Verizon has a landline business in just eleven states and Washington, D.C. These locations represent some of the best ILEC markets in the country. All of these geographic locales have high population densities, lowering the cost to service these homes. Verizon has retained its landline business in eight of the top ten markets measured by per capita income, seven of the top ten markets measured by median household income, and, most importantly, eight of the top ten markets measured by population density.

**FairPoint's Stock**

144. Between 2005 and 2007 the U.S. stock markets rose to unprecedented levels, hitting an all time high on October 9, 2007 when the Dow Jones Industrial Average reached 14,164. In 2007, some courts of this country touted Wall Street as having "the most efficient markets in the world." But as revealed by the failures of Bear Stearns, Lehman Brothers and others, during the time period surrounding the Transaction, the markets were not efficient. In the case of the Transaction, the markets were misled. Due to unreasonable and misinformed projections, and other financial alchemy, it took the U.S. financial markets over a year to properly value the Combined Entity's stock as worthless.

145. Eighteen months later, the truth was unveiled as the Transaction bankrupted the Combined Entity, leaving shareholders holding worthless stock and lenders holding more than $1 billion in debt that could not be repaid.

146.     In stark contrast, Verizon and VIT received Transfers of almost $2 billion in cash and marketable debt instruments from the Combined Entity through the Transaction.  Verizon's SEC filings reflected this benefit as follows:

> As a result of the transaction, the intercompany indebtedness of Verizon New England Inc., an indirect wholly-owned subsidiary of Verizon, will be reduced by slightly more than $500 million, and Verizon's external indebtedness is expected to be reduced by approximately $1.4 billion.

Verizon Communications, Inc., Press Release (Form 8-K) (Mar. 31, 2008).  Verizon and VIT were also unjustly enriched in other ways such as payment for services inadequately rendered, and contractual obligations assumed by the Combined Entity or entered into for the benefit of the Verizon Group.

## V.

## CAUSES OF ACTION

147.     Under North Carolina law, the law of each state that has adopted the Uniform Fraudulent Transfer Act or the Uniform Fraudulent Conveyance Act and federal law, including 11 U.S.C. § 548,  a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation or if the debtor is unable to pay its obligations as they come due.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (i) with intent to hinder, delay, or defraud any creditor of the debtor; or (ii) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

41

148.     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in the exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

149.     In determining intent, consideration may be given, among other factors, to whether: (i) the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred; (ii) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (iii) the transfer occurred shortly before or shortly after a substantial debt was incurred; (iv) the debtor transferred the essential assets of the business to a lender who transferred the assets to an insider of the debtor; and (v) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due.

***Count 1:     Constructive Fraudulent Transfers***

150.     Plaintiff hereby re-alleges each allegation in all preceding paragraphs.

151.     With respect to each Transfer or by some or all of them collectively, at the time of such Transfers:

> a.     Spinco, FairPoint, the Combined Entity and subsidiaries were insolvent or were rendered insolvent by each Transfer or by some or all of them collectively;

b.  Spinco, FairPoint, the Combined Entity and subsidiaries intended to incur or believed or reasonably should have believed that Spinco, FairPoint, and the Combined Entity were incurring debts beyond their ability to pay as they became due; or

c.  Spinco, FairPoint, the Combined Entity and subsidiaries were engaged or were about to engage in a business or transaction for which their remaining capital and/or assets, after each Transfer, were unreasonably small in relation to the business or transaction; or

d.  in the case of the TSA, the obligations incurred thereunder, which were assumed by FairPoint and the Combined Entity or its subsidiaries at Closing, were incurred to or for the benefit of an insider, under an employment contract and not in the ordinary course of business, and the services VIT provided were worth far less than, and not reasonably equivalent to, the over $170 million the Combined Entity transferred to VIT.

152.  The value of the Spinco Assets was worth far less to Spinco, FairPoint, and the Combined Entity than the Fraudulent Consideration.  Spinco, FairPoint, the Combined Entity did not receive fair consideration, and fair or reasonably equivalent value in exchange for the Fraudulent Consideration given to or for the benefit of Verizon, NYNEX, and Verizon New England in connection with each Transfer or the Transaction.

153.  Accordingly, each Transfer by Spinco, FairPoint and the Combined Entity was constructively fraudulent and may therefore be avoided under Section 548 of the Bankruptcy Code and, pursuant to Section 544(b) of the Bankruptcy Code, under North Carolina fraudulent transfer law (or other applicable state fraudulent transfer or conveyance law) and may be

recovered by Plaintiff under Section 550 of the Bankruptcy Code or other applicable state or federal law.

***Count II:   Actual Fraudulent Transfers***

154.    Plaintiff hereby re-alleges each allegation in all preceding paragraphs.

155.    In order to induce FairPoint to sign the Merger Agreement and related documents, Verizon concealed material facts with the intent to deceive FairPoint.   FairPoint reasonably relied on the deception and was actually deceived.

