# EXHIBIT B

# TO

# PLAINTIFF'S RESPONSE

# TO DEFENDANT'S MOTION TO DISMISS

# SECOND AMENDED COMPLAINT

STATE OF VERMONT
PUBLIC SERVICE BOARD

DOCKET NUMBER 7270

JOINT PETITION OF VERIZON NEW ENGLAND INC.,
D/B/A VERIZON VERMONT, CERTAIN AFFILIATES
THEREOF, AND FAIRPOINT COMMUNICATIONS, INC.
FOR APPROVAL OF AN ASSET TRANSFER,
ACQUISITION OF CONTROL BY MERGER AND
ASSOCIATED TRANSACTIONS, INVOLVING THE
PROPOSED SALE OF VERIZON VERMONT'S LONG
DISTANCE AND LOCAL EXCHANGES SERVICES IN
VERMONT TO FAIRPOINT COMMUNICATIONS --

March 30, 2008
2 p.m.
---
112 State Street
Montpelier, Vermont

Hearing held before the Vermont Public
Service Board, at the Third Floor Hearing Room, Chittenden
Bank Building, 112 State Street, Montpelier, Vermont, on
March 30, 2008, beginning at 2 p.m.

P R E S E N T

BOARD MEMBERS:     James Volz, Chairman
                   David C. Coen
                   John D. Burke

        STAFF:     George Young
                   Jay Dudley

CAPITOL COURT REPORTERS, INC.
P.O. BOX 329
BURLINGTON, VERMONT  05402-0329
(802) 863-6067
(802) 879-4736 (Fax)
E-MAIL:  info@capitolcourtreporters.com

Capitol Court Reporters, Inc. (800/802) 863-6067

confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 2 of 24 VZ-FP-00177704

```
 1              A P P E A R A N C E S
 2

    JUNE E. TIERNEY, ESQUIRE
 3  JAMES H. PORTER, III, ESQUIRE
         Appearing for the Vt. Department of Public Service
 4       112 State Street
         Montpelier, VT  05602-2601
 5
    SHEEHEY, FURLONG & BEHM
 6       Appearing for Verizon Vermont
         30 Main Street, P.O. Box 66
 7       Burlington, VT  05402-0066
    BY: PETER H. ZAMORE, ESQUIRE
 8
    ALEXANDER W. MOORE, ESQUIRE
 9       Appearing for Verizon New England, Inc.
         185 Franklin Street, 13th Floor
10       Boston, MA  02110-1585
11  DOWNS RACHLIN MARTIN, PLLC.
         Appearing for FairPoint Communications, Inc.
12       90 Prospect Street, P.O. Box 99
         St. Johnsbury, VT  05819-0099
13  BY: NANCY S. MALMQUIST, ESQUIRE
         JOHN H. HOLLAR, ESQUIRE
14
    SCOTT J. RUBIN, ESQUIRE  (by telephone)
15       Appearing for IBEW and CWA
         333 Oak Lane
16       Bloomsburg, PA  17815
17  PAULA FOLEY, DIRECTOR REGULATORY AFFAIRS
         (by telephone)
18       One Communications
         24 Albion Road, Suite 230
19       Lincoln, RI  02865
20  Also present:
         Peter Nixon
21       David O'Brien
         Sarah Hofmann
22       Chris Campbell
         Gene Johnson (by telephone)
23
24
25
```

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 3 of 24 VZ-FP-00177705

1                              INDEX

2    Witness                                    Page
     Janet Garrity (by telephone)                12
3        Direct Examination by Mr. Moore         12
     Walter Leach (by telephone)                 31
4    John Crowley                                32
     Ron Behrns                                  67
5        Examination by Ms. Tierney              74

6    Exhibit                                 Admitted
     Board 4                                      7
7    DPS EH 1                                    76
     FairPoint 19 through 22                     80

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 4 of 24   VZFP-00177706

1    bonds.

2            CHAIRMAN VOLZ:  No.  But the interest

3    rate itself affects the price you get paid for

4    the bonds, right?

5            MR. MOORE:  No.  Verizon -- at the end

6    of the day Verizon gets 540 million dollars in

7    debt reduction of its own debt.  That's all.

8    Verizon's interest is to see that interest

9    rate as low as possible, so that you can still

10   sell these bonds.  And we can --

11           CHAIRMAN VOLZ:  Why don't you have your

12   witness explain that.  Because I really would

13   like to have it under oath.

