# EXHIBIT A

2012 WL 3100778
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

U.S. BANK NATIONAL ASSOCIATION,
Litigation Trustee of the Idearc
Inc. et al. Litigation Trust, Plaintiff,
v.
VERIZON COMMUNICATIONS
INC., et al., Defendants.

Civil Action No. 3:10–CV–
1842–G. | July 31, 2012.

**Opinion**

### *MEMORANDUM OPINION AND ORDER*

A. JOE FISH, Senior District Judge.

 **\*1** Before the court is the defendants' partial motion to dismiss (docket entry 178) and supplement to their partial motion to dismiss (docket entry 238). For the reasons set forth below, the defendants' motion is granted in part and denied in part.

### I. *BACKGROUND*

#### A. *Factual Background*

This case deals with claims arising out of a large spin-off transaction. The plaintiff is U.S. Bank National Association ("U.S.Bank"), acting as litigation trustee of the Idearc Inc. *et al.* Litigation Trust. Plaintiff's Amended Complaint and Jury Demand (Filed Under Seal) ("Complaint") at 1 (docket entry 216). The defendants are Verizon Communications Inc. ("Verizon"), GTE Corporation ("GTE"), John W. Diercksen ("Diercksen"), and Verizon Financial Services, LLC ("VFS") (collectively, the "defendants"). *Id.* 1111 10–13.

On November 17, 2006, Verizon spun off its print and on-line directories business into an independent stand-alone company: Idearc, Inc. ("Idearc"). *Id.* ¶ 2. In the spin-off, Verizon transferred to Idearc all of its Idearc Information Services, LLC ("IIS") business and its other assets associated with the directories business. *Id.* ¶ 20. In return, Idearc

(1) assumed contractual obligations; (2) issued to Verizon 145,851,861 shares of common stock; (3) issued to Verizon two unsecured notes totaling $2.850 billion (the "unsecured notes"); (4) transferred $2,441,532,374.71 in cash (the "cash") to Verizon's wholly-owned subsidiary, VFS; and (5) became indebted to Verizon for $4.3 billion pursuant to a credit agreement dated November 17, 2006 (the "Verizon Tranche B"). *Id.* ¶¶ 18–19. After the spin-off, Verizon exchanged with its debt holders the unsecured notes and the Verizon Tranche B for outstanding Verizon debt. *Id.* ¶ 18. This reduced Verizon's outstanding indebtedness by approximately $7 .1 billion. *Id.* In addition, approximately $1.9 billion of the cash transferred from Idearc to VFS came from a credit agreement from JP Morgan Chase Bank, N.A. and other lenders. *Id.* ¶¶ 17–18; Defendants Verizon Communications Inc., Verizon Financial Services LLC, GTE Corporation, and John W. Diercksen's Supplemental Partial Motion to Dismiss and Brief in Support ("Supplement to Motion") at 3–4 (docket entry 238).

U.S. Bank alleges that the entire spin-off transaction was a "scheme" devised by Verizon to "obtain approximately $9.5 billion-not in the marketplace, but through the use of lawyers and Wall Street investment bankers." Complaint ¶ 1. According to U.S. Bank, Verizon had been experiencing a steady decline in its yellow pages telephone directory business, with revenues decreasing by $169 million between 2005 and 2006 alone. *Id.* Faced with the challenges of the "public's declining use of paper telephone directories and increased use of alternative information sources, such as the internet," *id.,* Verizon embarked on a complicated spin-off transaction to "reap [a] windfall to the injury of Idearc and Idearc's creditors by stripping Idearc of cash and burdening Idearc with massive debt." *Id.* ¶ 2.

 **\*2** According to U.S. Bank, Verizon could only complete its scheme by securing the approval of Idearc's board of directors, which it did by enlisting Diercksen—Verizon's Executive Vice President for Strategic Planning—to serve as "the sole member of Idearc's board." *Id.* ¶ 3. Diercksen approved the spin-off transaction, and he signed "all of the key contracts Verizon entered into with Idearc" to complete the deal. *Id.* Diercksen, however, resigned from his position on Idearc's board one day before the spin-off transaction, and retained his executive position with Verizon thereafter. *Id.* ¶ 21.

U.S. Bank points to Idearc's balance sheet as of December 31, 2006 as evidence that the spin-off transaction "rendered Idearc insolvent and left it with unreasonably small assets

to support its ongoing business." *Id.* ¶¶ 22, 23. That balance sheet indicated that Idearc had approximately $1.3 billion in assets, compared to about $10.1 billion in liabilities. *Id.* ¶ 22. U.S. Bank alleges that the assets Verizon transferred to Idearc were worth billions less than "the Fraudulent Consideration" that Idearc and its subsidiaries conveyed to Verizon. *Id.* ¶ 23.

On March 31, 2009, some 28 months after the spin-off transaction, Idearc petitioned for relief under Chapter 11 of the United States Bankruptcy Code. *Id.* ¶ 25. During the bankruptcy proceedings, Idearc admitted that "when [the spin-off transaction] occurred two and a half years ago it was saddled with too much debt," *id.* ¶ 26, a stark contrast with Verizon's report to the Securities and Exchange Commission that the spin-off transaction "resulted in an increase of nearly $9 billion in [Verizon] shareowners' equity, as well as a reduction of total debt by more than $ 7 billion and we received approximately $2 billion in cash." *Id.* ¶ 27. Idearc filed an amended reorganization plan in the bankruptcy court, which was confirmed on December 22, 2009. *Id.* ¶ 28. "The Plan relieved Idearc of approximately $6 billion of debt and valued the reorganized Idearc at approximately $4 billion." *Id.* The plan also created a plaintiff trust and assigned to it certain causes of action, including Idearc's claims against Verizon and former officers and directors of Verizon and Idearc. *Id.* ¶¶ 4, 29. The beneficiaries of the trust are principally bondholders of, and lenders to, Idearc and its subsidiaries, with claims totaling approximately $6 billion. *Id.* ¶ 4.

