REDACTED

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division
Civil Action No. 3:11-cv-00597-MOC-DCK

| | |
|---|---|
| THE FAIRPOINT COMMUNICATIONS, INC. *ET AL.* LITIGATION TRUST,<br><br>    Plaintiff,<br><br>vs.<br><br>VERIZON COMMUNICATIONS, INC., NYNEX CORPORATION, VERIZON NEW ENGLAND, INC., CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, AND VERIZON WIRELESS OF THE EAST LP,<br><br>    Defendants. | |

**THE TRUST'S (i) RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF THE TRUST'S EXPERT CARLYN R. TAYLOR, AND (ii) MEMORANDUM IN SUPPORT OF THE TRUST'S MOTION TO EXCLUDE DECLARATION OF BRADFORD CORNELL  [REDACTED]**

Plaintiff  (the "Trust") is filing this (i) response to Defendants' Motion to Exclude Certain Opinions of the Trust's Expert Carlyn R. Taylor (the "Motion") (Dkt 156, 157) and (ii) this memorandum in support of the Trust's Motion to Exclude Declaration of Bradford Cornell as follows:

### INTRODUCTION

Using the phrase "in essence" as a written sleight-of-hand,[1] Defendants propose a non-existent legal standard for proof of an actual fraudulent transfer claim, and then

---

[1] (Dkt. 157, Motion at p.2)

challenge the ability of the Trust's expert, Carlyn R. Taylor, to testify about that standard. To support their challenge, Defendants selectively ignore much of Ms. Taylor's report and testimony; argue things better raised during cross-examination at trial; and belatedly attempt to add a brand-new rebuttal expert, Dr. Bradford Cornell, many months past expert disclosure deadlines and on the eve of trial. Defendants' Motion should be denied and the Declaration of Bradford Cornell should be excluded from the record.

## ARGUMENT AND AUTHORITIES

**1. The Motion Is Based on a Faulty Premise That the Trust Must Prove Insolvency to Prevail on its Actual Fraudulent Transfer Claim.**

After the Court's summary judgment order, there remains one claim in this case: a section 548(a)(1)(A) actual fraudulent transfer claim.[2] For this claim, Defendants say that "[i]n essence, Plaintiff must prove that Verizon thought FairPoint was insolvent," which Defendants then use as the premise for seeking to exclude Ms. Taylor from giving certain opinions.[3] Defendants cite *no* legal authority to support their premise because there is none. In fact, the legal authorities are to the contrary. Many court opinions say a plaintiff does not need to prove a debtor was insolvent to prevail on an actual fraudulent transfer claim. Proving insolvency is not a required element. *E.g.*:

- *In re Cohen*, 199 B.R. 709, 716-17 (9th Cir. BAP 1996) ("The focus in the inquiry into actual intent is on the state of mind of the debtor. Neither malice nor insolvency are required.").

- *In re Kendall*, 491 B.R. 191, 2013 WL 1890660 *5 (10th Cir. BAP May 7, 2013) ("In analyzing actual intent to hinder, delay, or defraud, we focus on the debtor's state of mind, and not on either the debtor's solvency…").

---

[2] (Dkt. 150, Order at p.15-16).

[3] (Dkt. 157, Motion at p.2).

- *Springel v. Prosser*, 2012 WL 2149737, *7 (D. Virgin Islands June 12, 2012) ("insolvency, by itself, is not an element that must be established in order to prove an actual fraud claim.").

- *In re Equipment Acquisition Resources, Inc.*, 481 B.R. 422, 428 (Bankr. N.D. Ill. 2010) ("In determining whether a transfer is voidable as intentionally (as opposed to constructively) fraudulent, the focus is on the state of mind of the debtor. Neither malice nor insolvency are required…").

