**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:11-cv-00597-MOC-DCK**

|  |  |
|---|---|
| THE FAIRPOINT COMMUNICATIONS, INC. ET AL. LITIGATION TRUST,<br><br>Plaintiff,<br><br>- v. -<br><br>VERIZON COMMUNICATIONS, INC., NYNEX CORPORATION, VERIZON NEW ENGLAND, INC., and VERIZON INFORMATION TECHNOLOGIES L.L.C.,<br><br>Defendants. | **PLAINTIFF'S STATEMENT OF ISSUES, DEFENDANTS' STATEMENT OF ISSUES, AND JOINT STIPULATIONS OF FACT** |

In accordance with the Court's Revised Case Management Order (Dkt. No. 165), Plaintiff The FairPoint Communications, Inc. *et al.* Litigation Trust (the "Trust") and Defendants Verizon Communications Inc., NYNEX LLC (named in the Second Amended Complaint as NYNEX Corporation), Verizon New England Inc., and Verizon Information Technologies LLC (collectively, "Defendants") jointly submit Plaintiff's Statement of Issues, Defendants' Statement of Issues, and the parties' Joint Stipulations of Fact.

### PLAINTIFF'S STATEMENT OF ISSUES

1.  Did Northern New England Spinco Inc. ("Spinco") make one or more transfers of interests in property with an actual intent to hinder, delay, or defraud any entity to which Spinco was on March 31, 2008, or thereafter became, indebted?

2.  Should any Defendant's actual intent to hinder, delay, or defraud be imputed to Spinco?

3.  Did Spinco transfer an interest in property in connection with the Spinco Notes?

4.      If so, was Spinco's transfer made directly or indirectly to or for the benefit of any Defendant?

5.      Did any Defendant take a transfer for value and in good faith?

6.      What sum of money is Plaintiff entitled to recover from each Defendant on account of the avoided transfers?

7.      What sum of money is Plaintiff entitled to recover from each Defendant for prejudgment interest?

## DEFENDANTS' STATEMENT OF ISSUES

1.      Who is the relevant debtor under Section 548 of the Bankruptcy Code, Spinco or FairPoint?

2.      Should the intent of any Defendant be imputed to Spinco (if Spinco is the relevant debtor)?

3.      Did the relevant debtor (either independently or through the imputed intent of any Defendant) transfer any "interest of the debtor in property" to or for the benefit of any Defendant with "actual intent to hinder, delay, or defraud" creditors within the meaning of Section 548?

4.      Did any or all Defendants act in good faith and provide value?

5.      Is the Trust entitled to recover money from any Defendant under Section 550 of the Bankruptcy Code, and if so how much?

6.      May the Trust recover from any Defendant the face amount of the Notes?

7.      May the Trust recover for the benefit of beneficiaries of the Trust whose claims against FairPoint derive from the bank loans and Notes that were made and issued for the purpose of financing the Transaction and with knowledge that the proceeds of the bank loans and the Notes would be transferred or issued to Verizon New England Inc.?

2

## JOINT STIPULATIONS OF FACT

1.      On October 26, 2009, FairPoint Communications, Inc. ("FairPoint") and various of its subsidiaries (collectively the "FairPoint Debtors") filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

2.      On January 13, 2011, the Bankruptcy Court confirmed the FairPoint Debtors' plan of reorganization (the "Plan").

3.      The Plan and order confirming the Plan ("Confirmation Order") provided for the creation of the FairPoint Communications, Inc. Et Al. Litigation Trust (the "Trust").

4.      The Plan became effective on January 24, 2011.

5.      On January 24, 2011, pursuant to the Plan and Confirmation Order, reorganized FairPoint, for itself and the other Debtors, executed a Litigation Trust Agreement that established the Trust.

6.      Pursuant to the Litigation Trust Agreement, Mark Holliday was appointed as the Trust's sole Trustee.

7.      Per the terms of the Plan, the Trust's beneficiaries are former "Class 4" and "Class 7" creditors whose claims against the FairPoint Debtors' bankruptcy estates were allowed but were not paid in full upon Plan confirmation and at the effective date.

