IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:11-cv-00597-MOC-DCK

| | |
|---|---|
| THE FAIRPOINT COMMUNICATIONS, INC. ET AL. LITIGATION TRUST,<br><br>Plaintiff,<br><br>- v. -<br><br>VERIZON COMMUNICATIONS INC., NYNEX CORPORATION, VERIZON NEW ENGLAND INC., and VERIZON INFORMATION TECHNOLOGIES LLC,<br><br>Defendants. | **VERIZON'S POST-TRIAL RESPONSE BRIEF ON DAMAGES** |

**INTRODUCTION**

During closing argument at trial, the Trust effectively conceded that its massive "damages" demand is untenable. Despite insisting both before and during trial that the Court's options were all or nothing—award the Trust $1.7 billion or zero—the Trust now asks the Court to enter an award (still vastly overstated) of approximately $663 million. The Trust's desire to back away from its all-or-nothing demand at trial is understandable. The proposition that Verizon should pay $1.7 billion to a group of sophisticated investors that funded the transaction—not one of whom claims it was defrauded in any way by Verizon—along with other investors that later bought FairPoint debt at pennies on the dollar is not credible. And despite the Trust's post-trial efforts to conjure up a less massive number that it hopes the Court will find palatable, the fact remains that the Trust put on a legally and factually deficient, quasi-fraudulent inducement case, and is entitled to no recovery at all. Nothing about the Trust's lower figure overcomes its failure to prove that Verizon is liable for a fraudulent transfer under the Bankruptcy Code.

Even if the Court were to conclude that the Trust had met its burden of proving liability (which it has not), the Court should award only limited monetary relief, if any. As the Trust now acknowledges, under the Bankruptcy Code, this Court should offset the value of the assets Verizon transferred to FairPoint (and which FairPoint continues to own and successfully operate today) against any recovery. Thus, the Trust asks the Court to take the sum of the cash ($1.16 billion) and Spinco Notes ($527 million) FairPoint transferred or issued to Verizon when the transaction closed, which amounts to approximately $1.7 billion, and subtract the Trust's proposed valuation of the Northern New England land lines ("NNE Assets") as of March 31,

2008.  The Trust does *not* seek to recover the approximately $500 million Verizon shareholders received in FairPoint equity.[1]

But the Trust failed to prove that the NNE Assets that FairPoint acquired were worth less than the price FairPoint paid for them on March 31, 2008:  $2.2 billion, which is the combined value of the cash, Spinco Notes, and equity.  The Trust's only evidence of a lower value is the opinion of Carlyn Taylor, whose valuation of the NNE Assets as of that date is an outlier and contrary to each of the many contemporaneous, unbiased valuations by sophisticated financial institutions and the market itself.  Nor has the Trust provided a legitimate reason for disregarding altogether the valuation opinion of Verizon's expert, Craig Elson, who testified that the fair market value of the NNE Assets on March 31, 2008 would be the $2.2 billion price that FairPoint paid to acquire them.  If Mr. Elson is correct, the Trust is entitled to no recovery, under its own offset theory.

Moreover, as a matter of law, the Trust is not entitled to recover the $527 million that Verizon received from third parties in exchange for the Spinco Notes.  (D.I. 192, Verizon PCOL ¶¶ 111-15)  Any recovery to the Trust must reflect only the difference (if any) between (1) the $1.16 billion cash payment that Verizon received in the transaction and (2) the value of the NNE Assets that Verizon gave in exchange.  Even accepting the Trust's unreasonably low valuation of the NNE Assets, excluding the Spinco Notes alone would reduce the Trust's new demand to about $136 million.  And $136 million still overstates what Verizon should owe, if liable at all.

---

[1] Nor could the Trust seek recovery of this amount, given its (incorrect) assertion that FairPoint was insolvent and had no equity value as of March 31, 2008.  Had FairPoint been insolvent as of that date, as the Trust claims, the value of the FairPoint stock transferred to Verizon shareholders would have been $0, leaving no equity value for the Trust to recover.  *See U.S. Bank Nat'l Assoc. v. Verizon Commc'ns, Inc.*, No. 3:10-cv-1842-G, 2012 WL 3100778, at *12 (N.D. Tex. July 31, 2012) ("Even if the issuance of stock is construed as a potential transfer of property, however, the issuance of worthless stock cannot be a fraudulent transfer of property").

