# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Charlotte Division
### Civil Action No. 3:11-cv-00597-MOC-DCK

**THE FAIRPOINT COMMUNICATIONS, INC.** *ET AL.* **LITIGATION TRUST,**

        **Plaintiff,**

    **v.**

**VERIZON COMMUNICATIONS, INC., NYNEX CORPORATION, VERIZON NEW ENGLAND, INC., AND VERIZON INFORMATION TECHNOLOGIES L.L.C.,**

**Defendants.**

## THE TRUST'S RESPONSE TO VERIZON'S POST-TRIAL BRIEFS

The Trust's *Post-Trial Proposed Findings of Fact and Conclusions of Law* (the "Proposed Findings") (Dkt. 194) explains and provides factual support as to why the Trust should prevail on its fraudulent transfer claims against the Verizon Defendants.[1] Neither Defendants' *Post Trial Brief* (the "Post-Trial Brief") (Dkt. 193) nor Defendants' *Post-Trial Response to Brief on Damages* (Dkt. 196) ("Post-Trial Damages Brief") alters that conclusion, but they do merit brief replies.

---

[1] Unless otherwise noted, defined terms in this Response are as defined in the Trust's Proposed Findings, and references to "FF__" and "CL__" refer to the applicable findings of fact or conclusions of law in the Proposed Findings.

## INTRODUCTION

The principal argument raised by Verizon in its Post-Trial Brief is that the evidence at trial supported a common law fraudulent inducement claim rather than a statutory fraudulent transfer claim. In short, Verizon argues that even if it committed fraud in connection with the $1.7 billion that Spinco borrowed and then transferred to Verizon as part of the Transaction, it was the wrong kind of fraud for the Trust to recover under Section 548(a)(1)(A) of the Bankruptcy Code (the "Code"). Verizon is wrong. The Trust met its burden under Section 548(a)(1)(A) of the Code. For the reasons outlined in its Proposed Findings, the Trust respectfully requests that the Court enter a judgment in favor of the Trust and against Verizon.

In addition, Verizon's Post-Trial Damages Brief contains two calculation errors that require an explanation and corrections as discussed in Section D below.

## ARGUMENT

### A.    THE TRANSFERS TO VERIZON ARE AVOIDABLE FRAUDULENT TRANSFERS

Verizon devotes approximately half of its Post-Trial Brief to arguing that Verizon committed the "wrong kind of fraud" for the Trust to recover under Section 548(a)(1)(A) of the Bankruptcy Code. Verizon argues that:

> Fundamentally, fraudulent transfer law does not concern itself with the "front end" of a transaction—why an investor decided to make a loan or finance a transaction. Common law fraud provides recourse to a lender that believes it was tricked, through fraudulent statements or omissions, into lending money. Instead, fraudulent transfer law looks at the "back end" of the transaction—a creditor's ability to collect on a loan it previously made.

(Dkt. 193, p. 2]

Essentially Verizon's argument boils down to its assertion that defrauding a creditor to obtain a loan for the purpose of making a transfer (the "front end" per Verizon) is somehow different than making a transfer with funds obtained by defrauding a creditor (the "back end" per

-2-

Verizon).  According to Verizon, only the latter situation would be subject to a fraudulent transfer claim because, again according to Verizon, the sole recourse for the former is a fraudulent inducement claim.  Verizon's argument ignores the notion that "both ends" of the Transaction, using Verizon's nomenclature, are intertwined by the same fraudulent activity.[2] Indeed, there is ample case law finding an actionable fraudulent transfer claim in a transaction facilitated by and/or intertwined with fraudulent inducement or similar deceitful conduct in connection with the extension of credit.[3]  As established at trial, that is precisely what happened here.