156.    Upon issuance of the Spinco Notes, and the payment of the Special Payment to Verizon New England, Spinco intended to hinder, delay, or defraud then-existing or future creditors of Spinco, FairPoint, the Combined Entity, and/or its subsidiaries.   Verizon controlled Spinco's actions, and as such its intent is imputed to Spinco.

157.    At the time of Closing of the Transaction, FairPoint allowed the Transfers to occur, knowing its precarious position.   FairPoint did so with the intent to hinder, delay, or defraud then-existing or future creditors of Spinco, FairPoint, the Combined Entity, and/or its subsidiaries.

158.    Verizon had control over Spinco by virtue its ownership and control of the Spinco and Spinco's board of director and officer at the time of the Transfers and exercised control over the Combined Entity by virtue of the Tax Sharing Agreement and TSA.   The Transfers of the Fraudulent Consideration to Defendants were made with the actual intent of the Combined Entity to hinder, delay or defraud then existing or future investors by virtue of Verizon's control over it.

159.    Accordingly, each Transfer was made by Spinco, FairPoint, the Combined Entity and its subsidiaries with actual intent to hinder, delay or defraud its respective creditors and may therefore be avoided under Section 548 of the Bankruptcy Code and, pursuant to Section 544(b) of the Bankruptcy Code, under North Carolina fraudulent transfer law (or other applicable state

fraudulent transfer or conveyance law) and may be recovered by Plaintiff under Section 550 of the Bankruptcy Code or other applicable state or federal law.

## VI.

## PUNITIVE DAMAGES

160.     Plaintiff hereby re-alleges each allegation in all preceding paragraphs.  Because Defendants' conduct alleged herein was committed with malice and/or fraud, Plaintiff seeks an award of punitive or exemplary damages against Defendants to the full extent permitted by any applicable state or federal laws.

## VII.

## ATTORNEY'S FEES AND COSTS

161.     Plaintiff hereby re-alleges each allegation in all preceding paragraphs.  Plaintiff seeks recovery of all reasonable and necessary attorney's fees, costs and expenses incurred in connection with this action to the full extent permitted by any applicable state or federal laws.

## VIII.

## JURY TRIAL DEMAND

162.     Plaintiff requests that all triable issues be determined by a jury.

## IX.

## PRAYER

163.     WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court enter a judgment for Plaintiff and against Verizon, NYNEX, Verizon New England, and VIT, and award Plaintiff a monetary judgment against Verizon, NYNEX, Verizon New England, and VIT equal to the Fraudulent Consideration transferred or incurred by Spinco, FairPoint, the Combined Entity, and/or its subsidiaries to or for the benefit of Verizon, NYNEX, Verizon New England,

Case 3:11-cv-00597-MOC-DCK   Document 68   Filed 06/28/12   Page 45 of 47

and VIT in connection with the Transaction and TSA, plus pre- and post-judgment interest, costs, and attorneys fees at the maximum rates allowed by law, punitive damages and such further and other relief for which Plaintiff may be justly entitled to recover.

Respectfully submitted, this 28 day of June, 2012.

/s/  Jonathan D. Sasser
Jonathan D. Sasser
**ELLIS & WINTERS LLP**
N.C. State Bar No. 10028
PO Box 33550
Raleigh, North Carolina  27636
Telephone Number:  (919) 865-7000
Facsimile Number:  (919) 865-7010
jon.sasser@elliswinters.com

J. Wiley George (TX Bar. No. 07805445)
Robin Russell (TX Bar No. 17424001)
Charles B. Hampton (TX Bar No. 00793890)
Scott Locher (TX Bar No. 12457500)
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas  77002
Telephone Number:  (713) 220-4200
Facsimile Number:  (713) 238-7192
wileygeorge@andrewskurth.com
rrussell@andrewskurth.com
charleshampton@andrewskurth.com
scottlocher@andrewskurth.com

Paul N. Silverstein (NY Bar No. PS 5098)
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, New York 10017
Telephone Number: (212) 850-2800
Facsimile Number: (212) 850-2929
paulsilverstein@andrewskurth.com

**ATTORNEYS FOR PLAINTIFF**

46

<u>**CERTIFICATE OF SERVICE**</u>

     The undersigned hereby certifies that copies of the foregoing were electronically filed today with the United States District Court, Western District of North Carolina using the Court's CM/ECF system which caused copies to be served upon the following counsel of record.

Robert E. Harrington
Andrew W. J. Tarr
**ROBINSON BRADSHAW & HINSON, P.A.**
101 North Tyron Street, Suite 1900
Charlotte, North Carolina 28246
rharrington@rbh.com
atarr@rbh.com

Lee Ann Stevenson
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
leeann.stevenson@kirkland.com

Philip D. Anker
**WILMER CUTLER PICKERING HALE & DORR LLP**
399 Park Avenue
New York, New York 10022
philip.anker@wilmerhale.com

     This the 28 day of June, 2012.


                    By:     /s/ Jonathan D. Sasser
                              Jonathan D. Sasser