14           MR. MOORE:  I would like to have the

15   witness sworn in.  Janet Garrity is on the

16   phone.

17           THE WITNESS:  Yes, I'm on the phone.

18           BOARD MEMBER COEN:  Will you raise your

19   right-hand.

20

21

22

23

24

25

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 5 of 24   VZ-FP-00177714

Page 12

```
 1                          JANET GARRITY
 2       having been first duly sworn, was examined and
 3   testified as follows:
 4                     CHAIRMAN VOLZ:   Thank you.
 5   DIRECT EXAMINATION BY MR. MOORE:
 6       Q.    Ms. Garrity, this is Alex Moore.  Hi, how are
 7   you?
 8       A.    Okay, Alex.
 9       Q.    Just for the record, please state your name.
10       A.    Janet M. Garrity.
11       Q.    Ms. Garrity, what is your position at Verizon?
12       A.    I'm Vice President, Financing and Cash
13   Management, and I'm an Assistant Treasurer of Verizon
14   Communications.
15       Q.    Can you briefly explain what your
16   responsibilities are in that position?
17       A.    I'm responsible for executing all financing
18   for Verizon Communications and its subsidiaries.  And I
19   provide a centralized treasury organization to conduct all
20   of our banking and cash management activities for Verizon
21   and all of its subsidiaries.
22       Q.    Have you been involved in the financing with
23   respect to the FairPoint transaction?
24       A.    Yes, we assisted -- I assisted FairPoint in
25   securing this financing in connection with the spin and
```

CAPITOL COURT REPORTERS, INC.
(802/800) 863-6067

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 6 of 24   VZFP-00177715

1  the merger.

2       Q.   Okay.  You're aware then this issue we are

3  talking about that is part of the purchase price that

4  FairPoint pays to Verizon at the closing comes in the form

5  of spinco bonds, right?

6       A.   That's right.

7       Q.   Can you explain what happens to those bonds

8  upon their issuance?

9       A.   Yeah.  Well Verizon New England is going to

10  contribute assets to spinco.  In an exchange for that

11  spinco is going to issue the spinco notes, the securities,

12  with a value of just under 540 million to Verizon New

13  England.  The notes have been sold by underwriters, and

14  they are currently priced to yield 13 and-a-half percent.

15            When those distributions from spinco happens,

16  Verizon New England will be the holder of the bonds, and

17  then there is intercompany transactions which will

18  transfer the spinco notes up to Verizon Communications.

19       Q.   Okay.  That's the parent company.  What

20  happens then?

21       A.   Well late last week Verizon Communications

22  entered into an exchange agreement with the group of

23  underwriters who have been out selling these bonds on

24  FairPoint and Verizon's behalf to the bondholders.  And we

25  entered into an exchange agreement with these under-

Confidential Case 3:11-cv-00597-FDW-DCK Document 79-2 Filed 08/02/12 Page 7 of 24 VZ-FP-00177716

Page 14

1    writers who were currently holding about 543 million

2    dollars of Verizon short-term obligations known as

3    commercial paper. And these underwriters and Verizon had

4    agreed to exchange approximately 527 million dollars of

5    the Verizon commercial paper for the spinco notes that

6    Verizon will be holding at the time.

7              This exchange is going to take place

8    immediately following the merger of spinco and FairPoint.

9    So all of this happens at the closing.

10   Q.    Okay. And what's the reason for the

11   difference between the 527 that they -- in commercial

12   paper that the underwriters hand over to Verizon, and the

13   540 million in spinco notes?

14   A.    Sure. The 540 million dollars is the value of

15   the notes to the holder. And the 527 million is the value

16   that Verizon is going to receive because we are paying the

17   underwriters 13 million dollars to spend the last several

18   weeks selling and distributing these spinco notes to the

19   ultimate bondholders.

20   Q.    Okay. So after the -- once the underwriters

21   have the spinco notes, what do they do with them?

22   A.    The underwriters are going to give them to

23   individual investors, and the underwriters are going to

24   receive the cash for the bonds.

25   Q.    Okay. So the underwriters have presold the

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 8 of 24   YZFP-00177717

Page 15

1    spinco notes to investors?

2        A.    That's right.  They have been out for the past
3    several weeks, along with FairPoint senior management,
4    describing the securities, describing the company, selling
5    the notes.