### B. *Procedural Background*

On September 15, 2010, U.S. Bank, as trustee of the trust created by Idearc's reorganization plan, filed this suit to prosecute the rights assigned to it under the plan. U.S. Bank asserts causes of action against the defendants for fraudulent transfer, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, unlawful dividend, promoter liability, unjust enrichment, and alter ego. *Id.* ¶¶ 32–133.

On December 28, 2011, the defendants filed a motion to dismiss some of these claims under Federal Rule of Civil Procedure 12(b)(6). Defendants Verizon Communications Inc., Verizon Financial Services LLC, GTE Corporation, and John W. Diercksen's Partial Motion to Dismiss Amended Complaint and Brief in Support ("Motion") at 1 (docket entry 178). On February 27, 2012, the defendants filed a supplement to the motion to dismiss. Supplement to Motion at 1.

**\*3** "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' " *In re Katrina Canal Breaches Litigation,* 495 F.3d 191, 205 (5th Cir.2007) (quoting *Bell Atlantic Corporation v. Twombly,* 550 U.S. 544, 570 (2007)), *cert. denied,* 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (citations, quotations marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Katrina Canal,* 495 F.3d at 205 (quoting *Twombly,* 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). *See Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50 (2009). The court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id.* The plausibility principle does not convert the Rule 8(a) (2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id.* at 1949. The plaintiff must "plead [ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[W]here the well—pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 1950 (*quoting* FED. R. CIV. P. 8(a)(2)). The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" its claims against the defendants "across the line from conceivable to plausible." *See id.* at 1950, 1952.

## II. *ANALYSIS*

In this motion, the defendants seek to dismiss some of the plaintiff's fraudulent conveyance claims, as well as the plaintiff's promoter liability, unjust enrichment, and alter ego claims.

### A. *Fraudulent Transfer (Claims 1 and 2 )*

**\*4** The defendants have moved to dismiss the plaintiff's fraudulent transfer claims against Verizon and VFS, which are brought under Texas Business and Commerce Code §§ 24.005, 24.006, and 24.008, and 11 U.S.C. §§ 544(b) and 550. In its complaint, the plaintiff alleges that Idearc's "fraudulent consideration" to Verizon and VFS consisted of five parts: (1) Idearc's assumption of contractual obligations; (2) the issuance to Verizon of 145,851,861 shares of Idearc common stock; (3) the issuance of two unsecured notes to Verizon in the amount of $2.850 billion; (4) $2,441,532,374.71 in cash; (5) the Verizon Tranche B, in which Idearc became indebted to Verizon for $4.3 billion. Complaint ¶¶ 18–19. Because the defendants challenge each of the five parts of the alleged fraudulent conveyance, the court will consider each in turn.

### 1. *Unsecured Notes and Verizon Tranche B*

In exchange for the print and online directory business, Idearc issued two types of debt to Verizon. Complaint ¶ 18. First, Idearc issued to Verizon two unsecured notes totaling $2.850 billion. *Id.* Second, Idearc became indebted to Verizon for $4.3 billion pursuant to a credit agreement, known as the Verizon Tranche B. *Id .* After the spin-off, Verizon exchanged with its debt holders the unsecured notes and the Verizon Tranche B for outstanding Verizon debt. *Id.* This transaction reduced Verizon's outstanding indebtedness by approximately $7.1 billion. *Id.* In its complaint, U.S. Bank argues that this $7.1 billion in debt was a fraudulent transfer from Idearc to Verizon and VFS. *Id.* ¶¶ 32–43.

Under 11 U.S.C. § 544(b), a bankruptcy trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law[.]" In this case, the applicable law is Texas Business and Commerce Code §§ 24.005 and 24.006. Complaint ¶¶ 32–43.

As these statutes make clear, because both "[a] transfer made or an obligation incurred" can be fraudulent as to a particular

creditor, both can be avoided. TEX. BUS. AND COM.CODE §§ 24.005, 24.006. Moreover, under 11 U.S.C. § 550(a)(1), if a transfer is avoided under Section 544, a bankruptcy trustee "may recover, for the benefit of the estate, the property transferred, or ... the value of such property." This recovery can be had from "the initial transferee of such transfer."

Section 550 appears to make a distinction between a transfer of property and the incurrence of an obligation. While a debtor can recover under Section 550 for a transfer of property, it cannot recover under Section 550 for an obligation incurred. *See In re Asia Global Crossing, Ltd.,* 333 B.R. 199, 202 (Bankr.S.D.N.Y.2005) ("If the trustee avoids a 'transfer,' he can recover the property transferred or the value of the property under § 550. If, on the other hand, he avoids an obligation, the obligation is rendered unenforceable, there is nothing to return and § 550 affords no remedy."); see also *In re MacMenamin's Grill Ltd.,* 450 B.R. 414, 429 (Bankr.S.D.N.Y.2011) ("There clearly is a difference between making a transfer and incurring an obligation; otherwise, the relevant statutory provisions would not have used both terms.").

**\*5** As a result, the court must distinguish between a transfer of property and the incurrence of an obligation. The Bankruptcy Code defines "transfer" very broadly. *See* 11 U.S.C. § 101(54) ("The term 'transfer' means the creation of a lien; the retention of title as a security interest; the foreclosure of a debtor's equity of redemption; or each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property.") (internal punctuation and lettering omitted).

While the Code does not define the term "obligation," one court has understood it to mean "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract." *In re Asia Global Crossing, Ltd.,* 333 B.R. at 203 (*quoting* BLACK'S LAW DICTIONARY (8th ed.2004)). When a debtor issues a note or makes a guarantee, it incurs an obligation; it does not transfer any property. *In re MacMenamin's Grill Limited,* 450 B.R. at 429 (concluding that the debtor's incurrence of a loan obligation was not a transfer of property); see also *Covey v. Commercial National Bank of Peoria,* 960 F.2d 657, 661 (7th Cir.1992) ("Although a note or guarantee is not a 'transfer' for purposes of 11 U.S.C. § 101(54) ... both [a] note and guarantee are obligations."); *In re Foxmeyer Corporation,* 290 B.R. 229, 234 (Bankr.D.Del.2003) ("[A] guarantee obligation ..., even if the same is avoidable as a fraudulent conveyance, cannot

result in any recovery to the Trustee under § 550(a)(1) given that only transfers of property are remediable under § 550(a)(1)."); *Don E. Williams Company v. Commissioner of Internal Revenue,* 429 U.S. 569, 582–83 (1977) ("[A] promissory note, even when payable on demand and fully secured, is still, as its name implies, only a promise to pay, and does not represent the paying out or reduction of assets.").