A leading bankruptcy treatise agrees that insolvency is not a required element of an actual fraudulent transfer claim. 5 *Collier on Bankruptcy* ¶548.04[3] (Lawrence P. King ed., 15th ed. 1999) ("[t]he trustee is under no duty, in proceeding under section 548(a)(1)(A), to show that the transaction was consummated during the debtor's insolvency or precipitated the debtor's insolvency."). And a leading treatise for federal civil jury instructions provides that, for a section 548(a)(1)(A) claim, the jury should be instructed that an actual fraudulent transfer may still exist "even if the fair value of the debtor's assets was greater than the amount of the debtor's liabilities." 3B Federal Jury Prac. & Instr. (Civil) § 164.200, p.538 (2001). Instead, the key issue for an actual fraudulent transfer case is whether the debtor acted with an intent to hinder, delay or defraud its creditors. 11 U.S.C. §548(a)(1)(A).[4]

Accordingly, Defendants' focus on proof of insolvency is wrong. All of the cases Defendants cited in their Motion are completely off point, because the cited portions pertained to *constructive* fraudulent transfer claims for which insolvency is a required

---

[4] Either direct or indirect evidence can be used to establish wrongful intent. And as the Court previously recognized, indirect evidence of wrongful intent (sometimes referred to as "badges of fraud") can include circumstantial evidence such as (i) the adequacy of consideration, (ii) the close relationship between the parties, (iii) the financial condition of the debtor before and after the transaction, (iv) a pattern, course of conduct or onset of financial difficulties, and/or (v) the general chronology of events and transactions under inquiry. (Dkt. 150, Order at p.9). Thus, while a plaintiff does not have to prove insolvency to establish a claim of actual fraudulent transfer, proof of a debtor's financial condition can nevertheless be relevant.

element, or to approval of a sales price of a debtor's assets where no allegations were made that the price was tainted by fraudulent conduct.

Additionally, Defendants' Motion focuses on the wrong persons. The Motion incorrectly presupposes that the stock and bond markets' opinions of FairPoint's solvency as indicated by its stock and bond prices are relevant. But, as shown above, it is the debtor Spinco's state of mind (and here also *Verizon's* state of mind imputed to the debtor Spinco) that is the focus of the actual fraudulent transfer inquiry--*not what the stock or bond markets believed*. Particularly here given that the direct evidence of Spinco/Verizon's wrongful intent includes their employees hiding negative information and making affirmative misrepresentations to regulators, potential creditors and the investing public.[5] Indeed, courts have held that reliance by a creditor is also not an element of the claim, further demonstrating that it is the debtor's state of mind that is and should be the focus of an actual fraudulent transfer claim. *See e.g., Henry v. Rizzolo*, 2011 WL 2970958, *3 (D. Nev. July 20, 2011).[6]

Because it is Spinco and Verizon's state of mind that is relevant, the Trust's summary judgment evidence focused on proof of Spinco/Verizon employees' thoughts, beliefs, intents, actions and inactions. As the Court held in denying summary judgment on the actual

---

[5] Such evidence includes that the dual Spinco/Verizon employees ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[6] There is also no dispute that the combined Spinco/FairPoint entity ultimately could not pay the massive debts it incurred in connection with the transaction, resulting in bankruptcy and its creditors left with cents on the dollar. As such, even Defendants have to admit that within a relatively short period of time after the merger, Spinco/FairPoint was insolvent regardless of what stock market investors may have believed or not believed at any point in time.

HOU:3357550.6

fraudulent transfer count, such evidence, if established at trial, can support a judgment to avoid the transfers to Verizon as actual fraudulent transfers.

2. **Defendants' Criticism of Ms. Taylor Should be Addressed During Cross-Examination at Trial, Not in a Pre-Trial Motion to Exclude.**

Even assuming Defendants' Motion was based on an accurate premise, which it is not, Defendants' criticism of Ms. Taylor should nevertheless be raised during cross-examination at trial and not during a separate pre-trial *Daubert* hearing. Because this will be a bench trial, the Court is both the trier of fact and the gatekeeper for the admission of evidence. In this dual role, the Court is more than qualified to weigh and assess the credibility and analyses of the parties' respective experts as those experts testify during the course of the trial. *Gannon v. United States*, 292 F. App'x 170, 172 (3rd Cir. 2008). Defendants recognize the Court's role, acknowledging that "[c]ourts conducting bench trials often reserve questions of admissibility for trial instead of evaluating those questions at a separate pre-trial *Daubert* hearing."[7] This acknowledgment by Defendants is not surprising given that the issues they raise in the Motion are at best fodder for cross-examination, not a basis by which to exclude snippets of Ms. Taylors' opinions before the Court has heard any evidence at trial.