8.      The "Class 7" creditors are unsecured creditors whose claims against the FairPoint bankruptcy estate on the petition date, which were later allowed, totaled $578,109,212.55, $574,636,995 of which were claims of the holders of the unsecured bonds (the "Notes") used to finance the transaction described further herein.

Case 3:11-cv-00597-MOC-DCK   Document 171   Filed 11/15/13   Page 3 of 11

9.      After the Plan was confirmed and went effective, the Class 7 creditors received (i) 2,101,676 shares of common Reorganized FairPoint common stock ("Reorganized FairPoint Stock"), certain warrants to purchase up to 3,582,402 shares of Reorganized FairPoint Stock exercisable pursuant to Exhibit C to the Plan, and (iii) 45% of the Trust interests.

10.     Per the terms of the Plan, the "Class 4" creditors are those whose claims against the FairPoint Debtors' bankruptcy estates derived from  secured loans.

11.     The "Class 4" creditors' claims on the petition date, which were later allowed, totaled approximately $2 billion.

12.     After the Plan was confirmed and went effective, the Class 4 creditors received (i) $1 billion debt obligation of Reorganized FairPoint, (ii) 23,620,718 shares of Reorganized FairPoint Stock, and (iii) 55% of the Trust interests.

13.     Verizon Communications Inc. ("Verizon") is a Delaware corporation headquartered in New York, NY.

14.     Defendant NYNEX LLC ("NYNEX"), mis-named in the Second Amended Complaint as NYNEX Corporation, is a Delaware limited liability corporation with its primary place of business in New York, NY.

15.     NYNEX was at all material times, and remains today, wholly-owned by Verizon.

16.     Defendant Verizon New England, Inc. ("VNE") is a New York corporation with its primary place of business in Boston, MA.

17.     VNE was at all material times, and remains today, wholly-owned by NYNEX.

18.     Verizon Information Technologies LLC ("VIT") is a Delaware limited liability company.

19.     VIT was at all material times, and remains today, 100% owned directly or indirectly by Verizon.

20.     FairPoint is a Delaware corporation headquartered in Charlotte, North Carolina.

21.     FairPoint was established in 1991 as company to acquire and operate local telephone companies in rural markets.

22.     In February 2005, FairPoint became a public company.

23.     For purposes of this stipulation, "NNE Businesses" is defined to mean Verizon's landline businesses in Maine, New Hampshire, and Vermont.

24.     In March 2006, FairPoint formally engaged Lehman Brothers as financial advisors for the proposed transaction; shortly thereafter, FairPoint engaged Morgan Stanley as financial advisors for the proposed transaction.

25.     Lehman Brothers and Morgan Stanley advised FairPoint regarding the proposed transaction.

26.     FairPoint and Verizon negotiated terms for the transaction during 2006 and early January 2007.

27.     FairPoint was represented by the law firm of Paul Hastings Janofsky & Walker in the negotiations.

28.     Verizon was advised by Merrill Lynch and the law firm of Debevoise & Plimpton.

29.     On January 14, 2007, Deutsche Bank delivered a Fairness Opinion to FairPoint's Board of Directors.

30.     On January 14, 2007, Merrill Lynch delivered a Fairness Opinion to Verizon's Board of Directors.

5

31.     To facilitate the proposed transaction, on December 20, 2006, Verizon incorporated Northern New England Spinco Inc. ("Spinco") as a Delaware corporation, with Verizon being Spinco's sole shareholder.

32.     On or about December 20, 2006, Verizon appointed its officers (i) Steve Smith as Spinco's sole director and as a Spinco Vice-President, (ii) John Diercksen as Spinco's President, (iii) Goodwin Bennett as a Spinco Vice President, and  (iv) Janet Garrity as Spinco's Treasurer.