2

**ARGUMENT**

As the Trust now argues, if the Court finds Verizon liable for a fraudulent transfer, the Court should award the Trust an amount reflecting the difference (if any) between (1) the value of the NNE Assets on March 31, 2008 and (2) the value of any fraudulent transfer that the Trust may recover under the Bankruptcy Code. The Trust gets the numbers on both sides of this equation wrong. On the first side (the value of the NNE Assets), the Trust assumes a valuation that has no evidentiary basis other than Ms. Taylor's opinion and that disregards other more credible evidence supporting a valuation at least two times higher. On the second side (the value of the transfers), the Trust improperly includes the alleged value of the Spinco Notes, which the Trust has no right to recover under the Bankruptcy Code. Correcting for the Trust's errors, the Trust is entitled to no recovery at all.

**I. The Trust failed to meet its burden of proving "damages" under its offset scenario**

The Trust failed to prove that the assets that FairPoint received in the transaction were worth less than the price FairPoint paid for them. As a result, the Trust cannot recover any amount under its new offset theory, which depends on proof that the value of the NNE Assets as of March 31, 2008 was less than the value of the alleged fraudulent transfer.

The Trust relies exclusively on Ms. Taylor's valuation of the NNE Assets to argue that FairPoint paid more for the NNE Assets than they were worth. But Ms. Taylor does not dispute that on January 15, 2007, when the parties signed the binding agreements, the fair market value for the NNE Assets was $2.7 billion—the price FairPoint, as a willing buyer, and Verizon, as a willing seller, agreed to. (D.I. 192, Verizon PFOF ¶ 273) By the time the transaction closed on March 31, 2008, FairPoint's stock price had decreased, making the purchase price approximately $2.2 billion—the combined value of the cash ($1.16 billion), Spinco Notes (between $527 and

3

$551 million),[2] and equity (approximately $500 million) that FairPoint provided to Verizon (or its shareholders) in exchange for the NNE Assets. (*Id*. at ¶ 89) Yet, under the Trust's theory, supported solely by the outlier opinion of Ms. Taylor, the NNE Assets were worth only approximately $1 billion on March 31, 2008, rather than the $2.2 billion that FairPoint, still a willing buyer, and Verizon, still a willing seller, exchanged on that date. But the Trust did not prove that as of March 31, 2008 the NNE Assets were worth less than $2.2 billion—much less $1.7 billion (the amount used in the Trust's calculation), or $1.16 billion (the proper amount against which to compare the value of the NNE Assets, as explained in Section II.A. below).

Despite the Court's repeated statements at trial that it was disinclined to adopt one expert's valuation over the other's, the Trust's new post-trial damages calculation requires the Court to accept Ms. Taylor's valuation, and reject Mr. Elson's outright. This is the only way the Court could find that the NNE Assets were worth only approximately $1 billion on March 31, 2008.[3] But even if the Court were now willing to decide the various methodological disputes between Ms. Taylor and Mr. Elson and resolve the valuation issue, Ms. Taylor's valuation is not credible. According to Ms. Taylor, the value of the NNE Assets declined from $2.7 billion on January 15, 2007 to approximately $1 billion on March 31, 2008. While the financial markets certainly worsened during that period, Ms. Taylor provided no plausible explanation for such a precipitous decline in value over 14 months. Nor did Ms. Taylor explain why she rejected (or ignored) the $2.2 billion value that Verizon and FairPoint each ascribed to the NNE Assets on March 31, 2008 in favor of her own litigation-contrived valuation. And neither Ms. Taylor nor

---

[2] The Spinco Notes had a face value of $551 million; Verizon used them to cancel $527 million in outstanding Verizon commercial paper. In its post-trial brief, the Trust includes $527 million in the amount against which it applies its offset.

[3] To arrive at its proposed damages figure of $663,628,230, the Trust used a midpoint of Ms. Taylor's various valuations—$1,023,805,500—and subtracted that from the alleged value of the cash and Spinco Notes—$1,687,433,730. (D.I. 194, Trust PCOL ¶ 113)

4

the Trust has even attempted to explain how the value of the NNE Assets could have dropped by two-thirds in the 14-month period between signing and closing without triggering the contractual provision the parties negotiated to protect against a material decline in the business, a provision everyone testified had not been triggered.  (D.I. 192, Verizon PFOF ¶¶ 85, 226)