Fraudulent transfer law is also not as "rigid" or "black and white" as Verizon would have this Court believe. *See In re Nat'l Audit Def. Network*, 367 B.R. 207, 220 (Bankr. D. Nev. 2007); 5 Collier on Bankruptcy ¶ 548.04[1][a] at 548-58 (16th ed. 2013) ("myriad variations" of fraud can fit the actual fraudulent transfer intent).  Simply because the facts here may not fit within

---

[2]  In this regard, there is nothing in Section 548(a)(1)(A) that precludes a transferee from being liable for an otherwise fraudulent transfer simply because the creditors from whom assets were transferred were fraudulently induced to extend credit to the debtor to fund the transfer.  *See, e.g., Official Comm. of Unsecured Creditors of Toy King Distribs. v. Liberty Sav. Bank, FSB (In re Toy King Distribs.)*, 256 B.R. 1, 131-32 (Bankr. M.D. Fl. 2000) (debtor's concealment of information "intended to present the debtor in a false light to solicit additional trade credit" supported claim for actual fraudulent transfer under Section 548(a)(1)(A) of the Code).

[3]  *See e.g.*, CL 44-53.   Among other things, actual intent to hinder, delay, or defraud a creditor may exist where a debtor makes transfers by falsely portraying circumstances and/or concealing information to induce or affect credit extensions or forbearance or engaging in other deceitful actions.  *See e.g., In re Model Imperial, Inc.*, 250 B.R. 776, 792-93 (Bankr. S.D. Fla. 2000) (fraudulent transfer supported by evidence of debtor "concealing material information about its finances and operations…creating the false impression that it was in compliance with borrowing restrictions…depriving the Bank Group of the opportunity to make an informed decision…and… affirmatively concealing material facts…for the purpose of inducing reliance by the Bank Group in the form of continued financing."); *In re Student Fin. Corp.*, 382 B.R. 212, 217 (Bankr. D. Del. 2007) (fraudulent transfer supported by evidence that "throughout the period of time in which the Debtor requested loans from SWH…the Debtor affirmatively misrepresented its financial condition to SWH and others, including the Debtor's insurance companies, other lenders, and finanaical rating agencies."); *ASARCO, LLC v. Americas Mining Co.*, 396 B.R. 278, 372-73 (S.D. Tex. 2008) ("Although the transfer itself was not concealed, the Court finds that the dissemination of inaccurate information [related to the transfer] might have misled interested parties regarding the transaction and constitutes some evidence of [the defendant's] intent."); *In re Gene Express, Inc.*, 2013 WL 1787971 *4 (Bankr. E.D.N.C. Apr. 26, 2013) (allegation involving defendants' failure to disclose association with debtor in buying debtors' assets from lessee supported actual fraudulent transfer claim under Section 548(a)(1)(A));  *In re Tronox*, 2013 WL 6596696 (Bankr. S.D.N.Y. Dec. 12, 2013) at *32 (intent supporting fraudulent transfer finding was established not by the purpose of the transfer but in the manner in which the transfer was accomplished).

-3-

what Verizon claims to be the traditional fraudulent transfer "box" (i.e., "Phil selling his $20,000 car to his friend Wiley for $5,000") does not mean that Verizon's conduct is not actionable under Section 548(a)(1)(A) of the Code.[4]

Moreover, Verizon does not cite the Court to any case law holding that a transfer by a debtor who engaged in fraud to obtain a loan for the **purpose** of making the transfer is not subject to a fraudulent transfer claim.[5] There is no such law because that kind of conduct by a debtor falls within the express language of Section 548(a)(1)(A). Instead, Verizon cites to *Boston Trading Group v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) and *In re First Alliance Mortgage Company*, 471 F.3d 977 (9th Cir. 2006). Both cases are inapposite, however, because they each involved transfers that, unlike the Transfers here, were unrelated to the underlying fraud by which the money that funded the transfers was obtained.

Specifically, *Boston Trading* involved two investment advisors that dishonestly obtained funds by "churning" client accounts, and subsequently used a portion of those funds to make a legitimate debt repayment to the transferee. *Boston Trading*, 835 F.2d at 1510. The *Boston Trading* court found that while the transferee may have known about the improper churning, the transferee "*did not participate in* [the investment advisors'] dishonesty" and was "not a friend, relative, or other person 'specially connected' to [the investment advisors]." *Id.* at 510-11 (emphasis in original). Under those facts, the *Boston Trading* court determined that a claim against the transferee under the Massachusetts actual fraudulent transfer statute was not viable because according to that court, "[f]raudulent conveyance law is basically concerned with transfers that 'hinder, delay or defraud' creditors; it is not **ordinarily** concerned with how such

---

[4] *See* Note 3, *supra.*

[5] Nor is the Trust aware of any such case law.