6        Q.    Okay.  So that transfer takes place at the
7    closing as well; is that correct?

8        A.    That is correct.

9        Q.    So let's stop.  At the end of the closing,
10   tomorrow, let's just go through the different parties, and
11   maybe you can tell me where they end up.  So at the end of
12   the closing tomorrow, where does Verizon end up with
13   respect to this part of the transaction?

14       A.    Okay.  Verizon is not going to hold the spinco
15   notes any more.  And Verizon is going to get to retire
16   approximately 520 million dollars of its current
17   outstanding debt.

18       Q.    Okay.

19       A.    And the underwriters, they are going to
20   distribute the bonds to the bondholders, and they are
21   going to receive 13 million dollars in fees for that.

22       Q.    Okay.  And where do the bondholders end up?

23       A.    The bondholders end up having an obligation of
24   FairPoint, and they are going to get paid the semiannual
25   interest payments, and then they will get the principal

CAPITOL COURT REPORTERS, INC.
(802/800) 863-6067

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 9 of 24   VZ-FP-00177718

Page 16

1   back at the end of the maturity of the notes.

2        Q.   Okay.  So of these parties, who benefits from
3   the -- having a higher interest rate?

4        A.   Well that would be the investors.  The
5   bondholders.

6        Q.   Okay.  Who benefits from having a low interest
7   rate?

8        A.   Well the FairPoint shareholders would benefit
9   from a low interest rate.

10       Q.   And does Verizon receive interest on the
11  bonds?

12       A.   Verizon won't receive any interest on the
13  bonds because Verizon is exchanging these bonds for
14  Verizon's debt outstanding immediately at the closing.

15                 CHAIRMAN VOLZ:  I had a question.  What
16            if -- if the interest rate were lower, would
17            Verizon get a different amount than it's
18            getting when they sell the bonds, and what
19            would that be?

20                 THE WITNESS:  The interest rate has
21            already been set by the folks who are
22            interested in purchasing the bonds.  The
23            bondholders, so I'm not quite sure I
24            understand the question.

25                 CHAIRMAN VOLZ:  Well if it had been set

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 10 of 24   VZ-FP-00177719

```
 1            at a different amount, at a lower or higher
 2            amount, what would be the effect on the net
 3            proceeds to Verizon?
 4                 THE WITNESS:  Well Verizon was
 5            interested in selling 540 million dollars
 6            worth of bonds.  If the interest rate were
 7            lower, we wouldn't have been able to sell 540
 8            million dollars worth of bonds.
 9                 CHAIRMAN VOLZ:  All right.
10                 MR. MOORE:  Maybe I can unpack that a
11            little bit.  I think it's a little bit --
12                 CHAIRMAN VOLZ:  Well I would really like
13            to get this from the witnesses under oath.  So
14            in other words, what you're saying is the
15            interest rate has to be high enough in order
16            to sell the amount you want to sell.
17                 THE WITNESS:  That's correct.
18                 CHAIRMAN VOLZ:  And if it's not high
19            enough, then you just don't have a
20            transaction.
21                 THE WITNESS:  That's correct.
22                 CHAIRMAN VOLZ:  And for the amount.  So
23            at one point you testified that Verizon was
24            going to get 527, and then a minute later you
25            said 520.  What's the difference between those
```

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 11 of 24   VZ-FP-00177720

Page 18

1              two numbers?

2                        THE WITNESS:  I think I either said 540

3              or 527.  540 is the proceeds from the bond

4              issuance, and 527 million dollars is the value

5              of the commercial paper that Verizon will

6              receive in exchange.

7                        CHAIRMAN VOLZ:  Okay.  And then --

8                        THE WITNESS:  The difference between the

9              two is the 13 million that the underwriters

10             see.

11                       CHAIRMAN VOLZ:  I thought you also

12             mentioned 520 at one point.

13                       THE WITNESS:  I don't think so.

14                       CHAIRMAN VOLZ:  All right.  I guess

15             maybe I misheard.

16                       BOARD MEMBER COEN:  Let me ask a

17             question.  Okay.  Has Verizon at all

18             considered holding on to the paper themselves,

19             at the interest rate that has been discussed

20             in this case previously and agreed to, and

21             therefore -- and also save the fee of 13

22             million dollars to the bond sellers?

23                       THE WITNESS:  No.

24                       BOARD MEMBER COEN:  This has never been

25             under consideration?