In their motion to dismiss, the defendants argue that the unsecured notes and Verizon Tranche B issued by Idearc as a part of the spin-off are "obligations" under the Bankruptcy Code. Motion at 8–11. As a result, while such obligations may be avoided under Section 544, they were not transfers of property and therefore cannot support any recovery under Section 550. The plaintiff makes a number of arguments as to why this court should allow it to recover under Section 550. However, because the court is not persuaded by any of these arguments, the plaintiff's fraudulent transfer claims for the $7.1 billion in debt are dismissed.

The plaintiff attempts to distinguish the cases cited above by positing that "[n]one of the cases cited by Defendants in support of their position that delivery of the Unsecured Notes and Tranche B to Verizon does not constitute a transfer deal with a set of circumstances where a debtor gave a note or other form of debt to a transferee who then sold the note to an innocent third party." Plaintiff's Brief in Support of Response to Defendants Verizon Communications Inc., Verizon Financial Services LLC, GTE Corporation, and John W. Diercksen's Partial Motion to Dismiss Amended Complaint ("Plaintiff's Brief") at 8 (docket entry 194). The plaintiff appears to be arguing that because the debt can be transferred as easily as property, the debt effectively becomes property when it is transferred to a third party. The plaintiff has not provided any citations in support of this argument, and the court does not find it persuasive.

**\*6** The plaintiff also argues that "[w]hen a company sells its stock, bonds, or notes (securities), property of the company is transferred to the buyer." Plaintiff's Brief at 7. At least two courts have held that a company transfers property to another when it sells its own stock. *See Global Crossing Estate Representative v. Winnick,* No. 04Civ. 2558(GEL), 2006 WL 2212776, at \*8 (S.D.N.Y. Aug. 3, 2006); see also *In re Pitt Penn Holding Company, Inc.,* No. 11–51879, 2011 WL 4352373, at \*5–6 (Bankr.D.Del. Sept. 16, 2011) (citing *Global Crossing* with approval). These cases, however, do not deal with bonds, notes, or other debt instruments issued by a company and thus do not apply to the unsecured notes or Verizon Tranche B issued by Idearc. Moreover, some courts

have held that a company does not transfer property when it sells its own stock. *See Decker v. Advantage Fund Ltd.,* 362 F.3d 593, 596 (9th Cir.2004); *In re Curry and Sorensen, Inc.,* 57 B.R. 824, 829 (B.A.P. 9th Cir.1986).

Further, the plaintiff suggests that because "the issuance of the Tranche B, a secured debt, created liens on the assets of Idearc pursuant to the Credit Agreement that governed the Tranche B, a transfer clearly took place." Plaintiff's Brief at 7. Section 101(54) defines transfer as one of four actions. It is true that Section 101(54)(A) states that word "transfer" means "the creation of a lien." However, while the creation of a lien may constitute a transfer, Section 101(54)(D) suggests that the creation of a lien does not constitute a transfer of property or an interest of property. *See* 11 U.S.C. § 101(54)(D)(i)-(ii) ("The term 'transfer' means each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with ... property; or an interest in property.") (internal lettering omitted). Because Section 550 only deals with recovery of avoided transfers *of property,* this argument fails.

Moreover, even if the court were to view the lien created by the Verizon Tranche B as a transfer of an interest of the debtor in property, it is hard to see how there could be recovery under Section 550(a). This is true because a plaintiff is entitled to recover under Section 550(a) "to the extent that a transfer is *avoided* under section 544[.]" (emphasis added). If Idearc avoided the obligation owed through the Verizon Tranche B, then the lien on Idearc's assets would effectively disappear as well. Thus, there is no need for any recovery under Section 550 for this alleged transfer of property.

The plaintiff cites two cases where the court appeared to construe the issuance of debt instruments as transfers of property. Plaintiff's Brief at 7–8 (citing *Weaver v. Kellogg,* 216 B.R. 563, 571 (S.D.Tex.1997); *In re Verestar, Inc.,* 343 B.R. 444 (Bankr.S.D.N.Y.2006)). In *Weaver,* the defendants had executed a series of promissory notes to the debtor, which replaced other notes that the defendants had executed years before. *Id.* at 569–70. These replacement notes "extinguished or conveyed valuable legal rights [the debtor] held against Defendants." *Id.* at 573. The court held that "the execution of the new notes constituted transfers because they conveyed property to Defendants and altered [the debtor's] rights against Defendants." *Id. Weaver* is easily distinguishable from this case. While Idearc (the debtor) issued the notes to Verizon (the defendants) in the matter currently before the court, in *Weaver* the defendants issued the notes to the debtor. Moreover, the "transfer" in *Weaver* was the loss of rights that

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

4

the debtor held against the defendants. It would be odd to refer to such an action as the incurrence of an obligation. By contrast, it is easy to see Idearc's unsecured notes and the Verizon Tranche B as an obligation incurred.

**\*7** In *Verestar,* the court held that a note executed by a debtor conveyed property to a defendant. In support of this proposition, the court stated that "In *Weaver* ..., the Court held that a debtor's execution of promissory notes constituted a transfer for purposes of § 548, even though the notes were not paid down, because the notes altered the debtor's rights by documenting changes in interest rates and payment deadlines." 343 B.R. at 469. However, as mentioned above, it was the defendants who executed the promissory notes to the debtor, and not the other way around. As a result, the *Verestar* court's reliance on *Weaver* is misplaced. Moreover, *Verestar* itself does not support the proposition that because an executed promissory note is a transfer of property, a debtor can recover for it under Section 550. Instead, *Verestar* stated only that "[e]xecution of the Note constituted a transfer subject to avoidance as a fraudulent transfer," *id.* at 470, and Section 550 is not mentioned at any time in the court's opinion.