A. **Defendants Do Not Challenge Ms. Taylor's Qualifications or the Admissibility of the Vast Majority of Her Opinions.**

The Trust retained Ms. Taylor to provide expert analysis and opinions on a number of industry and financial issues relevant to this case. In compliance with the Court's agreed schedule, Ms. Taylor timely (i) provided a detailed report on December 3, 2012 of her

---

[7] (Dkt. 157, Motion at n.30)

opinions and analysis,[8] (ii) provided a detailed rebuttal report on January 30, 2013 to rebut the report of the Defendants' financial expert, Craig T. Elson,[9] and (iii) submitted to a deposition on March 28, 2013.[10] Defendants do not challenge Ms. Taylor's qualifications as an expert or the admissibility of most all of her analysis and opinions. Nor could they.

Ms. Tayor has extensive industry and financial experience in the telecommunications industry and unique experience with Verizon. As detailed in her report and the CV attached to her report, Ms. Taylor is a Senior Managing Director and the leader of the telecommunications industry group for FTI Consulting, Inc., a world recognized consulting organization.[11] She has B.S. and M.A. degrees in economics from the University of Southern California (graduating valedictorian), she is a Certified Public Accountant, accredited in business valuation by the American Institute of Certified Public Accountants ("AICPA"), a Certified Insolvency and Restructuring Advisor ("CIRA"), and has numerous other relevant certifications, qualifications, testimony and publications. During her extensive career, Ms. Taylor has led more than 100 engagements involving financial restructuring of telcom and media companies and led 150 or more material investment banking and financial consulting engagements involving issues of valuation, due diligence, M&A advisory and similar topics. She also has unique experience with Verizon through her prior advisory work on the restructuring of Verizon's disastrous sale of telephone land lines in Hawaii, and her advisory work for one of the major creditors groups during the FairPoint bankruptcy proceeding.

---

[8] Attached as Exhibit A are excerpts of Ms. Taylor's December 3, 2012 Original Report.

[9] Attached as Exhibit B are excerpts of Ms. Taylor's January 30, 2013 Rebuttal Report.

[10] Attached as Exhibit C are excerpts from Ms. Taylor's March 30, 2013 deposition testimony.

[11] Exhibit A, pp. 7-8, 239-248

As detailed in her reports and deposition testimony, Ms. Taylor followed documented and well-recognized industry methodologies and procedures in reaching her opinions.[12] In fact, Defendants' designated financial expert, Mr. Elson, used the exact same methodologies, conceptual framework and approaches that Ms. Taylor used in her reports. The discussion and chart on pages 1 through 4 of Ms. Taylors' rebuttal report summarizes these similar methodological approaches.[13] That the parties' experts used similar methodologies but reached differing conclusions justifies exploration during cross-examination at the upcoming bench trial. Not in a pre-trial *Daubert* hearing.

**B. Ms. Taylor's opinions are the product of reliable principles and methods supported by evidence.**

Defendants argue that Ms. Taylor should not be permitted to testify about her opinions involving FairPoint's public stock price because she did not support her opinions with an "event study" that specifically quantifies changes in FairPoint's stock price caused by misrepresentations to the market. As discussed further below, however, factors unique to this case made using an event study for the purpose suggested by Defendants either unreliable or not possible. The Motion ignores these problems. Also discussed below, even if a reliable event study could have been performed, it would not and is not the only basis by which Ms. Taylor can support her opinions. Rather, there is substantial support for Ms. Taylor's opinions as she detailed in her reports and testimony. Details Defendants have also chosen to ignore.

---

[12] Exhibit A, pp. 2-34 (Table of Contents and Summary of Opinions)

[13] Exhibit B, pp. 1-4.