33.     Steve Smith was  Vice President, Business Development in Verizon's Domestic Telecom unit.

34.     John Diercksen was Verizon's Executive Vice President – Strategy, Development and Planning.

35.     Goodwin Bennett was Vice President and Associate General Counsel for Verizon.

36.     Janet Garrity and Neil Olson were both officers in Verizon's Treasury department.

37.     Steve Smith, John Diercksen, Goodwin Bennett, and Janet Garrity were Spinco's only officers, and Steve Smith was Spinco's only director until the Merger.

38.     On January 15, 2007, Verizon, Spinco, and FairPoint signed contracts providing terms for the transaction ("Transaction").

39.     Verizon and Spinco executed a Distribution Agreement on January 15, 2007.

40.     Also on January 15, 2007, Verizon, Spinco and FairPoint signed an Agreement And Plan Of Merger ("Merger Agreement").

41.     On January 15, 2007, FairPoint formally engaged Capgemini U.S. LLC ("Capgemini") in connection with the build-out, integration, and implementation of new back-office systems.

42.     Capgemini was a global systems integration firm.

43.     FairPoint agreed to pay Capgemini approximately $200 million for the work.

44.     On January 15, 2007, FairPoint signed a Transition Services Agreement ("TSA") with VIT and others.

45.     Verizon's landline telephone businesses in Maine, Vermont and New Hampshire were subject to regulation by the public utility commission of each such state.

46.     Each of the three states had a public utility commission ("PUC" or collectively the "PUCs").

47.     The Merger Agreement provided that the PUCs had to approve the Transaction before it could occur.

48.     In addition, the Federal Communications Commission ("FCC") had to approve the transfers of the applicable FCC licenses.

49.     On January 31, 2007, Verizon, through its wholly-owned subsidiaries, and FairPoint (together, the "Applicants") jointly filed applications with the PUCs for the necessary approvals of transfer of Verizon's local exchange and long distance businesses to FairPoint (the "Applications").

50.     To approve the transfers, each PUC had to find that Transaction was in the public interest.

51.     The PUCs and FCC heard testimony and evidence regarding the proposed Transaction, including from certain intervenors who opposed the Transaction.

52.     On November 26, 2007, the Examiner of the Advisory Staff to the Maine PUC issued a report recommending to the Maine PUC that it deny the Maine Application.

53.     On December 21, 2007, the Vermont PUC issued an order denying approval of the Transaction.

54.     On December 17, 2007, the New Hampshire PUC declined to approve the Transaction.

55.     On December 21, 2007, the Applicants, the Maine Office of the Public Advocate, and the Maine PUC Staff, among others, executed a Stipulation (the "Maine Stipulation") of terms to settle all issues regarding the Maine PUC's approval of the Transaction.

56.     The Applicants subsequently entered similar stipulations with Vermont and New Hampshire PUC staffs.

57.     On February 1, 2008, the Maine PUC approved the Maine Stipulation and formally approved the Transaction.

58.     On February 15, 2008, the Vermont PUC approved the Vermont Stipulation and formally approved the Transaction.

59.     On February 25, 2008, the New Hampshire PUC, based on a 2-1 vote, approved the New Hampshire Settlement Agreement and formally approved the Transaction (the "New Hampshire Approval Order").

60.     One New Hampshire PUC Commissioner, Graham Morrison, dissented and voted not to approve the Transaction.

61.     As a condition for their Transaction approvals, the PUCs appointed Liberty Consulting Group as a third-party independent consultant to monitor the cutover readiness of FairPoint, and to provide periodic progress reports, including a final cutover readiness report to the PUCs.

62.     Bank of America, Lehman, Morgan Stanley, Deutsche Bank, Wachovia, and Merrill Lynch or their affiliates were represented by the law firm of Cahill Gordon & Reindel in connection with the Notes.