If the Court determines that it must adopt one of the two competing expert valuations in this case, it should be Mr. Elson's, not Ms. Taylor's.  Mr. Elson's opinion that the NNE Assets were worth at least $2.2 billion as of March 31, 2008 was supported by substantial evidence.  The market itself plainly valued the assets at more than $2.2 billion—on the day the deal closed, the total value of FairPoint's stock increased to approximately $800 million, reflecting the added value of the NNE Assets FairPoint obtained (compared to the increased debt it undertook).  (*Id.*, Verizon PCOL ¶ 57)  When added to FairPoint's debt—approximately $1.635 billion in bank debt plus the $551 million in Spinco Notes—the $800 million in FairPoint "equity value" implied that the total value of FairPoint's assets, most of which consisted of the NNE Assets, was approximately $3 billion.  Moreover, shortly before the transaction closed, Houlihan Lokey provided its own expert valuation, concluding that the NNE Assets were worth between $2.5 billion and $2.86 billion.  (*Id.*, Verizon PFOF ¶ 101)  As of January 2007, FairPoint's own advisor, Deutsche Bank, valued the NNE Assets as high as $3.2 billion in rendering its opinion that the transaction was fair from FairPoint's perspective.  Deutsche Bank's valuation was consistent with the contemporaneous opinions of FairPoint's other financial advisors, Lehman Brothers and Morgan Stanley, as well as Verizon's financial advisor, Merrill Lynch.  (*Id.*, Verizon PFOF ¶ 87)  No evidence supports Ms. Taylor's opinion that the value of those assets fell by nearly two-thirds—from $2.7 billion to only around $1 billion—by the time the deal closed.  Because Ms. Taylor's valuation opinion was not credible, the Trust failed to prove that

5

the NNE Assets were worth less than the consideration FairPoint provided on March 31, 2008, and the Trust is entitled to no damages.

Moreover, as a matter of law, the Trust is not entitled to recover any amounts for the sophisticated financial institutions (or their successors) that knowingly funded the transaction after conducting their own due diligence. (*Id.*, Verizon PCOL ¶¶ 116-26) The Trust in its post-trial brief does not attempt to disaggregate any amounts that Verizon, if liable, might owe to trade or other creditors who did not participate in the transaction.

## II. The Trust's post-trial alternate damages figure far overstates any amounts that Verizon could owe

Even if the Court were to consider Ms. Taylor's valuation opinion, the Trust still vastly overstates the damages that could be awarded.

### A. The Trust cannot recover from Verizon the $527 million that Verizon received from third parties in exchange for the Spinco Notes

As Verizon explained in its summary judgment motion (D.I. 117 at 29-30) and again in its Proposed Conclusions of Law (D.I. 192, Verizon PCOL ¶¶ 111-15), the Trust cannot as a matter of law recover the $527 million that Verizon received from third parties in exchange for the Spinco Notes. When Spinco issued the Notes to Verizon, it did not transfer cash; it incurred an obligation, which FairPoint assumed when the transaction closed. Thus, to make the creditors whole with respect to the Notes, all that was necessary in the bankruptcy was for FairPoint to cancel the debt, not "recover" cash that Spinco never transferred in the first place. (D.I. 117 at 29-30; D.I. 192, Verizon PCOL ¶¶ 111-15)

Accordingly, if the Court were to award any recovery under the Trust's offset theory, the relevant question is the deficiency (if any) between (1) the $1.16 billion cash payment that FairPoint paid and (2) the value of the NNE Assets it received in exchange. The Trust's proposed alternative award amount—which already excludes the value of the FairPoint stock that

6

the Trust itself concedes it may not recover—must further be reduced by $527 million, the portion of the alleged transfers that the Trust attributes to the Spinco Notes. The Trust's new damages number of $663,628,230 is thus overstated by $527 million. The largest recovery available to the Trust is approximately $136 million.

### B. Taking into account Mr. Elson's valuation reduces, or extinguishes, any possible recovery for the Trust

Any recovery by the Trust should be further reduced by taking into account the valuation opinion of Verizon's expert, Mr. Elson. The Trust provides no basis for disregarding Mr. Elson's valuation altogether (aside from the inconvenient fact that considering it will lower, or extinguish, any damages the Trust could recover). If the Court were to adopt Mr. Elson's valuation of $2.2 billion, rather than Ms. Taylor's, the Trust would be entitled to no recovery at all, as the Trust concedes. (D.I. 194, Trust PFOF ¶ 192) Even taking the average of Ms. Taylor's valuation ($1.02 billion) and Mr. Elson's ($2.2 billion), and then comparing that average to the $1.16 billion cash payment, the Trust would be entitled to no recovery.

Finally, even if the Trust could recover from Verizon for the Spinco Notes—and, for the reasons discussed, it cannot—any judgment in the Trust's favor would still need to be far less than the Trust suggests. Using the average of Mr. Elson's and Ms. Taylor's valuations, and including the $527 million, the Trust's recovery would be approximately $76 million.[4]

For the Court's convenience, the possible awards under the alterative scenarios using the Trust's offset theory are listed below:

---

[4] Specifically, the average of Ms. Taylor's mid-point valuation of $1,023,805,500 and Mr. Elson's valuation of $2.2 billion is $1,611,902,750. Subtracting that from the value of the $1.16 billion cash and the $527 million that Verizon received from third parties in exchange for the Spinco Notes (together, $1,687,433,730) would yield damages of $75,530,980.