HOU:3392590.10

debts were created," *Id.* at 1510 (emphasis added). Consistent with *Boston Trading* and the plain language of Section 548(a)(1)(A), however, fraudulent transfer law does encompass dishonest actions used to create a debt if the debt was created to fund the transfer, particularly when the transferor and transferee are related entities that were both engaged in the dishonesty to obtain the borrowed funds.[6]

Similarly, *First Alliance* involved a mortgage company that was engaged in a dishonest scheme to provide funds for its operations by overcharging for mortgages. *First Alliance*, 471 F.3d at 984-86. A portion of the funds was used at some point to make legitimate debt payments under a Master Repurchase Agreement ("MRA"). *Id.* at 986-87. After the mortgage company went bankrupt, the bankruptcy trustee sought to recover the debt payments made under the MRA as actual fraudulent transfers. *Id.* In rejecting that claim, the *First Alliance* court determined that the underlying fraud was unrelated to the MRA, and therefore these two components were not "just opposite sides of a single coin" as urged by the trustee. *Id.* at 1009. The First *Alliance* court explained:

> The district court found that First Alliance perpetrated a fraud by making misrepresentations in the sales pitch for the [mortgage] loans. The MRA had nothing to do with those misrepresentations…

*Id.* at 1008-09.

But that is not the situation here. Unlike *Boston Trading* and *First Alliance*, the loans by Spinco's creditors and the Transfers to Verizon were opposite sides of a single coin. Spinco borrowed $1.7 billion (via the Senior Debt and the Spinco Notes) for the express purpose of

---

[6] In this regard, the *Boston Trading* court recognized that there are no bright line rules that denote when a transfer does or does not fall within a fraudulent transfer claim, stating: "[w]e would not treat the [fraudulent transfer] 'paradigms' as rigid rules, nor would we insist that all cases fall clearly into one of those categories." *Boston Trading*, 835 F.2d at 1511.

HOU:3392590.10

funding the Transfers to Verizon.[7] The Transaction had to be structured in this manner so Verizon could treat the Transfers as tax-free returns of capital from Spinco. [FF36-46]. To obtain these Transfers, both the transferor (i.e. Spinco) and the transferee (i.e. Verizon) made material misrepresentations, material omissions, and engaged in other deceitful conduct to convince Spinco's creditors to extend credit in the face of the risk of a Hawaii-like failure in FairPoint's back-office build-out and a climate of deteriorating landline losses. [FF81-208]. Thus, unlike the facts in *Boston Trading* and *First Alliance*, here the fraudulent intent underlying Spinco/Verizon's efforts to obtain the $1.7 billion in loans was an integral part of, and inseparable from, the $1.7 billion in loan proceeds that Spinco transferred to Verizon as part of the Transaction.

## B.    FAIRPOINT'S FINANCIAL DOWNFALL AFTER THE TRANSACTION IS FURTHER EVIDENCE OF VERIZON'S FRAUDULENT INTENT.

Verizon also argues that Spinco/Verizon could not have acted with the requisite fraudulent intent in connection with the Transfers because, according to Verizon, prior to making

---

[7] *See e.g.,* PX233, Annex C, pp. 3, 6 and 8 --  *Consent in Lieu of Meeting of Board of Directors of Northern New England Spinco Inc.* dated March 25, 2008 signed by Steve Smith as Spinco's sole director, which stated:

> "RESOLVED FURTHER, [Spinco] is authorized to deliver…: (i) $551,000,000 aggregate principal amount of senior unsecured notes of the Corporation (the 'Notes'), which will be transferred to Verizon and which Verizon will seek to exchange for outstanding indebtedness of Verizon; and (ii) $1,160,000,000 in cash, to be funded through borrowings under the Credit Agreement…".
> …
> "RESOLVED, that, in order to fund the special cash payment to Verizon in the amount of $1,160 million and address other funding needs, the Board of Directors of [Spinco] hereby determines that it is advisable and in the best interest of the Corporation [Spinco] and its shareholder for the Corporation [Verizon] to enter into the Credit Agreement…"
> …
> "RESOLVED, that, in order to effect the Spin-Off, and as partial consideration for the Verizon Group's contribution to the Corporation of the Northern New England Business, the issuance by the Corporation [Spinco] to Verizon New England of the [Spinco Notes]…which, after the transfer of such [Spinco Notes] to Verizon, Verizon will exchange with certain of Verizon's creditors ("Verizon Creditors") for certain of Verizon's outstanding debt obligations…"

-6-

the Transfers "there was no evidence that Verizon, FairPoint or anyone else expected or intended that the transaction would result in FairPoint's bankruptcy and prevent FairPoint from paying its creditors in full." [Dkt. 193, p.13]. Even if the legal premise of Verizon's argument was accurate, which it is not,[8] as a factual matter Verizon's argument is wrong. There was substantial pre-closing evidence presented at trial that predicted FairPoint's post-closing demise.

First, prior to closing at least one PUC commissioner in New Hampshire, Graham Morrison, decided that there was not a "reasonable basis to conclude that FairPoint will not become insolvent or otherwise be unable to meet its service commitments through the modeling period which extends to the year 2015" [FF191]. Mr. Morrison predicted FairPoint's downfall. He was also the first witness at the trial, yet his testimony is conspicuously absent from Verizon's Post-Trial Brief.

In addition, before closing Verizon clearly understood that the back-office IT project was "a do or die thing for FairPoint," which Mr. Smith contemporaneously believed would "drawf [FairPoint's] current activities." [FF51, 61; PX009]. Verizon also knew before closing that the failure of the back-office IT project in Hawaii resulted in the financial downfall of Hawaiian Telcom. In fact, that Hawaiian Telcom was a known financial failure in the months leading up to closing is precisely why Verizon believed it was necessary to tell its false and misleading "positive IT story" to potential lenders in the FairPoint Transaction. [FF53-79].

---

[8] Contrary to the implication in Verizon's argument, Section 548(a)(1)(A) of the Code does not require proof that a debtor actually succeeded in hindering, delaying or defrauding a creditor, or even that a creditor was actually harmed, although both were established in this case. *See e.g., In re LendXFinancial, LLC*, 2012 WL 1597394, at *4-5 (Bankr. N.D. Ga. March 19, 2012) (fraudulent transfer claim does not require proof that the debtor succeeded in hindering, delaying or defrauding a creditor); *Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001) ("Nothing in §548 indicates that a trustee must establish that a fraudulent conveyance actually harmed a creditor.").

HOU:3392590.10

Before closing Verizon also received specific warnings that FairPoint was having problems similar to Hawaiian Telcom in developing the back-office IT systems,[9] and Verizon also knew that FairPoint was making repeated and increasingly more urgent requests for assistance that demonstrated FairPoint was having problems developing the new systems.[10] Before closing Verizon also (i) contemporaneously believed that FairPoint had underestimated the tasks necessary to successfully complete the back-office IT project,[11] (ii) made prescient predictions about FairPoint's inabilities,[12] (iii) sought to hide issues related to FairPoint's requests for help and inabilities from Liberty,[13] and (iv) repeatedly questioned the credibility and competence of the FairPoint management team to get the job done.[14] In sum, before closing Verizon knew there were significant issues with the FairPoint back-office IT project that, based on its direct experience with Hawaiian Telcom, could result in FairPoint's financial disaster.

This was especially true given what Verizon alone knew prior to closing about the severity of the deteriorating nature of the Spinco assets. For example, before closing Verizon knew that its internal projections for Spinco line losses were significantly worse than those used to sell the Transaction to the PUCs and potential lenders, and that Spinco's actual first quarter 2008 line loss results were also much worse than expected. [FF146-166]. Verizon also knew before closing that these internal projections and actual first quarter 2008 line loss results were

---

[9] FF111; PX94, FCG02093900 ("As I mentioned on our call, this is the same issue that was reported publicly in Hawaii as it was described as 'data was not able to flow trough [sic] systems.'"); PX666, DT 46:9-47:12 (Haga).