CAPITOL COURT REPORTERS, INC.
(802/800) 863-6067

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 12 of 24  VZFP-00177721

Page 19

1          THE WITNESS:  Never.

2          BOARD MEMBER COEN:  Okay.  Had the

3      interest rate that had been agreed to and

4      discussed in this case been under

5      consideration?

6          MR. MOORE:  Mr. Coen, could I just ask

7      to clarify what you mean by the interest rate

8      that's been discussed?

9          BOARD MEMBER COEN:  No.  We have in our

10      filings an interest rate of around 8

11      and-a-half or 9 percent.

12          CHAIRMAN VOLZ:  That's been assumed in

13      all --

14          BOARD MEMBER COEN:  That's been assumed,

15      and that's why we are here.  So I was

16      wondering if that was even discussed by

17      Verizon as being an appropriate interest rate.

18      And I remind you, you're under oath.

19          THE WITNESS:  Is there a question for

20      me?

21          BOARD MEMBER COEN:  It certainly is.

22          THE WITNESS:  Verizon has been

23      interested in selling the bonds to

24      underwriters or having underwriters sell the

25      bonds to third parties because Verizon has

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 13 of 24  VZ-FP-00177722

Page 20

```
 1          always been interested in exchanging these
 2          bonds for Verizon commercial paper.  That
 3          enables us to have a tax free transaction with
 4          FairPoint.  So that is the only thing that we
 5          have had any interest in.
 6                   MR. MOORE:  I have more questions for
 7          her.  I'm happy to let you -- just so you
 8          know, I have more.
 9                   CHAIRMAN VOLZ:  Okay.
10                   MR. DUDLEY:  Ms. Garrity, my name is Jay
11          Dudley.  I'm an analyst for the Board.
12                   THE WITNESS:  Yes.
13                   MR. DUDLEY:  What the Board is trying to
14          get their arms around is what is driving the
15          rather significant disparity between the 8
16          and-a-half percent interest rate that we were
17          made aware of in Mr. Leach's testimony from
18          January, and now the 13, and what you were
19          saying is -- is it 13 and-a-half or 13 and an
20          eighth?  Can we clarify that.
21                   THE WITNESS:  Sure.  The coupon on the
22          bond is 13 and an eighth.  And it was priced
23          to yield 13 and-a-half percent.
24                   MR. DUDLEY:  Okay.  And is this
25          considered subordinated debt?  Is this
```

Confidential Case 3:11-cv-00597-FDW-DCK Document 79-2 Filed 08/02/12 Page 14 of 24 VZ-FP-00177723

Page 21

1         subordinated debt in light of the overall

2         transaction?

3               THE WITNESS:  This is subordinate to the

4         debt in the credit facility because that is

5         secured debt.

6               MR. DUDLEY:  Okay.  And this is

7         unsecured; correct?

8               THE WITNESS:  This is unsecured so it is

9         effectively subordinated.  Yes.

10              MR. DUDLEY:  So beyond that what is

11        driving the interest rate of 13 and-a-half

12        percent?

13              THE WITNESS:  There has been significant

14        changes in the credit market over the past

15        year.  I'm not quite sure at what time the

16        interest rate was originally given to you, but

17        interest rates have changed significantly over

18        the course of the year, and investors'

19        appetite for high yield securities is

20        significantly changed from what it had been

21        previously.

22              MR. DUDLEY:  So the investors here, if I

23        understand you correctly, are earning a

24        significant risk premium with the current

25        bonds; is that correct?

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 15 of 24   YZ-FP-00177724

Page 22

1          THE WITNESS:  Yes.  High yield bonds

2     today are yielding significantly more than

3     they were a year ago.

4          MR. DUDLEY:  And is there a rating on

5     this debt currently?

6          THE WITNESS:  Yes.  It's in the single B

7     range.

8          MR. DUDLEY:  So it's borderline junk.

9          THE WITNESS:  These are not investment

10     grade bonds.

11          MR. DUDLEY:  Okay.  And just to clarify,

12     Verizon is not receiving any type of premium

13     for this issuance; correct?

14          THE WITNESS:  Verizon is not receiving

15     any premium for this issuance.

16          MR. DUDLEY:  Okay.

17          CHAIRMAN VOLZ:  Do you know what the

18     interest rates that might have been available

19     for this type of issuance or this type of

20     transaction were in the January time frame?