The plaintiff suggests that the court should use its "equitable jurisdiction to recognize the substance of a transaction rather than adhere to the form of the transaction." Plaintiff's Brief at 5. The plaintiff urges the court to "[look] through the machinations of the Verizon structure to the practical effect of the transactions involved in the Spin-off, the net result is that (among other things) Idearc effectively borrowed $7.1 billion and transferred it to Verizon." *Id.* The court declines the plaintiff's invitation to so construe the spin-off transaction. First, the plaintiff has provided no evidence or case citation that another court has reconstrued such a transaction in this way. Second, this court has already explained that the extant case law demonstrates that the $7.1 billion in unsecured notes and the Tranche B are obligations-not property. As a result, Section 550 does not provide a means of recovery of that debt from the defendants. The court will not use its "equitable jurisdiction" to circumvent the Bankruptcy Code's decision to limit monetary recovery to fraudulent transfers of property.

The plaintiff also contends that this court should use its broad equitable power under 11 U.S.C. § 105. Plaintiff's Brief at 4–5. Under Section 105, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The use of the word "provisions ... suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely

to a general bankruptcy concept or objective." COLLIER ON BANKRUPTCY ¶ 105.01 (16th ed.2012). As the Fifth Circuit has explained, Section 105 "cannot alter another provision of the code." *In re Zale Corporation,* 62 F.3d 746, 760 (5th Cir.1995). "A bankruptcy court's supplementary equitable powers under § 105(a) may not be exercised in a manner that is inconsistent with the other, more specific provisions of the Code." *Id.* at n. 42 (quoting *In re Western Real Estate Fund, Inc.,* 922 F.2d 592, 601 (10th Cir.1990)) (internal changes omitted). In this case, the language of Section 550 shows that it only applies to transfers of property, and not the incurrence of obligations. The plaintiff is essentially asking the court to use its equitable jurisdiction and Section 105 to expand the scope of recovery under Section 550 to the incurrence of obligations. Because allowing this action would be inconsistent with a more specific provision of the Code, the court will decline the plaintiff's invitation to do so.

**\*8** The plaintiff insists that the court's interpretation of Section 550 would yield an unjust result. Plaintiff's Brief at 6. As the plaintiff explains, "[i]n the event of a fraudulent transfer of property by a debtor to a transferee who then sells the property to an innocent third party for value, the trustee for a debtor cannot recover from the innocent third party, but the value of the property transferred may be recovered by the trustee from the initial transferee." *Id.* This is because Section 550(a) allows a trustee to recover property transferred, or the value of such property, from either "the initial transferee of such transfer or the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee." However, a trustee may not recover from any "immediate or mediate transferee" if that transferee took "for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." *Id.* § 550(b)(1). The trustee also may not recover from a immediate or mediate good faith transferee of the primary immediate or mediate transferee. *Id.* § 550(b)(2).

The plaintiff essentially contends that it would be unfair to immediate or mediate transferees to exclude notes and other debt instruments from recovery under Section 550. The plaintiff elaborates that "if the debtor gives the [initial] transferee a note, which is then sold by the transferee for value to an innocent third party, the trustee can avoid the obligations of the note in the hands of the innocent third party, who would be unprotected, but the trustee cannot recover from the initial transferee." Plaintiff's Brief at 6–7. The plaintiff argues that this result "def[ies] logical common sense, [and]

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

it is inconsistent with the language and purpose of [the Texas Fraudulent Transfer Act] and the Bankruptcy Code." *Id.* at 7.

The court finds this argument unpersuasive. The purpose of Section 550(b) is to protect innocent "immediate or mediate transferees" who take property that is subject to avoidance as a fraudulent transfer. In order to take the property "in good faith," these innocent transferees will likely have little or no knowledge of the debtor or the nature of the transfer from debtor to the initial transferee. In contrast, if an immediate or mediate transferee were to purchase a note or other form of debt from the initial transferee, it is unlikely that any immediate or mediate transferee would take "in good faith." This is so because any entity that purchases a note or other form of debt will have to know something about both the debtor (*i.e.,* the entity that issued the debt instrument) and the nature of the transfer from the debtor to the initial transferee (*i.e.,* the context in which the debt was issued). In these circumstances, an immediate or mediate transferee of a note or other debt instrument would not be an "innocent third party."

**\*9** The plaintiff cites a series of cases decided in the context of leveraged buyouts, and other complicated financial transactions, in which courts "collapsed" steps of the transaction to ensure that the goals of the fraudulent transfer statute were met. Plaintiff's Brief at 5 n. 6; see also *Orr v. Kinderhill Corporation,* 991 F.2d 31, 35 (2nd Cir.1993) ("Thus, an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.") (internal citations and quotations omitted). In *HBE Leasing Corporation v. Frank,* 48 F.3d 623, 635 (2nd Cir.1995), the Second Circuit explained the "paradigmatic" leveraged buyout scheme, where courts will "collapse" transactions for purposes of fraudulent transfer statutes:

> "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing."

However, the issue in the defendants' motion to dismiss is not whether the fraudulent transfer statute applies to the

unsecured notes and Tranche B. Instead, the issue is whether the plaintiff can recover money damages under Section 550, or if Idearc's only remedy was to avoid the obligations made in the unsecured notes and Tranche B. The "collapse" cases that the plaintiff cites do not aid the court in answering this question.

Because the unsecured debt and Verizon Tranche B were obligations incurred, and not transfers of property, the plaintiff cannot recover money damages from the defendants under Section 550. Therefore, to the extent that the plaintiff's fraudulent transfer claims attempt to recover for these debts under Section 550, the defendants' motion to dismiss is granted.

### 2. *Cash*

In exchange for the print and online directory business, Idearc also gave Verizon approximately $2.4 billion in cash. Complaint ¶¶ 18–19. Approximately $1.9 billion of this amount was funded through a loan by third-party banks and other financial institutions under a credit agreement. Supplement to Motion at 3. Under this agreement, Idearc was required to use this loan to make a cash distribution to Verizon. *Id.* at 3–4. In accordance with the agreement, the $1.9 billion was paid to Verizon on the same day it was loaned to Idearc. *Id.* at 4.