### i. Ms. Taylor's opinions do not require an "event study" to be admissible.

An event study is a methodology sometimes used to measure damages in a securities fraud case because the damage calculation in those cases requires a specific dollar quantification caused by changes in a company's stock price. Those are the kinds of cases on which Defendants' Motion relies,[14] and the Trust does not dispute that a properly performed event study is a recognized methodology. But none of Defendants' cases hold that an event study must be performed for an expert to offer the more general opinion that a positive public stock market price is or is not always evidence of a company's solvency. Nor has the Trust found such a case.[15]

Moreover, despite Defendants' reliance in their Motion on the value implied by Wall Street's public stock market prices, Defendants' expert, Mr. Elson, placed a value on the merged Spinco/FairPoint entity at levels below that implied by the company's stock price when the transaction closed.[16] [17] And just like Ms. Taylor, Mr. Elson did not use an "event study" to support his opinions. While Mr. Elson did not opine that his calculated

---

[14] (Dkt. 157, Motion, p. 2).

[15] Courts never mandate that expert witnesses use a particular methodological approach to be admissible because to do so would be tantamount to the court requiring particular answers from experts. Instead, to comply with *Daubert,* an expert is only required to consider available and accepted methodologies and independently determine how and which methodologies are appropriate for the particular analysis and fact pattern at issue. Which is exactly what Ms. Tayor did in this case when she considered using an event study but determined that it would not be reliable or feasible because of factors unique to this case.

[16] Attach as Exhibit D are excerpts from Mr. Elson's January 4, 2013 report, pp. 19, 128.

[17] Mr. Elson's lower valuation is driven in part by the inclusion in his analysis of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And as the Trust pointed out during the summary judgment proceeding, there is evidence that Spinco/Verizon purposefully withheld from Fairpoint and the investors that showed rapidly accelerating first quarter 2008 line losses. *See e.g.*, Trust Summary Judgment Exhibit 105, attached here as Exhibit E▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Spinco/FairPoint value dropped below solvency, conceptually his analysis is consistent with Ms. Taylor because both valuations illustrate that a company's stock price is not always reflective of its true value. Defendants must believe that Mr. Elson has followed accepted methodologies and should be permitted testify or they would not have designated him as an expert. The same must be true for Ms. Taylor.

To the extent it is even relevant, the place to explore Wall Street's efficiency for putting a value on the merged entity is at trial during the direct and cross-examination of the parties' respective experts, not during a limited but time consuming pre-trial *Daubert* hearing that would necessarily be based on an incomplete record. *See e.g. Gannon*, 292 F. App.'x at 172.

        ii.        **Defendants ignore evidence that an event study would not be useful or feasible because of factors unique to this case.**

Defendants also contend that because Ms. Taylor considered trying an event study but determined that "you couldn't use that methodology to test this," her testimony should be partially excluded. Defendants neglect to explain to the Court, however, that Ms. Taylor testified why an event study would not work here. Among other things, Ms. Taylor concluded that factors unique to the timing and facts of this case would make an event study either unreliable or unfeasible for the purpose suggested in Defendants' Motion.

For example, Ms. Taylor testified that an event study could not test the impact of certain misrepresentations on Spinco/FairPoint's stock price because corrective disclosures of those misrepresentations occurred during the calibration period necessary to create the event study model. As Ms. Taylor testified, to do an event study:

[redacted]



Ms. Taylor also testified that an event study was not feasible or useful because several post-closing corrective disclosures were made either (i) contemporaneously with different inaccurate positive disclosures, or (ii) well after it became clear to the public markets that Spinco/FairPoint was in trouble and likely insolvent. For example, Ms. Taylor testified:



Similarly, Ms. Taylor pointed to corrective disclosures that were not made until the 1st Quarter 2009, by which time the company was already trading in penny stock territory. As Ms. Taylor explained in her rebuttal report:



---

[18] Exhibit C, p.176

[19] Exhibit C, p.177

[20] Exhibit B, p. 31.

[REDACTED]

This testimony explains Ms. Taylor's view as to why an event study was not helpful here. Yet Defendants did not address or attempt to explain any of this testimony in their Motion.

### iii. Defendants' Motion ignores other evidence that supports Ms. Taylor's opinions.

Defendants also argue that Ms. Taylor's opinions challenged in the Motion were purportedly based exclusively on "her years of experience in the telecom industry" and statements from "unnamed witnesses."[22] But that is simply not accurate. While Ms. Taylor's extensive industry and financial expertise should not be minimized, her opinions do not rest exclusively on industry experience. Nor are her opinions based on "unnamed sources,"[23] but instead flow from analysis and evidence that Defendants largely ignore.