8

63.     Section 8.1(l) of the Merger Agreement provided that a pre-condition for the Merger to occur was for Verizon and FairPoint to "have received the opinion of a nationally recognized independent valuation firm selected by Verizon attesting to the solvency of the Surviving Corporation on a pro forma basis immediately after the Effective Date [of the Merger], which opinion shall be in customary form" (the "Solvency Opinion").

64.     On February 22, 2008, Houlihan Lokey provided a Solvency Opinion to the Board of Directors of Verizon and the Board of Directors of Spinco.

65.     The Transaction closed on March 31, 2008.

66.     On June 17, 2008, FairPoint issued a press release saying the targeted cutover was delayed to November 2008.

67.     On September 15, 2008, FairPoint announced that it was further delaying cutover to the end of January 2009.

68.     On September 15, 2008, Lehman Brothers Holdings Inc. filed for bankruptcy.

69.     In November 2008, Liberty reported to the PUCs that FairPoint was making progress to be ready to cutover at the end of January 2009.

70.     In November 2008, the PUCs did not intervene to delay cutover.

71.     In late November 2008, FairPoint issued its notice to Verizon of cutover readiness for the end of January 2009.

72.     On or around January 30, 2009, proceedings began to cutover.  The cutover was completed on or around February 9, 2009.

73.     After cutover, FairPoint experienced problems with its new back office systems.

This 15th day of November, 2013.

/s/ Jonathan D. Sasser
Jonathan D. Sasser (N.C. Bar No. 10028)
James M. Weiss (N.C. Bar No. 43286)
**ELLIS & WINTERS LLP**
PO Box 33550
Raleigh, NC  27636
Phone: 919-865-7000
Facsimile: 919-865-7010
jon.sasser@elliswinters.com
jamie.weiss@elliswinters.com

*Of Counsel:*
J. Wiley George
Robin Russell
Charles B. Hampton
Scott Locher
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, TX  77002
Phone: 713-220-4200
Facsimile: 713-238-7192
wileygeorge@andrewskurth.com
rrussell@andrewskurth.com
champton@akllp.com
slocher@akllp.com

Paul N. Silverstein
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, NY  10017
Phone: 212-850-2800
Facsimile: 212-850-2929
paulsilverstein@andrewskurth.com

*Attorneys for Plaintiff*

/s/ Robert E. Harrington
Robert E. Harrington (N.C. Bar No. 26967)
Andrew W. J. Tarr (N.C. Bar No. 31827)
**ROBINSON, BRADSHAW
& HINSON, P.A.**
101 North Tryon Street, Suite 1900
Charlotte, NC  28246
Phone: 704-377-8387
Facsimile: 704-373-3987
rharrington@rbh.com

*Of Counsel:*
Philip S. Beck
Mark L. Levine
James B. Heaton, III
Brian C. Swanson
Abby M. Mollen
**BARTLIT BECK HERMAN PALENCHAR
& SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL  60654
Phone: 312-494-4400
Facsimile: 312-494-4440
philip.beck@bartlit-beck.com
mark.levine@bartlit-beck.com
jb.heaton@bartlit-beck.com
brian.swanson@bartlit-beck.com
abby.mollen@bartlit-beck.com

Philip D. Anker
**WILMER CUTLER PICKERING HALE
AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY  10007
Phone: 212-230-8890
Facsimile: 212-230-8800
philip.anker@wilmerhale.com

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was electronically filed today using the Court's

CM/ECF system which will electronically notify the following counsel of record:

Jonathan D. Sasser
James M. Weiss
**ELLIS & WINTERS LLP**
PO Box 33550
Raleigh, North Carolina  27636
jon.sasser@elliswinters.com
jamie.weiss@elliswinters.com

J. Wiley George
Robin Russell
Charles B. Hampton
Scott Locher
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas 77002
wileygeorge@andrewskurth.com
rrussell@andrewskurth.com
champton@akllp.com
slocher@akllp.com

Paul N. Silverstein
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, New York  10017
paulsilverstein@andrewskurth.com

This 15th day of November, 2013.

s/ Robert E. Harrington
Robert E. Harrington

11