7

| Valuation Source | Including Value of Spinco Notes | Excluding Value of Spinco Notes |
|---|---|---|
| Taylor | $663,628,230 (Trust's proposed award) | $136,628,230 |
| Elson | $0 | $0 |
| Taylor/Elson Average | $75,530,980 | $0 |

**III.     This Court should determine the amount of any recovery**

In its brief, the Trust acknowledges that this Court may properly decide any issue of damages, and in its pretrial Statement of Issues, the Trust included that issue among those that it asked this Court to resolve at trial.  (D.I. 171 at 2)  For the first time now, however, the Trust also suggests that the damages questions could be resolved by a new bankruptcy judge in New York.  (D.I. 195 at 6-7)  Any issues concerning how much, if any, the Trust can recover should be resolved by this Court.  The Trust cites no law, and we are aware of none, that would allow this Court to refer the damages portion of this lawsuit to a bankruptcy judge in a different district.  *Cf*. 28 U.S.C. § 157(a) (permitting the referral by a district court of proceedings relating to a bankruptcy case only to a bankruptcy judge in the same district).  And the FairPoint bankruptcy case is closed; it would have to be reopened, something that only a bankruptcy (or district) judge in the Southern District of New York, where the bankruptcy case proceeded, could do.  11 U.S.C. § 350(b).  In any event, as a matter of judicial economy, it makes no sense to have this Court decide liability, only to throw questions of damages, if any, to a new bankruptcy judge in a separate court with no familiarity with this matter (the bankruptcy case is closed and the prior bankruptcy judge, sadly, passed away several weeks ago)—a course that would necessitate additional trial or hearings.  This would be a substantial waste of resources for both Verizon and the Trust and would significantly delay the outcome of this case.  This Court has heard the evidence and testimony and is in the best position to decide issues of both liability and damages.  No part of this case should be transferred to a new bankruptcy judge in New York.

8

## CONCLUSION

The Trust has failed to prove that the FairPoint transaction constituted a fraudulent transfer. But even if the Court determines that Verizon is liable, the Trust is not entitled to any recovery. The Trust is suing overwhelmingly for the benefit of sophisticated financial institutions (or their successors) that, as a matter of law, cannot seek to avoid the payments to Verizon that they knowingly funded. Moreover, even using the Trust's offset theory, the weight of the evidence, and controlling law, show that the Trust is entitled to no recovery for the benefit of any creditors because the Trust cannot recover the $527 million value of the Spinco Notes, and the value of the NNE Assets that FairPoint acquired was greater than the $1.16 billion in cash it provided to Verizon, the only other amount that even the Trust claims it can recover.

January 29, 2014						Respectfully submitted,

							/s/ Robert E. Harrington
							Robert E. Harrington (N.C. Bar No. 26967)
							Andrew W. J. Tarr (N.C. Bar No. 31827)
							**ROBINSON, BRADSHAW & HINSON, P.A.**
							101 North Tryon Street, Suite 1900
							Charlotte, NC 28246
							Phone: 704-377-8387
							Facsimile: 704-373-3987
							rharrington@rbh.com
							atarr@rbh.com

*Of Counsel:*
Philip S. Beck
Mark L. Levine
James B. Heaton, III
Brian C. Swanson
Abby M. Mollen
**BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP**
54 West Hubbard, Suite 300
Chicago, IL 60654
Phone: 312-494-4400
Facsimile: 312-494-4440
philip.beck@bartlit-beck.com
mark.levine@bartlit-beck.com
jb.heaton@bartlit-beck.com
brian.swanson@bartlit-beck.com
abby.mollen@bartlit-beck.com

Philip D. Anker
**WILMER CUTLER PICKERING HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Phone: 212-230-8890
Facsimile: 212-230-8800
philip.anker@wilmerhale.com

*Attorneys for Defendants*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing was electronically filed today using the Court's CM/ECF system which will electronically notify the following counsel of record:

>Jonathan D. Sasser
>James M. Weiss
>**ELLIS & WINTERS LLP**
>PO Box 33550
>Raleigh, North Carolina 27636
>jon.sasser@elliswinters.com
>jamie.weiss@elliswinters.com
>
>J. Wiley George
>Robin Russell
>Charles B. Hampton
>Scott Locher
>**ANDREWS KURTH LLP**
>600 Travis, Suite 4200
>Houston, Texas 77002
>wileygeorge@andrewskurth.com
>rrussell@andrewskurth.com
>champton@akllp.com
>slocher@akllp.com
>
>Paul N. Silverstein
>**ANDREWS KURTH LLP**
>450 Lexington Avenue
>New York, New York 10017
>paulsilverstein@andrewskurth.com

This 29th day of January, 2014.

>/s/ Robert E. Harrington
>Robert E. Harrington