[10] FF107-130.  *See e.g.*, TT 1918:22-1921:16, 1920:17-19 (Smith) (discussing Verizon's pre-closing proposal to trade assistance for intellectual property: "But the theory of the offer was Peter [FairPoint officer], you guys are asking us for a lot of stuff. It must mean you need a lot of help.").

[11] FF131-135.

[12] FF83-86,134.

[13] FF101-106.

[14] FF136-145.

HOU:3392590.10

not provided to FairPoint or potential lenders. *Id.* Verizon's fraudulent intent was also supported indirectly by the rapid financial downfall of Spinco/Fairpoint following the Transaction and other badges-of-fraud discussed in the Trust's Proposed Findings. [FF167-208]. All such evidence further establishes that Spinco/Verizon possessed the requisite fraudulent intent required to avoid the Transfers under Section 548(a)(1)(A) of the Code.

## C. VERIZON'S ARGUMENT THAT ITS MISREPRESENTATIONS WERE MERE "PUFFERY" AND THEREFORE NOT ACTIONABLE MISSES THE SIGNIFICANCE OF THIS EVIDENCE.

Verizon argues that its alleged misrepresentations are not actionable because they were purportedly mere "puffery" or would otherwise not support a fraudulent transfer claim. [Dkt. 193, p.19-22].[15] Verizon is mistaken. There is a stark difference between making optimistic statements in support of a transaction and affirmatively making material public representations that you internally believe are not true. The former might be considered "puffery" but the latter is just a garden variety lie.[16]

Nevertheless, Verizon's argument misses the significance of this evidence. This evidence is significant because it shows that Verizon believed it had to misrepresent, withhold information and be deceitful in order to obtain the Transfers. Stated differently, the reason Verizon did not

---

[15] Verizon also contends that the evidence refuted the Trust's claims that Verizon hid information from Liberty and misrepresented the "transparency" that Liberty provided the Transaction. To support its contention, Verizon points the Court to the January 2008 Liberty report that referred to assistance needed by FairPoint from Verizon. [Dkt. 193, p.21]. But it is this very January 2008 report that led Mr. Smith to instruct Mr. Nixon to hide information from Liberty, which Mr. Nixon agreed to do. [FF103]. In addition, many of the urgent requests for assistance by FairPoint and the IP Exchange Proposal did not happen until after this January 2008 report. [FF112-130]. Furthermore, the evidence at trial established that none of the subsequent Liberty reports mentioned any of the ongoing issues between FairPoint and Verizon. [FF104]. Thus, it is Verizon's argument that is refuted by the evidence, not the Trust's.

[16] Indeed, Verizon's cases do not even stand for the proposition that Verizon contends they do. For example, Verizon cites *Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th 1993) in purported support for its argument that Verizon's misrepresentations are not actionable. In *Raab*, however, the court expressly stated that that law requires companies *"to speak truthfully to investors,"* and "the market gives the most credence to those predictions supported by specific statements of fact*, and those statements are, of course, actionable if false or misleading*." *Id.* at 289-90 (emphasis added). As described in the Proposed Findings, Verizon's misleading statements, omissions, and other deceitful actions to the PUCs and potential lenders were material, specific, detailed, and untrue. [FF81-166].

HOU:3392590.10

simply tell the truth to the PUCs and potential lenders was because Verizon knew that the truth would jeopardize its ability to obtain the $1.7 billion in Transfers.[17]  Such conduct is direct evidence that Spinco/Verizon were acting with an intent to defraud Spinco's creditors.