21          BOARD MEMBER COEN:  Of this year?

22          THE WITNESS:  January of this year.

23          CHAIRMAN VOLZ:  Yes.

24          THE WITNESS:  We didn't sell -- we

25     didn't go out to sell the securities in

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 16 of 24  VZ-FP-00177725

```
 1          January of this year.  There has been very
 2          little high yield issuance this year at all.
 3          It may have been the fourth or fifth
 4          transaction of its type done this year in, you
 5          know, a size of 500 million.  It's been a
 6          difficult time for the high yield credit
 7          markets.
 8               CHAIRMAN VOLZ:  What were the other
 9          interest rates of the other three or four that
10          preceded this?
11               THE WITNESS:  I know that Charter
12          Communications, I think their rate was around
13          12 and-a-half percent.
14               BOARD MEMBER COEN:  You're aware that
15          this was represented to us on the 28th and
16          29th of January at 8 and-a-half percent.
17               THE WITNESS:  I don't know.
18               BOARD MEMBER BURKE:  Ms. Garrity, this
19          is John Burke.  I'm to this point in time a
20          silent member of the Board.  But I would be
21          interested in knowing in particular to -- from
22          Verizon's point of view, I'll ask FairPoint
23          this, but you really had little or no concern
24          about what the interest rate that these bonds
25          carried was, did you?  You didn't really care
```

Page 24

1          what they were, did you?

2                  THE WITNESS:  I would say that that is

3          not true.  I would say that everybody who was

4          involved in the distribution of these bonds

5          was interested in the same thing which was

6          selling all the bonds at the lowest possible

7          interest rate.

8                  BOARD MEMBER BURKE:  Well you've got to

9          explain to me why then the lowest possible

10         interest rate really mattered much to you.

11                 THE WITNESS:  Because Verizon's

12         shareholders will be owning 60 percent of

13         FairPoint.

14                 BOARD MEMBER BURKE:  And so you were

15         concerned then because the cash flow to --

16         that FairPoint would be generating could be

17         significantly affected by the amount of

18         interest they were paying on this particular

19         portion of their debt, is that true?

20                 THE WITNESS:  I didn't hear the middle

21         of the question.  Could you say that again?

22                 BOARD MEMBER BURKE:  Sure.  You were

23         concerned because FairPoint's cash flow and

24         your stockholders are going to own significant

25         parts of FairPoint's stock, the cash flow that

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 18 of 24   VZFP-00177727

```
1         would be available to FairPoint's going to be
2         significantly affected by the amount of
3         interest and the amount of interest that
4         FairPoint pays as a result of this portion of
5         the indebtedness, is that true?
6                   THE WITNESS:  Well I would say that we
7         wouldn't think that it was significantly
8         higher, that FairPoint has a lower interest
9         rate and hedged their interest on their other
10        debt, and the amount of debt that FairPoint is
11        assuming in this transaction has decreased
12        significantly with the additional cash
13        contributions that Verizon is making.
14                  BOARD MEMBER BURKE:  The -- it's
15        interesting that you would link those two.
16                  THE WITNESS:  I think they are just
17        factual.
18                  BOARD MEMBER BURKE:  Okay for now.
19                  CHAIRMAN VOLZ:  You had more questions
20        for your witness?
21                  MR. MOORE:  Let me think -- check to see
22        if you covered them all.
23                  CHAIRMAN VOLZ:  All right.
24                  MR. MOORE:  I think that's all I have.
25        Let me just clarify one thing, I think, that
```

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 19 of 24   P-00177728

Page 26

1          the Chairman asked.  The Chairman or one of
2          the Board members asked you a few minutes ago,
3          whether Verizon -- maybe it was Mr. Coen --
4          had considered holding on to the bonds.  Let
5          me ask you a slightly different question.
6                   At the closing, is Verizon free to
7          change its mind and to say, gee, now that I
8          see it's 13 percent, these look pretty good to
9          us and we are going to hold on to them?
10                  THE WITNESS:  No.  There is a number of
11         reasons why we don't want to hold on to those
12         notes.  First of all, we have already entered
13         into an exchange agreement with the
14         underwriters, and so we have done that
15         already, we have entered into an agreement
16         with the underwriters to sell these bonds to
17         investors.  So these investors expect to
18         receive these bonds on Monday.  We expect to
19         exchange them with our commercial paper on
20         Monday.
21                  And third, I understand from our tax
22         attorneys that holding the spinco notes could
23         jeopardize the tax free treatment of the
24         entire transaction.  So it has never been in
25         our interest to do anything but what we have

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 20 of 24 P-00177729

Page 27

1     said all along that we are going to do.