In their motion to dismiss, the defendants maintain that this $1.9 billion distribution cannot be recovered by the plaintiff as a fraudulent transfer. The defendants reason that because Idearc had no control over the $1.9 billion, it could not be said that there was an interest "of the debtor [Idearc]" in the property, *i.e.,* the $1.9 billion fund.

Under the Bankruptcy Code, "a trustee may avoid any transfer or an interest *of the debtor* in property or any obligation incurred *by the debtor* that is voidable under applicable" fraudulent transfer law. 11 U.S.C. § 544(b) (emphasis added). In response to this requirement, courts have developed the "earmarking doctrine." *See* Supplement to Motion at 6. The Fifth Circuit has explained that "[t]he earmarking doctrine is a judicially created, equitable exception to § 547(b) [1] that holds that money loaned to a debtor by a new creditor to pay an existing debt to an old creditor is not a 'transfer of an interest of the debtor in property.' " *Caillouet v. First Bank and Trust,* 548 F.3d 344, 347 n. 3 (5th Cir.2008). This is because "[i]f all that occurs in a 'transfer' is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes

the same sum to a creditor, only the identity of the creditor has changed." *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1356 (5th Cir.1986). As a result, "[i]n cases where a third person makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds never become part of the debtor's assets, and therefore no preference is created." *Id.* (*quoting* 4 COLLIER ON BANKRUPTCY ¶ 547.25 (15th ed.1986)).

**\*10** In this case, the traditional understanding of the earmarking doctrine does not apply. This is because the loan made by the third party banks and other financial institutions to Idearc was not used "to pay an existing debt to an old creditor." *See Caillouet,* 548 F.3d at 347 n. 3. As a result, there was no "substitution of one creditor for another." *Coral Petroleum, Inc.,* 797 F.2d at 1356.

As the defendants point out, "the 'earmarking doctrine' is simply an 'interpretation of the statutory requirement' that a fraudulent or otherwise avoidable transfer 'must involve a transfer of an interest of the debtor in property.' " Reply of Defendants Verizon Communications Inc., Verizon Financial Services LLC, GTE Corporation, and John W. Diercksen to Plaintiff's Opposition to Defendants' Supplemental Partial Motion to Dismiss ("Supplemental Reply") at 6 (docket entry 272) (quoting *In re Trigem America Corporation,* 431 B.R. 855, 864 (Bankr.C.D.Cal.2010)). In this case, the banks loaned Idearc $1.9 billion in cash, which it then transferred to Verizon. Even if only briefly, this money was an interest of the debtor in property, and therefore is within the purview of the fraudulent transfer statutes. Moreover, the $1.9 billion transfer clearly did have the effect of diminishing Idearc's assets. Therefore, the plaintiff has successfully pled a claim for fraudulent transfer of the cash, and as a result, the defendants' motion to dismiss the fraudulent transfer claim for the $1.9 billion in cash is denied.

### 3. *Idearc's Assumption of Contractual Obligations*

The plaintiff's complaint avers that it is entitled to recover as a fraudulent conveyance the assumption of contractual obligations. Complaint ¶¶ 18–19, 32–43. According to the complaint, these agreements are defined as "including, but not limited to, a publishing agreement, a non competition agreement, a branding agreement, a billing and collection agreement, a listing license agreement, an intellectual property agreement, a tax sharing agreement, an employee matters agreement and a transition services agreement." *Id.* ¶ 20. The defendants argue that the plaintiff's complaint fails to sufficiently plead a claims for both intentional

and constructive fraudulent conveyance with respect to the "contractual obligation," because it fails to specifically identify the obligations or payments challenged.[2] Motion at 11.

Generally, a complaint must comply with the requirements of Federal Rule of Civil Procedure 8(a). Under Rule 8(a)(2), "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." However, when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). A party alleging fraud must specify "the who, what, when, where, and how" of the alleged fraud. *Benchmark Electronics, Inc. v. J.M. Huber Corporation,* 343 F.3d 719, 724 (5th Cir.2003); see also *Williams v. WMX Technologies, Inc.,* 112 F.3d 175, 177–78 (5th Cir.), *cert. denied,* 522 U.S. 966 (1997). Rule 9(b)'s heightened pleading "provides defendants with fair notice of the plaintiff['s] claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents [a] plaintiff[ ] from filing baseless claims and then attempting to discover unknown wrongs." *Tuchman v. DSC Communications Corporation,* 14 F.3d 1061, 1067 (5th Cir.1994).

**\*11** As the court has explained before, "[t]he Fifth Circuit has yet to address whether the heightened pleading standard of Rule 9(b) applies to claims for fraudulent transfer." Memorandum Opinion and Order of September 19, 2011 (docket entry 106) (citing *Janvey v. Alguire,* 647 F.3d 585, 599 (5th Cir.2011)). However, the trend in this district is to conclude that fraudulent consideration claims are not subject to Rule 9(b)'s pleading requirements. *See Janvey v. Alguire,* No. 3:09–CV–0724–N, 2011 WL 7047035, at \* 10 (N.D.Tex. Sept. 6, 2011) (Godbey, J.); *GE Capital Commercial, Inc. v. Wright & Wright, Inc.,* No. 3:09–CV–0572–L, 2009 WL 5173954, at \* 10 (N.D.Tex. Dec. 31, 2009) (Lindsay, J.).

Moreover, the court agrees that there is "no principled reason for applying Rule 9's pleading requirements to [the plaintiff's] fraudulent transfer claims." *Janvey,* 2011 WL 7047035 at \* 10 (quoting *Wing v. Horn,* No. 2:09–CV–342, 2009 WL 2843342, at \*5 (D.Utah Aug. 28, 2009)). This is because fraud is simply not an aspect of a fraudulent transfer claim. For example, a plaintiff will make out a claim for common law fraud under Texas law by demonstrating "(1) material misrepresentation; (2) falsity; (3) knowledge; (4) intention to induce reliance; (5) reliance; and (6) injury." *Newington Limited v. Forrester,* No. 3:08–CV–0864–G, 2011 WL 3652425, at \* 3 (N.D.Tex. Aug. 16, 2011) (Fish, J.). In

a fraud claim, the plaintiff must show that the defendant had both "knowledge" of the fraud and an "intention to induce reliance." *See id.* In contrast, in a fraudulent transfer claim, the defendant's intent or conduct is irrelevant. *See* TEX. BUS. AND COM.CODE §§ 24.005–24.006; see also *Wing, 2009 WL 2843342 at \*5* ("[T]he defendant's conduct is simply not an element of the [fraudulent transfer] claim.")).