For example, Ms. Taylor's opinions are supported by substantial evidence showing investors began to treat the merged Spinco/FairPoint entity as insolvent and unable to pay its debts when the real truth of the company's situation began to become apparent in the months following the merger. Ms. Taylor testified that by October 2008, approximately six months after the merger, the public bond debt for Spinco/FairPoint was priced at 50% of par,[24] and stated in her rebuttal report that [REDACTED]

---

[21] Exhibit B, p. 40.

[22] (Dkt. 157, Motion, p.5).

[23] For example, Ms. Taylor testified that her conclusion that investors care about a telecom company's line losses was based on her experience in the industry, the financial analyst reports referenced in her report and conversations with FairPoint executives such as Al Giammarino, the now former CFO. Exhibit C, p. 179-183.

[24] Exhibit C, p.61-62.

[REDACTED] Yet in October and November 2008, Wall Street investors put a positive stock price on Spinco/FairPoint, which Defendants claim should be treated as absolute proof of solvency. But, Defendants completely ignore the apparent incongruity between the public debt and public stock markets presumably because it does not support their positions in this case.

Ms. Taylor, however, explained the incongruity. Ms. Taylor indicated that because of the massive levels of debt that Spinco/FairPoint incurred in connection with the transaction, Spinco/FairPoint's public stock was trading primarily at its option value and not at the intrinsic value of the company as a going concern operation ("option value" analysis). As Ms. Taylor explained:



---

[25] Exhibit B, p.38. Moreover, Ms. Taylor's findings are again consistent with Mr. Elson's, who also noted that by [REDACTED] Exhibit D, p. 35.

[26] Exhibit B, p.26 (emphasis added).

Ms. Taylor supports her option value analysis with extensive calculations and citation to accepted option price methodologies and industry leading authorities.[27] She also testified about her option value opinions and analysis extensively during her deposition.[28] Yet Defendants' Motion fails to mention or address this evidence that supports Ms. Taylor's opinions about the public markets.

**3. The Court Should Exclude and Not Consider The Declaration of Bradford Cornell.**

Federal Rule 26(a)(2)(D) requires that "[a] party must make [expert testimony] disclosures at the times and in the sequence that the court orders." Federal Rule 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a)…the party is not allowed to use that information or witness to supply evidence **on a motion**, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (emphasis added). Defendants failed to timely disclose Dr. Cornell, and their failure is neither substantially justified nor harmless.

Under the Court's Amended Scheduling Order, (i) the Trust's expert reports were due December 3, 2012, (ii) Defendants' expert reports were due January 4, 2013, and (iii) the parties were permitted to serve rebuttal expert reports by January 30, 2013.[29] Both parties relied on this schedule in preparing the case for trial: (i) the Trust submitted Ms. Taylor's

---

[27] Exhibit B, pp. 25-42.

[28] For example, in response to a question about FairPoint stock price following the merger, Ms. Taylor testified that: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit C, p. 55-57.

[29] (Dkt. 96).

original report on December 3, 2012, (ii) Defendants submitted expert reports on January 4, 2013, including Mr. Elson's original report; and (iii) both Ms. Taylor and Mr. Elson submitted rebuttal reports to each other's original reports on January 30, 2013.[30]

The opinions that are the subject of Defendants' Motion were in Ms. Taylor's original December 2012 expert report. As such, Defendants effectively had two opportunities (January 4 and January 30) to designate and issue a rebuttal report challenging Ms. Taylor's opinions. And in fact, Defendants designated and submitted reports from Mr. Elson on January 4 and January 30 that addressed the same issues that were addressed in Ms. Taylor's reports. As previously mentioned, however, Mr. Elson chose not to perform an event study to support the conclusions in either of his reports.

Now on the eve of trial and almost eight months after the rebuttal expert deadline expired, Defendants, under the guise of a *Daubert* challenge, are attempting to identify a new rebuttal expert to fill in what Defendants now apparently view as gaps in Mr. Elson's analysis. There is no justification for Defendants' belated disclosure of a new expert witness, and Defendants do not even attempt to give one. Moreover, even at this late date Defendants have not complied with the expert disclosure requirements of Rule 26(a)(1)(B). Instead Dr. Cornell states that he "will provide the detailed results of [his] event study analysis" at some later date if it would be helpful to the Court.[31] Not only is this belated and incomplete

---

[30] Under the Court's schedule, Defendants designated and submitted original or rebuttal reports for four expert witnesses, inclusive of Mr. Elson. Defendants did not identify Dr. Cornell on any of its expert designations or submit an report disclosing Dr. Cornell's opinions and analysis.