**D.  VERIZON'S POST-TRIAL DAMAGES BRIEF REQUIRES A BRIEF RESPONSE.**

Verizon argues in its Post-Trial Damages Brief that the Trust failed to "meet its burden" of proving damages under an offset theory. [Dkt. 196, p.3].  But providing Verizon with an "offset" is not the Trust's theory of recovery or burden to prove.  The Trust's position is that the Court should avoid and permit recovery for the full $1.7 billion in Transfers without offsets. [CL80-96].  The discussion of potential offsets in the Trust's Proposed Findings merely acknowledges that alternative remedies are potentially available to the Court based on Verizon's affirmative defenses that any award to the Trust should be offset by either (i) the value of the Spinco assets exchanged for the Transfers, or (ii) a potential Section 502(h) resulting claim if the Court were to award the entire $1.7 billion without offsets. [CL106-118].[18]

Verizon also argues that the Court should exclude the Spinco Notes Transfer from the damages calculation, but there is no basis to exclude this Transfer from any award.  The evidence at trial established that Verizon used Spinco's interest in the Spinco Notes proceeds to obtain cash via the debt-for-debt exchange. [FF43; TT 1151:22-1153:15 (Bennett); PX228, pp.12-16

---

[17] A fact confirmed by a Verizon treasury official four days after closing.  [FF80; PX670, DT 139:7-140:22 (Olson); PX243 ("[m]any an unhappy investor in [Hawaiian Telcom].  But more important, a close to impossible sale of the FRP bonds if this [more bad news about Hawaii] had happened two weeks ago.  Timing is close to everything.") (emphasis added)].

[18] Contrary to Verizon's assertions (Dkt. 196, p.9), the Trust never suggested that the Court refer damages to the Bankruptcy Court for the Southern District of New York.  The Trust agrees with Verizon that this Court should fully determine both liability and damages.  In the event the Court were to award the full amount of the Transfers without any offsets, Verizon may be able to subsequently assert a Bankruptcy Code Section 502(h) claim that would be payable in "bankruptcy dollars."  [Dkt. 195, p.2].  In that event, it is the Trust's position that the classification and treatment of any 502(h) claim could be determined by either this Court or the Bankruptcy Court. If the Court to were to award an amount less than the full amount of the Transfers, however, a potential Section 502(h) determination would not be required.

HOU:3392590.10

(Garrity March 30, 2008 testimony before Vermont PUC)].  As such, Spinco's right to cash proceeds generated from the Spinco Notes was a property interest transferred to Verizon as part of the Transaction and can be recovered by the Trust under Section 548(a)(1)(A).  [CL55-72]. The Court should therefore include the Spinco Notes Transfer in its damage calculation.

Verizon's Post-Trial Damages Brief also states that to determine damages the Court must now be "willing to decide the various methodological disputes between Ms. Taylor and Mr. Elson," implying that there were significant differences in approaches used by the two experts. (Dkt. 196, p.5).  But Verizon is exaggerating the differences.  Both experts followed the same general methodologies and used many of the same assumptions. [FF187-192].  Moreover, to the extent there were differences in assumptions, they had a relatively nominal impact on the ultimate valuation conclusions. [FF187 n.20]  Instead, the biggest driver of difference between the two experts' valuation opinions related to line loss projections, which both experts believed had to be adjusted in order to provide a credible valuation opinion. [FF187-188].[19]  As Mr. Elson testified "I thought it was critically important…[i]n rendering a reliable opinion, to begin my analysis with information that was known or knowable as of March 31, 2008. That is precisely why I updated the line loss information in the model to take that into account." [TT 1534:15-20 (Elson)].  The experts differed, however, in the magnitude of the adjustment. [FF188-190].  On that front, Ms. Taylor was significantly more credible and provided a much more reasoned explanation for her adjustments. [FF183-192].[20] [21]

---

[19] In this regard, Houlihan's use of "projected" line loss numbers in its valuation analysis when significantly worse actual line loss results were available at the time is one of the many reasons why Houlihan's opinion was also not credible. [FF193-194].

[20] In contrast to Ms. Taylor's extensive telecom experience, Mr. Elson considers himself a "generalist" with no specialized expertise in the telecom industry.  [FF184-186].   Mr. Elson also agreed that Ms. Taylor has "a lot more" telecom experience than he does and testified that this assignment was the first time in his entire career that he has ever projected telecom line losses.  [FF186, 190].