2              MR. MOORE:  Thank you.  I have no

3     further questions.

4              MR. DUDLEY:  Ms. Garrity, are the bonds

5     convertible at any point?  Convertible to

6     stock?

7              THE WITNESS:  These bonds are not.

8              MR. DUDLEY:  Okay.  Thank you.

9              BOARD MEMBER COEN:  Just a clarifying

10    question.  There are no fees or any other kind

11    of payment being -- that would come to Verizon

12    in the sale of these bonds; is that correct?

13             THE WITNESS:  There are no fees coming

14    to Verizon.

15             BOARD MEMBER COEN:  Thank you.

16             CHAIRMAN VOLZ:  So the net effect if I

17    understood your testimony earlier of what

18    Verizon will eventually receive is 527

19    million.

20             THE WITNESS:  That is correct.

21             CHAIRMAN VOLZ:  Okay.

22             BOARD MEMBER BURKE:  And just to be

23    absolutely clear, the other 13 million not

24    realized is being paid to underwriters, and

25    those underwriters are not either directly or

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 21 of 24   VZ-FP-00177730

Page 28

1          to any significant degree affiliated with
2          Verizon or any other of its affiliates, is
3          that true?
4                    THE WITNESS:  That is correct.  The
5          underwriters are holding Verizon commercial
6          paper, and in exchange for receiving these
7          spinco notes, we are going to get 527 million
8          dollars of our commercial paper back.  The
9          underwriters have agreed with investors to
10         sell these bonds for approximately 540 million
11         dollars.
12                   BOARD MEMBER BURKE:  Ms. Garrity, do you
13         have any general sense on an average maybe, I
14         know there will be obviously different rates,
15         do you have any sense on an average of what
16         the percentage of interest is running with
17         that overall Verizon 527 million dollar debt
18         that's going to be retired?
19                   THE WITNESS:  The debt that's going to
20         be retired is all commercial paper that was
21         issued in early March and expires in a couple
22         of weeks.  And it had an interest rate of 3
23         percent which is, you know, a very short term
24         interest rate.  Not something that you could
25         compare with long-term high yield debt of

CAPITOL COURT REPORTERS, INC.
(802/800) 863-6067

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 22 of 24 YZ2P-00177731

```
1              FairPoint.  This debt was -- would only be
2         outstanding for 29 days.
3                   CHAIRMAN VOLZ:  Does the Department have
4         any questions for this witness?
5                   MS. TIERNEY:  The Department has no
6         questions.
7                   CHAIRMAN VOLZ:  FairPoint, do you have
8         any questions?
9                   MS. MALMQUIST:  FairPoint has no
10        questions.
11                  CHAIRMAN VOLZ:  Okay.  Great.  I guess
12        we are done with Ms. Garrity then.
13                  MR. MOORE:  Would you like me to keep
14        her on the line?
15                  CHAIRMAN VOLZ:  Sure.
16                  MR. MOORE:  Okay.
17                  CHAIRMAN VOLZ:  Thank you, Ms. Garrity.
18                  THE WITNESS:  You're welcome.
19                  CHAIRMAN VOLZ:  Who would you like to
20        have testify next, Ms. Malmquist?
21                  MS. MALMQUIST:  Mr. Volz, I would like
22        to have Mr. Leach speak briefly, and then have
23        Mr. Crowley answer the questions that the
24        Board has raised if that works.  So I would
25        imagine you will need to swear them both in.
```

Confidential Case 3:11-cv-00597-FDW-DCK   Document 79-2   Filed 08/02/12   Page 23 of 24 FP-00177732

Docket Number 7270 - March 30, 2008

Page 30

1          CHAIRMAN VOLZ:  Okay Mr. Leach.

2          BOARD MEMBER COEN:  Mr. Leach, are you

3     on the phone?

4          THE WITNESS:  Yes, I am.

5          BOARD MEMBER COEN:  I remind you you're

6     still under oath.

7          THE WITNESS:  Yes, sir.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential Case 3:11-cv-00597-FDW-DCK  Document 79-2  Filed 08/02/12  Page 24 of 24  YZP-00177733