Finally, the policies behind the heightened pleading requirements for fraud claims do not apply in the fraudulent transfer context. Unlike fraud claims, fraudulent transfer claims are unlikely to cause defendants significant "harm to their reputation and goodwill ." *Tuchman,* 14 F.3d at 1067. Moreover, fraudulent transfer claims are not subject to abusive use in "strike suits" and are unlikely to help a plaintiff "in an attempt to discover unknown wrongs." *Id.*

In this case, the plaintiff's complaint sufficiently pleads a claim for fraudulent conveyance of the contractual obligations. *See* FED. R. CIV. P. 8(a)(2). The list of agreements in the complaint is more than enough to give the defendants fair notice of the contractual obligations in question. Therefore, the defendants' motion to dismiss the plaintiff's claims for fraudulent transfer with respect to the contractual obligations is denied.

#### 4. *Issuance of Idearc Common Stock*

The plaintiff's complaint alleges that the plaintiff is entitled to recover as fraudulent consideration the 145,851,861 shares of Idearc common stock issued to Verizon in connection with the spinoff. Complaint ¶¶ 18–19, 32–43.

 **\*12** As explained earlier, Section 544(b) provides that "a trustee may avoid any [fraudulent] transfer of an interest of the debtor in property." At least two courts have concluded that stock is not an interest of the debtor in property; it is simply shares of ownership of the debtor itself. *See Decker,* 362 F.3d at 596 (concluding that a trustee could not avoid sale of stock because "unissued stock is not an interest of the debtor corporation in property; it is merely equity in the corporation itself"); *Curry and Sorensen, Inc.,* 57 B.R. at 829 (concluding that "[a] share of capital stock represents a unit of ownership interest and has no extrinsic value to the corporation itself" and thus "an action directed at recovery of corporate stock could only affect equitable ownership of the corporation and would not restore property to the estate or avoid an estate obligation").

In contrast, other courts have concluded that the issuance of stock can constitute a transfer of an interest of the debtor in property. *See Global Crossing,* 2006 WL 2212776, at \*8 ("[A]n issuance of stock involves a corporation exchanging stock in itself for money or other valuable property. Given a corporation's power to transfer stock to third parties in exchange for value, the argument that the corporation lacks an interest in the stock itself at the time of issuance blinks economic reality."); see also *Pitt Penn Holding Company, Inc.,* 2011 WL 4352373, at \*5–6 (citing *Global Crossing* with approval).

Even if the issuance of stock is construed as a potential transfer of property, however, the issuance of worthless stock cannot be a fraudulent transfer of property. If a corporation is insolvent—*i.e.,* the sum of its debts is greater than the sum of its assets—then the shares of the corporation will be worthless. Because the transfer of "worthless" property cannot harm the debtor or its creditors, it cannot sustain any recovery as a fraudulent transfer. *See Global Crossing,* 2006 WL 2212776 at \*9 ("[T]he Estate Representative may not argue out of one side of its mouth that [the debtor] was in dire financial straits, completely insolvent, and destined for failure when [the] stock was transferred, and out of the other side argue that its stock had tremendous value that the creditors of [the debtor] should be permitted to now recover.").

In this case, the court does not need to decide whether the transfer of stock from Idearc to Verizon was a transfer of an interest of the debtor in property. That is because the plaintiff's complaint is premised on the idea that Idearc was insolvent at the time of the spin-off. *See* Complaint ¶ 36 (stating that Idearc was "burdened by massive debt without resources to repay the debt when it became due"). If Idearc was insolvent at the time of the spin-off, because its debts exceeded its assets, then its stock was worthless, and Idearc did not lose any property in the sale. *See Global Crossing,* 2006 WL 2212776 at \*9. As a result, Idearc's creditors could not have been harmed when the stock was sold.

 **\*13** The plaintiff responds "that the marketplace erroneously placed a value in excess of $4 billion on Idearc's stock at the time of the Spin-off because Verizon materially misled the market regarding Idearc's prospects." Plaintiff's Brief at 15. After it received that stock, the plaintiff argues, Verizon could have sold it in the open marketplace for $4 billion. *Id.* The plaintiff insists that "the fraudulent transfer statutes do not enable Verizon to reap such a windfall." *Id.* In point of fact, however, Verizon did not sell the stock on the

open marketplace; instead, it distributed the shares of Idearc to its own shareholders. Complaint ¶ 18. As a result, there was no "windfall" to Verizon itself. If there was any sort of windfall, then it was to Verizon's shareholders, who are not parties to this case.

For the reasons stated, the defendants' motion to dismiss the plaintiff's fraudulent transfer claims as to the shares of Idearc stock is granted.

### B. *Promoter Liability (Claim 9 )*

The defendants have also moved to dismiss the plaintiff's claim for "promoter liability." Motion at 15.

Promoters "undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business." *American Legacy Foundation v. Lorillard Tobacco Company,* 831 A.2d 335, 350 n. 67 (Del. Ch.2003) (quoting *Blish v. Thompson Automatic Arms Corporation,* 64 A.2d 581, 595 (Del.1948)). "There is, of course, a fiduciary relationship between the promoters of a corporation and the corporation itself." *Gladstone v. Bennett,* 153 A.2d 577, 582 (Del.1959). However, "a wholly owned subsidiary is not owed fiduciary duties by its corporate parent under normal circumstances." *In re Tronox Incorporated,* 450 B.R. 432, 438 (Bankr.S.D.N.Y.2011). Nevertheless, "even when a subsidiary is wholly-owned, a parent corporation may owe fiduciary duties as a promoter when it is engaged in a plan or scheme of promotion, until the scheme has been concluded." *Id.* at 439 (citing *Bailes v. Colonial Press, Inc.,* 444 F.2d 1241 (5th Cir.1971)).