[31] (Dkt. 157-6, Cornell Declaration at p.8).

disclosure unjustified, it is also harmful.[32] Accordingly, Dr. Cornell's declaration should be excluded from the record and not be considered by the Court in any respect. *See e.g., In re Chinese Manufactured Drywall Products Liability Litigation*, 2010 WL 8368142 (E.D.La. February 17, 2010) (granting motion to exclude affidavits from two experts attached to *Daubert* motion as an untimely designation of expert witnesses).

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied and the Declaration by Dr. Cornell attached to the Motion should be excluded from the record and not considered by the Court.

---

[32] For example, if the Court permitted Defendants to designate another expert (Dr. Cornell) and provide a report at this late date, the Trust must be given an opportunity to review and test his analysis, depose Dr. Cornell, and perhaps even designate a new rebuttal witness of their own. It is neither fair nor harmless to expect the Trust to deal with these issues when its focus should instead be on preparing the case for trial.

HOU:3357550.6
Case 3:11-cv-00597-MOC-DCK   Document 161   Filed 10/07/13   Page 15 of 18

Respectfully submitted,

/s/ Jonathan D. Sasser
Jonathan D. Sasser
**ELLIS & WINTERS LLP**
N.C. State Bar No. 10028
PO Box 33550
Raleigh, North Carolina 27636
Telephone Number: (919) 865-7000
Facsimile Number: (919) 865-7010
jon.sasser@elliswinters.com

J. Wiley George (TX Bar. No. 07805445)
Robin Russell (TX Bar No. 17424001)
Charles B. Hampton (TX Bar No. 00793890)
Scott Locher (TX Bar No. 12457500)
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas 77002
Telephone Number: (713) 220-4200
Facsimile Number: (713) 238-7192
wileygeorge@andrewskurth.com
rrussell@andrewskurth.com
charleshampton@andrewskurth.com
scottlocher@andrewskurth.com

Paul N. Silverstein (NY Bar No. PS 5098)
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, New York 10017
Telephone Number: (212) 850-2800
Facsimile Number: (212) 850-2929
paulsilverstein@andrewskurth.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was electronically filed today using the Court's CM/ECF system that will electronically notify and serve the following counsel of record:

Robert E. Harrington
Andrew W. J. Tarr
ROBINSON BRADSHAW & HINSON, P.A.
101 North Tyron Street, Suite 1900
Charlotte, North Carolina 28246
rharrington@rbh.com
atarr@rbh.com

Philip S. Beck
James B. Heaton, III
Mark L. Levine
Abby Marie Mollen
Brian C. Swanson
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
philip.beck@bartlit-beck.com
tamara.hoogewerf@bartlit-beck.com
jb.heaton@bartlit-beck.com
mark.levine@bartlit-beck.com
abby.mollen@bartlit-beck.com
brian.swanson@bbhps.com

Philip D. Anker
WILMER CUTLER PICKERING HALE & DORR LLP
399 Park Avenue
New York, New York 10022
philip.anker@wilmerhale.com

Craig Goldblatt
Danielle Spinelli
Lauren Hume (awaiting admission)
WILMER CUTLER PICKERING HALE & DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
craig.goldblatt@wilmerhale.com
danielle.spinelli@wilmerhale.com

-17-
HOU:3357550.6
Case 3:11-cv-00597-MOC-DCK   Document 161   Filed 10/07/13   Page 17 of 18

Scott H. Angstreich
Reid M. Figel
Andrew E. Goldsmith
David L. Schwarz
KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL
1615 M Street, N.W.
Washington D.C. 20036
sangstreich@khte.com
rfigel@khhte.com
agoldsmith@khhte.com
dschwarz@khhte.com

      This the 7th day of October, 2013.

                              By:   /s/ Jonathan D. Sasser
                                       Jonathan D. Sasser