HOU:3392590.10

Verizon also includes a chart in its Post-Trial Damages Brief that purports to show six possible offset awards based on the difference between (i) the Transfers (with and without the Spinco Note Transfer), and (ii) the value of the Spinco assets exchanged for the Transfers (as determined by Ms. Taylor, Mr. Elson and an average of these two). (Dkt. 196, p.9). As explained below, Verizon's chart contains two errors: (i) a factual error that overstates (in Verizon's favor) Mr. Elson's valuation analysis, and (ii) a calculation error that overstates (in Verizon's favor) the impact of excluding the Spinco Note Transfer from the calculation.

### 1. Error One: Verizon Overstates Mr. Elson's Valuation Analysis By Approximately $100 million.

Verizon states that Mr. Elson's "opinion" of the value for the Spinco assets was $2.2 billion and uses that number in its damages chart. [Dkt. 196, p.6]. That $2.2 billion number, however, is not based on Mr. Elson's expert valuation analysis of the Spinco assets, but instead appears to be a very loose mathematical approximation for what Verizon claims to be the value of the cash, Spinco Notes, and equity provided at closing. [Dkt. 196, p.2].[22]

Mr. Elson testified about his valuation analysis in which he used discounted cash flow (DCF) and EBITDA multiple approaches similar to those used by Ms. Taylor, but he failed to provide the Court with his valuation opinion for the Spinco assets using his analysis. Instead, Mr.

---

[21] Verizon also asserts that Ms. Taylor failed to adequately explain her valuation analysis at trial. [Dkt. 196, p.5]. But that assertion is simply not accurate. Ms. Taylor provided thorough and credible testimony in support of her valuation analysis, including detailed testimony as to the problems with the valuation analysis provided by Houlihan, Mr. Elson, or FairPoint's post-merger stock price. [FF183-204].

[22] Mr. Elson's testimony about the $2.2 billion number was plainly a very loose mathematical calculation in which he did not even quantify all of the underlying variables. [TT 1420:10-20]. Moreover, to the extent that number was based in part on FairPoint's post-closing stock price, which appears to be the case, it is not reliable because of material information that was being withheld or misrepresented to the market during the Spring and Summer of 2008, as further discussed in the Trust's Proposed Findings. [FF195-204; *See also*, TT 1557:9-1558:3 (Elson) (agreeing that "if there is material information that is not in the market, hidden from the market, misrepresented to the market…then the stock price does not necessarily reflect the fair market value of the assets."); TT 1983:24-1985:8 (Cornell) (same)].

HOU:3392590.10

Elson opined about values for the combined FairPoint/Spinco entity that included both the Spinco assets and other business assets that were held by FairPoint prior to the merger. [TT 1430:20-1432:3 (Elson)]. Nevertheless, during Ms. Taylor's testimony, she referenced Mr. Elson's value opinion for the Spinco assets when she compared it to hers. [PX452, Exhibit 1R]. That opinion per Mr. Elson's valuation analysis was $2,091,862,000. *Id.* Thus, to the extent the Court even considers Mr. Elson's opinion of value for just the Spinco assets, the correct number to use is $2,091,862,000, and not some loose unsupported approximation of $2.2 billion.

### 2. Error Two: Verizon Overstates the Impact of Excluding the Spinco Notes Transfer.

Verizon argues that in the event the Court determines that the Trust is not entitled to recover for the Spinco Note Transfer, the Trust's damages are the difference between (i) the $1.16 billion Cash Transfer, and (ii) the value of the Spinco Assets as determined by either Ms. Taylor, Mr. Elson or an average of the two. But that calculation incorrectly assumes that 100% of the Spinco assets were exchanged for just the $1.16 billion Cash Transfer -- when it is undisputed that the Spinco assets were exchanged for both the $1.16 billion Cash Transfer **and** the $527 million Spinco Notes Transfer.