In their motion, the defendants make three arguments as to why the promoter liability claim should be dismissed. Motion at 15–18. Because none of these arguments is persuasive to the court, the defendants' motion to dismiss the plaintiff's promoter liability claim is denied.

First, the defendants argue that the plaintiff lacks standing to bring a claim for promoter liability and breach of fiduciary duty. Motion at 16. "At common law the promoters of a corporation stand in a fiduciary relation to the *corporation,* charged with the duty of good faith" *Bailes v. Colonial Press, Inc.,* 444 F.2d 1241, 1244 (5th Cir.1971) (emphasis added). This fiduciary duty continues until the promotion has been accomplished. *Id.* In this case, U.S. Bank does not base its promoter liability claim on the defendants' fiduciary duty to Idearc's future shareholders, but on injuries to Idearc itself.

*See* Complaint ¶¶ 2, 5–6, 16, 18–19, 21–24, 79, 81–114. Consequently, the plaintiff litigation trust, standing in the shoes of Idearc, has standing to sue Idearc's promoters, who had a fiduciary duty to the corporation.

**\*14** Second, the defendants argue that the plaintiff has failed to state a claim for promoter liability because the defendants did not solicit any individual or entity to buy Idearc stock. Motion at 16–17. In support of this contention, the defendants cite *Roni LLC v. Arfa,* 903 N.Y.S.2d 352, 355 (N.Y.App.Div.2010), *aff'd,* 18 N.Y.3d 846 (N.Y.2011). However, the court has not been able to find anything in *Roni* that would suggest that solicitation is a required element of a promoter liability claim.

Third, the defendants argue that the a claim of promoter liability requires an allegation of a "secret profit." Verizon Parties' Reply in Support of their Partial Motion to Dismiss Amended Complaint ("Reply") at 7–8 (docket entry 202). For example, in *Gladstone,* the court stated that a promoter "will not be permitted to benefit by any secret profit which they may receive at the expense of the corporation or of its members." 153 A.2d at 582; see also *Roni,* 903 N.Y.S.2d at 354 ("Plaintiffs' central allegation ... is that the promoter defendants made secret profits at the expense of plaintiffs and the LLCs."). "[W]here the corporation deals with a promoter with full knowledge of all facts, courts will not set aside the transaction, since in such cases there is no secret or undisclosed property." *Gladstone,* 153 A.2d at 582.

The defendants have provided no argument or legal citation demonstrating that the only way a promoter breaches its fiduciary duties is to make a "secret profit."

For these reasons, the defendants' motion to dismiss the plaintiff's promoter liability claim is denied.

### C. *Unjust Enrichment (Claim 10 )*

The defendants have moved to dismiss the plaintiff's unjust enrichment claim. In particular, the defendants argue that U.S. Bank's unjust enrichment claim is barred by the two-year statute of limitations for unjust enrichment claims under Texas law. Motion at 18. *See Elledge v. Friberg–Cooper Water Supply Corporation,* 240 S.W.3d 869, 871 (Tex.2007) (citing TEX. CIV. PRAC. & REM. CODE § 16.003). However, the plaintiff argues that the doctrine of adverse domination tolled the statute of limitations and, therefore, the unjust enrichment claim is not barred. Plaintiff's Brief at 18–19. Because the court concludes that the doctrine of adverse

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

domination did not toll the statute of limitations, the plaintiff's unjust enrichment claim is timebarred, and the defendants' motion to dismiss this claim must be granted. [3]

"Under the common law doctrine of adverse domination, the statute of limitations for an entity's claim is tolled when the entity is controlled or dominated by individuals engaged in conduct that is harmful to the entity." *Janvey v. Democratic Senatorial Campaign Committee,* 793 F.Supp.2d 825, 831 (N.D.Tex.2011) (Godbey, J.). The doctrine of adverse domination "recognizes that officers or directors who have engaged in activities that harm an entity cannot be expected to bring suit against themselves." *Warfield v. Carnie,* No. 3:04–CV–0633–R, 2007 WL 1112591, at * 15 (N.D.Tex. Apr. 13, 2007) (Buchmeyer, J.). Therefore, "the corporation is considered to be 'incapacitated' while the wrongdoers are in control." *Id.* "[T]he statute of limitations begins to run only once the wrongdoing directors lose control of the entity." *Id.*

**\*15** Under Texas law, "the plaintiff need not show that the wrongdoers completely dominated the corporation, but rather must show only that a majority of the board members were wrongdoers during the period the plaintiff seeks to toll the statute." *Federal Deposit Insurance Corporation v. Dawson,* 4 F.3d 1303, 1310 (5th Cir.1993), *cert. denied,* 512 U.S. 1205 (1994). To be "wrongdoers," members of the board must have "actively participated in fraud or other *intentional* wrongdoing with regard to the claims at issue." *Federal Deposit Insurance Corporation v. Henderson,* 61 F.3d 421, 426 (5th Cir.1995) (emphasis added). Consequently, negligence, even gross negligence, is not enough to make a board member a "wrongdoer." *Resolution Trust Corporation v. Acton,* 49 F.3d 1086, 1091 (5th Cir.1995). A breach of fiduciary duty does not satisfy the intentional wrongdoing requirement either, as it amounts to constructive fraud rather than actual fraud. *Resolution Trust Corporation v. Bright,* 872 F.Supp. 1551, 1565 (N.D.Tex.1995) (Fitzwater, J.).

U.S. Bank alleges many actions taken by the entire Idearc board that evidence a lack of independence. Complaint ¶¶ 124–126(a)–(g). These actions include:

a. When outside counsel advised that having the incoming board ratify the Spin-off before its overseen by Diercksen as sole director raised a host of fiduciary duty issues and liabilities, the incoming board members acted anyway.

b. When outside counsel advised there was no legal reason to ratify, the incoming board members acted to ratify anyway.

c. The "independent board," carefully selected by Verizon, had neither the time, the information, nor the competency to approve the Spin-off.

d. Verizon forced the early vote so that it would take place before the Spin-off and without adequate time to investigate or hire outside consultants. Upon information and belief, Verizon stood ready to fire the "independent board" if it did not get in line.

e. The actions of the incoming board were directed by hopelessly conflicted lawyers who represented both the promoter and Idearc, and who clearly preferred one client (Verizon) over the other.

f. The incoming board never asked for a "fairness opinion" or even knew what one was.

g. The incoming board was tainted by business dealings with Verizon.