Accordingly, if the Court excludes on one side of the damages calculation the cash proceeds that Verizon received from the Spinco Notes, the Court must also exclude on the other side of the calculation the proportionate share of the value of the Spinco assets that were associated with the Spinco Notes proceeds. Otherwise the calculation would effectively mean that Verizon received $527 million of Spinco Notes cash proceeds for free. The variables for this corrected calculation are as follows:

HOU:3392590.10

**Cash Transfer and Spinco Notes Transfer**

|  | Dollar Value of Transfer | Percent of Total |
|---|---|---|
| Cash Transfer | $1,160,000,000 | 68.74% |
| Spinco Notes Transfer | 527,433,730 | 31.26% |
| Total | $1,687,433,730 | 100.00% |

**Value of Spinco Assets**
**(Associated with Both Cash Transfer and Spinco Notes Transfers)**

| Taylor Midpoint Value | $1,023,805,500 |
|---|---|
| Elson Value | $2,091,862,000 |
| Average Taylor/Elson | $1,557,833,750 |

**Value of Spinco Assets**
**(Associated with Cash Transfer Only)**

| Taylor Midpoint Value | $1,023,805,500 x 68.74% = $ 703,799,123 |
|---|---|
| Elson Value | $2,091,862,000 x 68.74% = $1,438,017,907 |
| Average Taylor/Elson | $1,557,833,750 x 68.74% = $1,070,908,515 |

Using the correct variables, Verizon's damages chart would be:[23]

| Valuation Source | Including Value of Spinco Notes | Excluding Value of Spinco Notes |
|---|---|---|
| Taylor | $663,628,230 | $456,200,877 |
| Elson | $0 | $0 |
| Taylor/Elson Average | $129,599,980 | $89,091,485 |

---

[23] The numbers are calculated as follows:

Including Value of Spinco Notes:
$1,687,433,740 - $1,023,803,500 = $663,628,230
$1,687,433,730 - $1,557,833,750 = $129,599,980

Excluding Value of Spinco Notes:
$1,160,000,000 - $703,799,123 = $456,200,877
$1,160,000,000 - $1,070,908,515 = $89,091,485

-14-

Respectfully submitted,

*/s/ Jonathan D. Sasser*
Jonathan D. Sasser
**ELLIS & WINTERS LLP**
N.C. State Bar No. 10028
PO Box 33550
Raleigh, North Carolina  27636
Telephone Number:  (919) 865-7000
Facsimile Number:  (919) 865-7010
jon.sasser@elliswinters.com

J. Wiley George (TX Bar. No. 07805445)
Robin Russell (TX Bar No. 17424001)
Charles B. Hampton (TX Bar No. 00793890)
Scott Locher (TX Bar No. 12457500)
**ANDREWS KURTH LLP**
600 Travis, Suite 4200
Houston, Texas  77002
Telephone Number:  (713) 220-4200
Facsimile Number:  (713) 238-7192
wileygeorge@andrewskurth.com
rrussell@andrewskurth.com
charleshampton@andrewskurth.com
scottlocher@andrewskurth.com

Paul N. Silverstein (NY Bar No. PS 5098)
**ANDREWS KURTH LLP**
450 Lexington Avenue
New York, New York 10017
Telephone Number: (212) 850-2800
Facsimile Number: (212) 850-2929
paulsilverstein@andrewskurth.com

**ATTORNEYS FOR PLAINTIFF**

HOU:3392590.10

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that copies of the foregoing were served on the following counsel of record for Defendants by using the Court's CM/ECF system that should notify the following counsel of record electronically:

Robert E. Harrington
Andrew W. J. Tarr
**ROBINSON BRADSHAW & HINSON, P.A.**
101 North Tyron Street, Suite 1900
Charlotte, North Carolina 28246
rharrington@rbh.com
atarr@rbh.com

Philip S. Beck
BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
Philip.beck@bartlit-beck.com

Philip D. Anker
**WILMER CUTLER PICKERING HALE & DORR LLP**
399 Park Avenue
New York, New York 10022
philip.anker@wilmerhale.com

Scott H. Angstreich
**KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL**
1615 M Street, N.W.
Washington D.C. 20036
sangstreich@khhte.com

This the 31st day of January 2014.


By:  /s/ Jonathan D. Sasser         
         Jonathan D. Sasser

HOU:3392590.10