*Id.* ¶ 126(a)-(g).

Taking these allegations as true, the court concludes that U.S. Bank has not pled that a majority of the board members were wrongdoers during the period U.S. Bank seeks to toll the statute. The board members, selected by Verizon and advised by a team of attorneys with an interest in Verizon, may have taken actions inconsistent with the well-being of Idearc around the time of the spin-off on November 17, 2006. However, these actions do not amount to fraud or intentional wrongdoing. U.S. Bank alleges only that "the conduct of those purporting to ratify the transaction was in complete disregard of their *fiduciary duties.*" *Id.* ¶ 125 (emphasis added). Breach of fiduciary duty is not enough to make an officer/director a "wrongdoer." Because U.S. Bank has not pled sufficient facts to show that a majority of the board members were wrongdoers, the adverse domination doctrine does not apply to toll the statute of limitations.

**\*16** Therefore, U.S. Bank's unjust enrichment claim is barred, and the defendants' motion to dismiss that claim is granted.

**D. *Alter Ego (Claim 11* )**

Westlaw

10

Finally, the defendants move to dismiss the plaintiff's claim for "alter ego," also commonly known as "piercing the corporate veil."

Alter ego is not a claim or independent cause of action-it is a remedy to enforce a claimed substantive right. *Western Oil and Gas JV, Inc. v. Griffiths,* 91 Fed. App'x 901, 903–04 (5th Cir.2003) ("[A]lter ego ... is an equitable remedy and not a cause of action. Absent a cognizable cause of action this remedy is unavailable."); *In re Grothues,* 226 F.3d 334, 337 (5th Cir.2000). Because alter ego is not a cause of action, to the extent that the plaintiff pleads alter ego as a cause of action, the defendants motion to dismiss is granted.

The plaintiff maintains that the court should construe its alter ego claim as pleading a theory of recovery for one of its other claims. Plaintiff's Brief at 21. Because courts must construe pleadings "liberally according to ... substance rather than ... form or label," *Hussain v. Boston Old Colony Insurance Company,* 311 F.3d 623, 633 n. 39 (5th Cir.2002), the court must determine whether the plaintiff's complaint has sufficiently pled facts that could warrant recovery under alter ego.

"In the typical corporate veil piercing scenario, the corporate veil is pierced such that individual shareholders can be held liable for corporate acts." *Chao v. Occupational Safety and Health Review Commission,* 401 F.3d 355, 364 (5th Cir.2005). However, the doctrine of alter ego can also apply in the corporate parent/subsidiary context. *See Union Carbide Corporation v. Montell N.V.,* 944 F.Supp. 1119, 1144 (S.D.N.Y.1996) (citing *Geyer v. Ingersoll Publication Company,* 621 A.2d 784, 793 (Del. Ch.1992)) ("Where a

subsidiary is in fact a mere instrumentality or alter ego of its owner, a court can pierce the corporate veil.") (internal quotations omitted). In order to pierce the corporate veil, a plaintiff must prove "(1) the parent and subsidiary operated as a single economic entity; and (2) an overall element of injustice or unfairness is present." *ASARCO LLC v. Americas Mining Corporation,* 396 B.R. 278, 317 (S.D.Tex.2008) (citing *In re Foxmeyer Corporation,* 290 B.R. 229, 235 (Bankr.D.Del.2003)).

In this case, the plaintiff has alleged sufficient facts showing that it would be entitled to recovery under a theory of alter ego. First, the plaintiff has pled facts indicating that, up and until the spin-off, Idearc and Verizon were operated as a single economic entity. Moreover, the court will not make a determination of injustice or unfairness in deciding a motion to dismiss. As a result, the plaintiff's alter ego theory of recovery survives the defendants' motion to dismiss.

### III. *CONCLUSION*

For the reasons stated above, the defendants' motion to dismiss is **GRANTED** in part and denied in part. The defendants' motion to dismiss the plaintiff's fraudulent transfer claims (Claims 1 and 2) is **GRANTED** for the promissory notes, the Verizon Tranche B, and the shares of Idearc stock, and **DENIED** for the cash and contractual obligations. The defendants' motion to dismiss the plaintiff's promoter liability claim (Claim 9) is **DENIED,** and the motion to dismiss the plaintiff's unjust enrichment and alter ego claims (Claims 10 and 11) are **GRANTED.**

**\*17  SO ORDERED.**

---

Footnotes

1    While the earmarking doctrine traditionally applies to fraudulent preference actions under 11 U.S.C. § 547, many courts have held that it applies with equal force in the context of fraudulent transfer actions. This is because both Sections 544(b) and 547 use the same language: "an interest of the debtor in property." *See In re Trigem America Corporation,* 431 B.R. 855, 864 (Bankr.C.D.Cal.2010); *Glinka v. Bank of Vermont,* 188 B.R. 125, 128–29 (D.Vt.1995); *Northen v. Centennial Healthcare Corporation,* No. 00–80676C–7D, 2002 WL 31031631, at \*7 (Bankr.M.D .N.C. Sept, 3, 2002); *see also* Memorandum Opinion and Order of March 21, 2012, at 9–10 (docket entry 288) (noting that, in a different context, "most courts do not recognize a distinction between fraudulent transfer claims and preferential transfer claims").

2    The defendants also argue that the plaintiff cannot avoid any contractual obligations that Idearc assumed under the confirmation plan. Motion at 12. Because the plaintiff agrees with the defendants, Plaintiff's Brief at 13 n. 27, there is no live dispute among the parties on this point.

3    U.S. Bank's unjust enrichment claim was asserted for the first time in its amended complaint on November 30, 2011. Regardless, the unjust enrichment claim would still be time barred even if it related back to the date of the plaintiff's Original Complaint under FED. R. CIV. P. 15(c), because the original complaint was filed on September 15, 2010, after the expiration of the statute of limitations for unjust enrichment on November 17, 2008.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.